Roland Tellis (SBN 186269)
**BARON & BUDD P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
rtellis@baronbudd.com

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
cseeger@seegerweiss.com

David S. Stellings
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
dstellings@lchb.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Counsel for Plaintiffs*

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK BIEDERMAN, CARL ANDERS TROEDSSON, and JAMES FARINET, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

For their complaint against FCA US LLC and Cummins Inc., Plaintiffs Frank Biederman, Carl Anders Troedsson, and James Farinet (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows:

## I.   NATURE OF THE ACTION

1.      Plaintiffs, individually and on behalf of all others similarly situated, allege the following based upon the investigation of counsel, a review of publicly available reports, as described below.

2.      Defendants FCA US LLC ("FCA") and Cummins, Inc. ("Cummins") have together designed, manufactured, marketed, and sold 2013-2023 Ram 2500 and 3500 diesel trucks (the "Class Trucks") with undisclosed and unauthorized emission control devices that illegally bypass, render inoperative, or otherwise reduce the effectiveness of the Class Trucks' emission control system (the "Emissions Control Devices").

3.      These Emissions Control Devices allow the Class Trucks to "pass" emissions inspections while emitting illegally high levels of pollutants during real-world driving, unbeknownst to the Class Trucks' owners and lessees.

4.      On December 21, 2023, Attorney General Merrick Garland announced "the Justice Department reached an initial agreement with Cummins Inc. to settle claims that, over the past decade, the company unlawfully altered hundreds of thousands of engines to bypass emissions tests in violation of the Clean Air Act. As part of the agreement, the Justice Department will require Cummins to pay $1.675 billion, the largest civil penalty we have ever secured under the Clean Air Act, and the second largest environmental penalty ever secured."[1]

5.      Attorney General Garland made the deleterious effect of Defendants' misconduct clear: "The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety. For example, in this case, our preliminary estimates suggest that defeat devices on some Cummins engines have caused them to produce thousands of tons of excess nitrogen oxide emissions. The

---

[1] *See* https://www.justice.gov/opa/pr/statement-attorney-general-merrick-garland-agreement-principle-cummins-settle-alleged.

cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections." *Id.*

6.     But that was not the only harm the Defendants' misconduct caused. Plaintiffs and Class Members also suffered an ascertainable economic loss, including, but not limited to, out-of-pocket loss. That loss can be measured in a number of ways, including, at a minimum, by the premium Class Members paid for a diesel vehicle over a comparable gas vehicle.

7.     Neither Defendants, nor any of their agents, dealers, or other representatives, informed Plaintiffs, or Class Members of the existence of Emissions Control Devices that would illegally impede the function of the emission system in the Class Trucks and result in illegally high pollution.

8.     Cummins has previously had issues with its truck engines producing excess emissions. In 2018, Cummins issued a recall for over 500,000 model year 2010-2015 medium- and heavy-duty trucks due to excess nitrogen oxide ("NOx") emissions.[2] Although some of the recalled vehicles were Class Trucks, including approximately 232,000 Ram 2500 and 3500 vehicles with Cummins engines, the reason for that recall had nothing to do with the Emissions Control Devices at issue here. Indeed, the California Air Resources Board ("CARB") specifically noted that "the cause of the excess emissions [in the earlier recall] was purely mechanical – the faster-than-expected degradation of the catalyst – and not the product of a 'defeat device' or cheating on tests."[3] The regulator's most recent allegations, in contrast, expressly address deliberate "defeat devices"—a much more serious allegation. Accordingly, even after the 2018 recall, the recalled Class Trucks remained equipped with unlawful Emissions Control Devices.

## II.  **THE PARTIES**

### A.     **Plaintiffs**

9.     Plaintiff **Frank Biederman** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in Upper Lake, California, purchased a new 2017 Ram 2500 Mega Cab (for the purpose of this paragraph, the "Class Truck") in June 2017 at Matt Mazzei Chrysler

---

[2] *See* https://ww2.arb.ca.gov/news/carb-investigation-leads-nationwide-recall-500000-cummins-heavy-duty-trucks.

[3] *Id.*

Dodge Jeep Ram, an authorized California FCA dealership located in Lakeport, California. Before purchasing his Class Truck, Plaintiff conducted extensive research, including on RAM's website. Plaintiff was looking for, among other things, a combination of torque, power, and fuel efficiency. He saw on RAM's website representations that his Class Truck purportedly had: (1) a clean-burning DEF system that made it so it would emit less pollutants than equivalent gasoline-powered trucks; (2) good fuel economy; and (3) strong towing and hauling capabilities. These were among the reasons Plaintiff purchased his Class Truck. Plaintiff did not know at the time he purchased his Class Truck that it was equipped with Emissions Control Devices designed to cheat emission tests and to deceive consumers, and that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Had Defendants not concealed the Emissions Control Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck, or would have paid less for it. Plaintiff would also not have paid the premium charged for the Class Truck versus a comparable gasoline-powered truck.

10.     Plaintiff **Carl Anders Troedsson** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in Tujunga, California, purchased a new 2015 Ram 2500 Laramie Crew Cab 4x4 (for the purpose of this paragraph, the "Class Truck") in April 2015 at Moss Bro. Chrysler Dodge Jeep Ram, an authorized California FCA dealership. Plaintiff did not know at the time he purchased his Class Truck that it was equipped with Emissions Control Devices designed to cheat emission tests and to deceive consumers. Plaintiff saw representations on the Ram Trucks' website in which his Class Truck was represented to have: (1) a clean-burning DEF system that made it so it would emit less pollutants than equivalent gasoline-powered trucks; (2) good fuel economy; and (3) strong towing and hauling capabilities. These representations were the primary reasons Plaintiff chose the Class Truck. At the time of purchase, Plaintiff did not know that the Class Truck could perform as advertised only by emitting pollutants, such as NOx,

1   at levels that are above legal limits, greater than what was advertised, and greater than emissions

2   emitted from gasoline-powered vehicles. Plaintiff has suffered a concrete injury as a direct and

3   proximate result of Defendants' unlawful conduct. Had Defendants not concealed the Emissions

4   Control Devices and disclosed that the Class Truck could perform as advertised only by emitting

5   pollutants at unlawful levels, Plaintiff would have seen and reviewed such disclosures and would

6   not have purchased the Class Truck, or would have paid less for it. Plaintiff would also not have

7   paid the premium charged for the Class Truck versus a comparable gasoline-powered truck.

8        11.    Plaintiff **James Farinet** (for the purpose of this paragraph, "Plaintiff"), a citizen of

9   California, residing in Mar Vista, California, purchased a new 2018 Ram 2500 Laramie Mega

10  Cab 4x4 (for the purpose of this paragraph, the "Class Truck") on or around February 15, 2019, at

11  Orange Coast Chrysler Dodge Jeep Ram Fiat, an authorized California FCA dealership. Plaintiff

12  did not know at the time he purchased his Class Truck that it was equipped with Emissions

13  Control Devices designed to cheat emission tests and to deceive consumers and regulators.

14  Plaintiff saw representations on the Ram Trucks' website in which his Class Truck was

15  represented to have: (1) a clean-burning and next generation DEF system that was purported to

16  lower emissions; (2) good fuel economy; and (3) strong towing and hauling capabilities. Plaintiff

17  also recalls speaking with the sales representative at Orange Coast Chrysler Dodge Jeep Ram Fiat

18  about the features of his Class Truck's DEF system and his Class Truck's purported lowered

19  emissions because of the system. These representations were the primary reasons Plaintiff chose

20  the Class Truck. At the time of purchase, Plaintiff did not know that the Class Truck could

21  perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal

22  limits, greater than what was advertised, and greater than emissions emitted from gasoline-

23  powered vehicles. Plaintiff has suffered a concrete injury as a direct and proximate result of

24  Defendants' unlawful conduct. Had Defendants not concealed the Emissions Control Devices and

25  disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful

26  levels, Plaintiff would have seen and reviewed such disclosures and would not have purchased the

27  Class Truck, or would have paid less for it. Plaintiff would also not have paid the premium

28  charged for the Class Truck versus a comparable gasoline-powered truck.

**B.      Defendants**

12.      Defendant FCA US LLC is a limited liability company organized and existing under the laws of the State of Delaware and is wholly owned by holding company Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

13.      FCA (sometimes referred to as Chrysler) is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

14.      FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

15.      FCA sells its trucks through FCA franchise dealerships. FCA distributes information about its RAM trucks to its dealers to pass that information to consumers. FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of its RAM products to consumers. The dealers act as FCA's agents in selling the Class Trucks and disseminating information about the Class Trucks to customers and potential customers. FCA also disseminates information about its vehicles on its website. At the point of sale, as well as in written materials and on its website, FCA could have told the truth.

16.      FCA also interacts regularly with regulators to obtain permission to sell the Class Trucks. This includes extensive interactions with the Environmental Protection Agency as well as with the California Air Resources Board in order to sell the Class Trucks in California.

17.      Defendant Cummins Inc. is a Fortune 500 company that designs, manufactures, and distributes diesel, natural gas, electric and hybrid powertrains and powertrain-related

1   components including filtration, aftertreatment, turbochargers, fuel systems, controls systems, air

2   handling systems, automated transmissions, electric power generation systems, batteries,

3   electrified power systems, hydrogen generation and fuel cell products. Cummins designs and

4   manufactures the diesel engine installed in all Class Trucks.

5       18.     Cummins conducts business in interstate and foreign commerce through its

6   network of approximately 460 wholly owned, joint venture, and independent distributor locations,

7   and more than 10,000 Cummins certified dealer locations in approximately 190 countries and

8   territories. It is headquartered in Columbus, Indiana.

9       19.     Cummins participates in the regulatory approval process with both the EPA and

10  CARB.

11                          **III. JURISDICTION AND VENUE**

12      20.     This Court has original jurisdiction over this action pursuant to the Class Action

13  Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse

14  citizenship from one Defendant, there are more than 100 Class Members, and the aggregate

15  amount in controversy exceeds $5 million, exclusive of interest and costs.

16      21.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because

17  Plaintiffs have claims under 18 U.S.C. § 1964 (RICO).

18      22.     Furthermore, this Court has supplemental jurisdiction over Plaintiffs' state law

19  claims under 28 U.S.C. § 1367.

20      23.     This Court has personal jurisdiction over Defendants under the California Code of

21  Civil Procedure section 410.10.

22      24.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part

23  of the events or omissions which give rise to the claims occurred in this District, and because

24  Defendants have caused harm to Class Members residing in this District, including Plaintiff Frank

25  Biederman. Defendants conduct substantial business, including through numerous dealerships,

26  and marketed, advertised, sold, and leased Class Trucks in this District.

27      25.     **Divisional Assignment:** This action is properly assigned to the Eureka Division of

28  this District pursuant to Civ. L.R. 3-2 because a substantial part of the events or omissions giving

rise to Plaintiffs' claims arose in the counties served by this Division and Plaintiff Frank Biederman and many Class Members purchased and maintain their Class Trucks in the counties served by this Division. Moreover, Defendants conduct substantial business in the counties served by this Division, have marketed, advertised, sold, and leased the Class Trucks and engines therein in those counties, and has caused harm to Class Members residing in those counties.

## IV. GENERAL FACTUAL ALLEGATIONS

26.     Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans. Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards). The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued Certificates of Compliance ("COC"), and every vehicle sold in the State of California must be covered by a CARB-issued Executive Order ("EO").

27.     There is an exceptionally good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

28.     Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions. Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust. This causes a more powerful compression of the pistons, which can produce greater engine torque (that is, more power).

29.     In addition to increased power, diesel engines typically offer better fuel economy than gasoline engines for a number of reasons. They operate at a higher compression ratio than gasoline engines; diesel fuel contains more energy than gasoline; and, unlike gasoline engines, diesel engines do not have an air intake throttle and therefore suffer no air intake throttling losses.

30.     The diesel engine also has performance and durability advantages over gasolines engines. The higher compression ratio and longer piston stroke of the diesel generates greater torque energy, which results in better vehicle acceleration performance. This performance is generally enhanced and tuned with the application of a turbo charger, which increases the power and performance across the map of engine speed and load. By comparison to gasoline engines, diesel engines are sturdier in design with more robust components, so the engines tend to be more durable and longer lasting.

31.     But this greater durability, increased power, and better fuel efficiency come at a cost: diesel produces dirtier and more dangerous emissions.

32.     If not controlled, emissions from diesel engines can include higher levels of NOx and particulate matter ("PM") (*i.e.*, soot) compared to emissions from gasoline engines. A byproduct of high temperature diesel combustion are two compounds: nitric oxide and nitrogen dioxide, collectively called NOx. These compounds are formed at high temperature in the cylinder during combustion through the dissociation of oxygen and nitrogen. NOx emissions lead to several forms of pollution. First, NOx contributes to high levels of ambient nitrogen dioxide, which by itself is a health hazard. Second, in the lower atmosphere, NOx can form tiny nitrate aerosol particulates that can be inhaled. And finally, NOx in the atmosphere reacts with hydrocarbon in the presence of sunlight to form ozone, a strong oxidizer and lung irritant. Ozone is a criteria pollutant and is regulated as part of the National Ambient Air Quality Standards. Exposure to these pollutants has been linked with harmful health issues, including asthma attacks and other respiratory illnesses severe enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illnesses are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2 is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 concentrations at ground level can be quite high, where they can impact the health of the breathers.

33.     To limit these dangerous pollutants, modern diesel engines employ a number of in-cylinder and aftertreatment technologies are employed to reduce these emissions.

34.     Inside the cylinder, NOx emissions can be reduced through exhaust gas recirculation, a process whereby exhaust gases are routed back into the intake of the engine and mixed with fresh incoming air. Exhaust gas recirculation lowers NOx by reducing the available oxygen, and by increasing the specific heat of the exhaust gas mixture which reduces maximum combustion temperatures. However, exhaust gas recirculation can also lead to an increase in PM as well, since less oxygen and lower temperatures prevent complete oxidation of PM formed during the combustion process.

35.     Given fundamental limits and tradeoffs in controlling NOx and PM formed during in-cylinder combustion, exhaust gas aftertreatment devices must be employed. Exhaust aftertreatment is expensive and complex, and is typically comprised of ceramic catalyst support and filter media, catalyst coatings, sheet metal shells and tubing, sensors, and controls. The fundamental aftertreatment components include particulate filters designed to trap solid particles and catalysts designed to either oxidize or reduce pollutants, transforming them into harmless inert gases, such as nitrogen gas ($N_2$), water ($H_2O$), and carbon dioxide ($CO_2$).

36.     Modern diesel engines are designed with the intent to balance trade- offs between emissions, fuel economy, reliability/durability, and cost. Meeting emission standards is at the forefront of the challenges that must be addressed. For the EPA to designate a diesel car as a "clean" vehicle, it must demonstrate emission levels of PM, NOx, carbon monoxide, and hydrocarbon below certain standards. In 2000, the EPA announced stricter emissions standards requiring all diesel models starting in 2007 to emit dramatically less NOx and PM than years prior.

37.     Before introducing affected vehicles into the U.S. stream of commerce (or causing the same), Defendants had to first apply for, and obtain, an EPA-administered COC certifying that the vehicles comport with the emissions standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. Moreover, the vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC.

38.     California's emission standards are even more stringent than those of the EPA. "CARB", the State of California's regulator for mobile emissions, including cars and trucks, requires a similar application from automakers to obtain an Executive Order confirming compliance with California's emission regulations before allowing the vehicle onto California's roads.

39.     The Ram pickup is designed to appeal to consumers who will want to use a "working truck"—*i.e.*, to haul a load or a trailer. The diesel option is attractive to consumers because diesel-powered vehicles allegedly offer better fuel economy and towing capacity relative to their gasoline-powered counterparts.

40.     Defendants have had a long-standing and mutually beneficial relationship, as Cummins has been providing diesel engines for Ram-branded pickup trucks dating back to 1989. Until 2013, Cummins was the exclusive supplier to Ram of diesel engines and continues to be the only supplier for the larger 2500 and 3500 pickup truck platforms.

**A.      The Class Trucks' Technology.**

41.     The 2013-2023 diesel versions of the 2500 and 3500 trucks are all powered by the Cummins 6.7-liter diesel engine, containing identical or substantially similar critical emission control components. The Ram 2500 and 3500 share an identical engine and differ only in the weight class to which they are certified. On information and belief, the defeat devices and/or undisclosed auxiliary emission control devices used in the Class Trucks are functionally identical.

**B.      Defeat Devices and Auxiliary Emissions Control Devices.**

42.     A defeat device is a part or component of a motor vehicle or engine that bypasses, defeats, or renders inoperative a vehicle's emission control device. Defeat devices can be hardware, software, or designs that allow a vehicle to pass an emission test but interfere with emissions controls in real-world driving conditions. In modern vehicles with electronic engine controls, defeat devices typically activated by illegal software in the vehicle's engine control module—the computer that controls the operation of the engine and emission control devices. Pursuant to the Clean Air Act, it is illegal to manufacture, sell, or install a defeat device.

43.     Defendants designed, manufactured, and installed a defeat device in approximately 630,000 model year 2013-19 Ram 2500 and 3500 vehicles and sold or leased them to unwitting consumers. These defeat devices cause the Class Trucks to emit far higher levels of pollution than legally allowed in real-world driving.

44.     An auxiliary emission control device is defined as any element of design that modifies or deactivates the operation of any part of the emission control system based on a variable parameter such as vehicle speed or RPM. Any and all auxiliary emission control devices must be disclosed as part of the certification process.

45.     Defendants designed, manufactured, and installed an undisclosed auxiliary emissions control device in approximately 330,000 model year 2019-23 Ram 2500 and 3500 vehicles and sold or leased them to unwitting consumers. These auxiliary emissions control devices cause the Class Trucks to emit far higher levels of pollution than legally allowed in real-world driving.

46.     The above Emissions Control Devices were the subject of an investigation pursued by the EPA and CARB, and resulted in a record-breaking $1.675 billion penalty.

47.     A subset of the Class Trucks were the subject of earlier emissions-related recalls. Upon information and belief, however, those recalls did not address or eliminate the Emissions Control Devices.

48.     To the extent that additional recalls have been or will be announced, those recalls do not change the fact that Plaintiffs and Class Members have overpaid for Class Trucks. Furthermore, any modification direct at emissions compliance will likely negatively impact other performance characteristics of the Class Trucks.

**C.     Defendants' omissions and the harm to Plaintiffs and the Classes.**

49.     At no point did Defendants disclose to Plaintiffs or Class Members that any of the Class Trucks contain Emissions Control Devices.

50.     Defendants intentionally and knowingly omitted material facts regarding the Class Trucks with an intent to mislead Plaintiffs and Class Members.

51.     In purchasing or leasing the Class Trucks, Plaintiffs and Class Members were deceived by the Defendants' failure to disclose that aspects of the emission system in the Class Trucks turn off or are limited during normal driving conditions, that the emissions controls were defective, and that the Class Trucks emitted unlawfully and unexpectedly high levels of pollutants.

52.     Plaintiffs and Class Members reasonably relied upon the Defendants' omissions. Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Class Members did not, and could not, unravel the Defendants' deception on their own.

53.     Defendants had a duty to disclose that the emission system in the Class Trucks turns off or is limited during normal driving conditions and that these Class Trucks were defective, emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, were non-EPA and non-CARB-compliant and unreliable, because Plaintiffs and Class Members relied on the Defendants' material representations that the Class Trucks they were purchasing were reduced-emission vehicles, and free from defects.

54.     Plaintiffs and Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and Class Members overpaid for their Class Trucks and did not receive the benefit of their bargain, and their Class Trucks have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' omissions.

55.     Defendants' violations present a continuing risk to Plaintiffs and Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

56.     Defendants' omissions alleged herein caused Plaintiffs and Class Members to make their purchases or leases of their Class Trucks. Absent those omissions, Plaintiffs and Class Members would not have purchased or leased their Class Trucks, would have paid less for their Class Trucks, and/or would have purchased or leased less expensive alternative vehicles that did not contain diesel engines that failed to comply with EPA and California emissions standards.

57. Accordingly, Plaintiffs and Class Members have suffered injury in fact, including lost money or property, as a result of the Defendants' omissions.

**D. FCA's History and Pattern of Emissions Violations.**

58. The EPA issued a Notice of Violation against Fiat Chrysler Automobiles N.V. (a.k.a. Stellantis N.V.) and FCA US LLC on January 12, 2017, for failing to justify or disclose defeat devices in model year 2014-2016 Ram 1500 EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles.

59. The EPA found that FCA did not disclose or justify various control devices in their Certificate of Conformity applications, as required by EPA regulations, and that FCA was in violation of the Clean Air Act each time it sold, offered for sale, introduced in commerce, or imported approximately 103,828 of these EcoDiesel vehicles.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

60. All statutes of limitations applicable to Plaintiffs' claims are subject to tolling under the doctrines of fraudulent concealment tolling, the discovery rule, and/or equitable estoppel due to Defendants' ongoing misrepresentations and omissions alleged throughout Plaintiffs' Complaint regarding the Class Trucks, and their ongoing scheme to knowingly and intentionally conceal from Plaintiffs and Class Members the fact that the Class Trucks contain Emissions Control Devices. Plaintiffs could not have independently discovered the Emissions Control Devices in their Class Trucks either before they purchased or leased the Class Trucks, or until the U.S. Department of Justice's announcement in December 2023.

**A. Fraudulent Concealment Tolling**

61. As alleged in detail above, throughout the relevant time period, Defendants actively concealed and failed to disclose the Emissions Control Devices to Plaintiffs, consumers, the EPA, and CARB, which prevented Plaintiffs and Class Members from learning the true nature of the emissions from their Class Trucks.

62. Additionally, throughout the relevant time period, Defendants knew that the Class Trucks emitted pollutants at many times the level a reasonable consumer would expect and in excess of that allowed by law. Nevertheless, Defendants purposefully and knowingly engaged in,

or conspired to engage in, pervasive and ubiquitous false and misleading marketing and

advertising campaigns that portrayed the Class Trucks as having clean diesel emissions systems,

complying with U.S. emissions standards, able to be legally operated within the U.S., and would

retain all of its operating characteristics throughout their useful life, including high fuel economy.

63.     Defendants knew that disclosing the Emissions Control Devices to consumers

and/or federal and state regulators would have the ultimate effect of reducing the sales and leases

of the Class Trucks, as well as the sale and lease prices thereof, or eliminating the sales and leases

altogether if the Class Trucks violated U.S. emissions standards.

64.     Further, at the time Defendants made, helped make, or conspired to make false and

misleading representations to federal and state regulators regarding the Class Trucks' actual real

world emissions, they knew that disclosing the truth would ultimately result in, inter alia,

regulators disclosing or requiring Defendants to disclose the defects to the public, thereby causing

Plaintiffs and Class Members to not purchase or lease the Class Trucks or pay less for them.

65.     Had Defendants disclosed the Emissions Control Devices and the fact that the

Class Trucks actually emitted pollutants at a much higher level than gasoline vehicles do and at a

much higher level than a reasonable consumer would expect, Plaintiffs and Class Members would

have reviewed these disclosures and would not have purchased or leased the Class Trucks, or

would have paid less for them, and would not have paid a premium.

66.     Indeed, Plaintiffs and Class Members reviewed Defendants' representations

through various sources, including FCA's website, marketing and advertising materials for the

Class Trucks, labels on the Class Trucks, and by discussing Class Trucks with salespeople at

dealerships.

67.     Defendants intended that Plaintiffs and Class Members rely on their

misrepresentations, omissions, and concealment regarding the emissions of the Class Trucks

described above by actively concealing that the Class Trucks contained Emissions Control

Devices. Plaintiffs justifiably relied on these misrepresentations, omissions, and concealment to

their detriment.

68.     Given the highly technical nature of Emissions Control Devices and the specialized and technical knowledge needed to discover them, Plaintiffs could not have independently discovered the Emissions Control Devices until the U.S. Department of Justice's announcement in December 2023.

69.     Accordingly, Plaintiffs and Class Members were damaged by Defendants' false and misleading representations and fraudulent concealment described herein.

**B.      Discovery Rule Tolling**

70.     At the time they purchased or leased their Class Trucks, due to Defendants' conduct described herein, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Emissions Control Devices and misrepresenting the true emission qualities of the Class Trucks.

71.     Plaintiffs and Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the true emissions of the Class Trucks, which was discovered by Plaintiffs only shortly before this action was filed.

72.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Trucks.

**C.      Estoppel**

73.     Defendants were under a continuous duty to disclose to Plaintiffs, Class Members, and federal and state regulators the true character, quality, and nature of emissions from the Class Trucks, their emissions systems, and the Emissions Control Devices.

74.     Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, performance, and character of the emissions systems, and the emissions, of the Class Trucks.

75.     Even if some Plaintiffs were aware or could have been aware of the facts giving rise to their causes of action within the limitations period of their claims, their inability to timely

file their claims are the direct result of Defendants' willful and intentional misconduct described above. It would be unconscionable to enforce the limitation period against Plaintiffs, and gross injustice would result from doing so.

76.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations or warranty mileage and age limitations in defense of this action.

## VI. CLASS ALLEGATIONS

77.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

        a.     **The Nationwide Class:** All persons or entities in the United States who own, owned, lease, and/or leased a Class Truck as of December 23, 2023. Class Trucks include 2013 to 2023 Ram 2500 and Ram 3500 pickups equipped with a Cummins 6.7-Liter diesel engine.

        b.     **The California Subclass:** All persons or entities in the state of California who own, owned, lease, and/or leased a Class Truck as of December 23, 2023.

78.     Excluded from the Classes are individuals with personal injury claims resulting from the high emissions in the Class Trucks. Also excluded from the Classes are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

79.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

80.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

**B.** **Numerosity**

81.     Federal Rule of Civil Procedure 23(a)(1): Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Approximately 960,000 Class Trucks were sold in the United States, and the precise number may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**C.** **Predominance of Common Issues**

82.     Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

a.      Whether Defendants engaged in the conduct alleged herein;

b.      Whether Defendants designed, marketed, distributed, leased, sold, or otherwise placed Class Trucks into the stream of commerce in the United States;

c.      Whether Defendants knew about the comparatively and unlawfully high emissions and, if so, how long Defendants have known;

d.      Whether Defendants designed, manufactured, marketed, and distributed Class Trucks with defeat devices and/or undisclosed auxiliary emission control devices;

e.      Whether Defendants' conduct violates RICO and consumer protection statutes, and constitutes breach of contract and fraudulent concealment as asserted herein;

f.      Whether Plaintiffs and Class Members overpaid for their Class Trucks; and

g.      Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and, if so, in what amount.

**D.     Typicality**

83.     Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of Class Members' claims because, among other things, all Class Members were comparably injured through Defendants' wrongful conduct as described above.

**E.     Adequacy of Representation**

84.     Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.     Declaratory Relief**

85.     Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate declaratory relief, with respect to each Class Member as a whole.

**G.     Superiority**

86.     Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in managing this class action. The damages or other financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to litigate their claims against Defendants individually, so it would be impracticable for Class Members to seek redress for Defendants' wrongful conduct individually. Even if Class Members could afford individual litigation, the court system could not.

87.     Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VII.   CLAIMS

## COUNT I

**Violations of the Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1962(c)–(d)**
**(On behalf of the Nationwide Class)**

88.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

89.     Plaintiffs bring this Count on behalf of the Nationwide Class against Defendants.

90.     Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

91.     18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."

92.     At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

93.     Defendants are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity.

94.     As a direct and proximate result of their fraudulent scheme and common course of conduct described throughout this Complaint, Defendants were able to extract billions of dollars from Plaintiffs and Class Members. As explained in detail below, Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) & (d).

95.     At all relevant times, Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Trucks and the engines therein, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed to obtain EPA COCs, as well as CARB EOs, to sell the Class Trucks containing illegal Emissions Control Devices throughout the United States. Through

this enterprise, hereinafter referred to as the "Emissions Fraud Enterprise," Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

96. Alternatively, each Defendant constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity in the United States.

97. In particular, Defendants jointly designed, manufactured, and sold the Class Trucks, and FCA obtained the COCs and the EOs through material misrepresentations and omissions to introduce the Class Trucks into the United States. Cummins participated in the Emissions Fraud Enterprise by designing, developing, supplying, and promoting the 6.7-liter diesel engine installed in all Class Trucks.

98. At all relevant times, the Emissions Fraud Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Trucks through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities.

99. Each member of the Emissions Fraud Enterprise shared in the bounty generated by the enterprise—*i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide, and sharing the benefit of earning emissions "credits" as described below.

100. The Emissions Fraud Enterprise functioned by selling vehicles, including Class Trucks, and their component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain Emissions Control Devices. However, Defendants and their co-conspirators, through the Emissions Fraud Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Trucks.

101.    The Emissions Fraud Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Class Trucks throughout the country, and the receipt of monies from the sale of the same.

102.    Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Trucks to the public nationwide.

103.    Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, Defendants functioned as a continuing unit to further the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

104.    Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the Enterprise, they have a separate existence from the Enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

105.    Through the Enterprise, Defendants engaged in a pattern of racketing activity in order to increase revenue and profits by selling the Class Trucks in interstate and foreign commerce, and to increase the emissions credits they earned, thereby allowing them to sell dirty vehicles as well, all for an additional profit. The Emissions Fraud Enterprise involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Class Trucks throughout the country, and the receipt of monies from the sale of the same.

106.    Defendants worked closely together to further the Emissions Fraud Enterprise by and among the following manner and means:

a.   Jointly planning to manufacture a diesel engine and truck that would purportedly meet EPA and state emissions;

b.   Designing, manufacturing, distributing, and selling Class Trucks that emit more pollution than allowed under the applicable regulations;

c.   Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

d.   Introducing Class Trucks into the United States without a valid COC and/or EO;

e.   Concealing the unlawfully high emissions of the Class Trucks from regulators and the public;

f.   Otherwise misrepresenting or concealing the true nature of the Class Trucks and their real-world emissions from the public and regulators;

g.   Illegally selling and/or distributing the Class Trucks; and

h.   Collecting revenues and profits from the sale of the Class Trucks.

107.   To carry out, and attempt to carry out, the scheme to defraud, Defendants, each of whom is a person associated in fact with the Emissions Fraud Enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

108.   Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343), within the past ten years. The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Emissions Fraud Enterprise. Defendants knowingly and intentionally participated in the scheme

to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

109.     Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

110.     Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

        a. **Mail Fraud**: Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Trucks by means of false pretenses, misrepresentations, promises, and omissions.

        b. **Wire Fraud**: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

111.     Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, and shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

        a. The Class Trucks;

        b. The essential hardware for the Class Trucks;

        c. The Emissions Control Devices;

        d. False and misleading emissions tests;

        e. Fraudulent applications for COCs and EOs submitted to the EPA and CARB for each model year;

        f. Fraudulent applications for COCs and EOs approved by the EPA and CARB for each model year;

g.     Vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and EOs;

h.     False or misleading communications to the public and regulators;

i.     Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and concealed the true nature of the Class Trucks;

j.     Documents intended to facilitate the manufacture and sale of the Class Trucks, including bills of lading, invoices, shipping records, reports and correspondence;

k.     Documents to process and receive payment for the Class Trucks by Class Members, including invoices and receipts;

l.     Payments to Cummins; and

m.     Deposits of proceeds.

112.    Although Cummins did not apply for the COCs and EOs, it was aware that such applications were made by FCA.

113.    Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

114.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Trucks, which Defendants knew or recklessly disregarded as containing Emissions Control Devices and emitting illegal amounts of pollution.

115.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden from Plaintiffs and Class Members, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred.

116.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants

conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

117.    Defendants aided and abetted others in violating the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 & 1343 offenses.

118.    To achieve their common goals, Defendants actively and intentionally concealed from the general public the unlawfulness and emissions of the Class Trucks.

119.    Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Trucks, their engines, and the Emissions Control Devices contained therein.

120.    Indeed, for the conspiracy to succeed each of the Defendants and their co-conspirators had to agree to implement and use similar devices and fraudulent tactics—specifically complete secrecy about the Emissions Control Devices in the Class Trucks.

121.    Defendants knew and intended that government regulators, as well as Plaintiffs and Class Members, would rely on the material misrepresentations and omissions made by them about the Class Trucks. Defendants knew and intended that consumers would incur damages as a result.

122.    Plaintiffs and hundreds of thousands of other consumers relied upon Defendants' misrepresentations, omissions, and concealment. Plaintiffs' reliance is made evident by the fact that they purchased Class Trucks that did not comply with emissions regulations and which never should have been introduced into the U.S. stream of commerce.

123.    As described herein, Defendants engaged in a pattern of related and continuous predicate for at least a decade. The predicate acts constituted various unlawful activities, each

conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class Members based on their misrepresentations, omissions, and concealment, while providing Class Trucks worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

124.    The predicate acts all generated significant revenue and profits for Defendants at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Emissions Fraud Enterprise and furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class Members' funds and avoiding the expenses associated with remediating the Class Trucks.

125.    By reason of and as a result of the conduct of Defendants, and in particular its pattern of racketeering activity, Plaintiffs and Class Members have been injured in multiple ways, including but not limited to:

a.    Overpayment for Class Trucks, in that Plaintiffs and Class Members overpaid for their vehicles at the time of purchase. Plaintiffs would not have purchased their Class Trucks if Defendants truthfully disclosed the vehicles were unlawfully on the road and/or did not deliver improved emissions and fuel performance over gasoline-powered vehicles. Alternatively, Plaintiffs would not have paid a diesel premium if proper disclosures had been made.

b.    Plaintiffs have also been injured because they have been unwittingly driving vehicles with emissions systems that are not what a reasonable consumer would expect.

c.    Plaintiffs have been wrongfully deprived of their property in that deliberate misrepresentations, omissions, and concealment artificially inflated the price for their Class Trucks.

126.     Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**

**Violations of the California Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq.***
**(On behalf of the California Subclass)**

127.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

128.     Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

129.     California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

130.     The Class Trucks are "goods" as defined in Cal. Civ. Code § 1761(a).

131.     Plaintiffs and the other California Subclass members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California Subclass members, and the Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

132.     The purchase and leases of Class Trucks by Plaintiffs and the Class Members constitute "transactions" as defined in Cal. Civ. Code § 1761(e).

133.     In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the CLRA.

134.     As alleged above, Defendants knowingly and intentionally omitted, concealed, and/or failed to disclose material facts concerning the functionality, reliability, efficiency, performance, safety, and other material features of the Class Trucks and engines, which misled Plaintiffs and the California Subclass.

135.     Defendants' conduct, as described hereinabove, was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

a. Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods.

b. Cal. Civ. Code § 1770(a)(3): Misrepresenting the certification by another.

c. Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have.

d. Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another.

e. Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

f. Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

136. Defendants knew or should have known that their conduct violated the CLRA.

137. In the various channels of information through which Defendants sold and marketed Class Trucks and their engines, Defendants failed to disclose material information to Plaintiffs and the California Subclass, which it had a duty to disclose. Defendants owed Plaintiffs and the California Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Class Trucks to turn off or limit effectiveness in normal driving conditions;

b. Intentionally concealed the foregoing from Plaintiffs and the California Subclass; and/or

c. Made incomplete representations that they manipulated the emissions system in the Class Trucks to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the California Subclass that contradicted these representations.

138.   Defendants knew, should have known, or were reckless in not knowing of the defective design and/or manufacture of the Class Trucks and their engines, and that the Class Trucks were not suitable for their intended use.

139.   Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. Plaintiffs have also sent a notice letter to Defendants in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and California Subclass members are entitled under the CLRA.

**COUNT III**
**Violations of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On behalf of the California Subclass)**

140.   Plaintiffs incorporate by reference paragraphs 1-87 above as though fully set forth herein.

141.   Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

142.   Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

143.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been

- 29 -

known to the Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other California Subclass members.

144.    Defendants have violated § 17500 because the omissions and incomplete representations regarding the functionality, reliability, efficiency, performance, safety, and other features of the Class Trucks and engines as set forth in this complaint were material and likely to deceive a reasonable consumer.

145.    All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

146.    Plaintiffs, individually and on behalf of the other California Subclass members, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the other California Subclass members any money the Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as may be appropriate.

**COUNT IV**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California Subclass)**

147.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

148.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

149.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

150.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

151.    The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

152.    In connection with the purchase or lease of each one of its new vehicles, FCA provides an express base vehicle warranty to repair the vehicle in the case of "defects in material and workmanship."

153.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

154.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the light-duty trucks' emission systems. Thus, FCA also provides an express warranty for their light-duty trucks through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their light-duty trucks' emission systems. Thus, FCA also provides an express warranty for their light-duty trucks through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

155.    In addition, the EPA mandates vehicle manufacturers to issue general emission-related warranties with respect to all vehicles emission control systems. Thus, FCA also provides an express warranty for their trucks through 40 C.F.R. § 1037.120. The general emission-related warranty required by the EPA covers the design and manufacture of all parts of the emission control system, ensuring they are free from defect in materials and workmanship. The warranty provides protection for light-duty vehicles for five years or 50,000 miles, whichever comes first.

1  For medium- and heavy-duty vehicles, the warranty provides 5 years or 100,000 miles, whichever

2  comes first.

3       156.    FCA was required to provide these warranties to purchasers or lessees of Class

4  Trucks.

5       157.    FCA's warranties formed a basis of the bargain that was reached when consumers

6  purchased or leased Class Trucks. However, FCA knew or should have known that the warranties

7  were false and/or misleading.

8       158.    Despite the existence of warranties, FCA failed to inform Plaintiffs and California

9  Subclass members that the Class Trucks were defectively designed and manufactured to emit

10  more pollution and achieve worse performance on the road than what was disclosed to regulators

11  and represented to consumers who purchased or leased them. This design and the Emissions

12  Control Devices that effectuate it are defects.

13       159.    FCA breached the express warranty promising to repair and correct FCA's defect

14  in materials and workmanship. FCA has not repaired or adjusted the Class Trucks' materials and

15  workmanship defects, and is unable to do so without negatively affecting the performance of the

16  Class Trucks.

17       160.    Affording FCA a reasonable opportunity to cure their breach of written warranties

18  would be unnecessary and futile here.

19       161.    Furthermore, the limited warranty promising to repair and correct FCA's defect in

20  materials and workmanship fails in its essential purpose because the contractual remedy is

21  insufficient to make California Subclass members whole and because FCA has failed and/or has

22  refused to adequately provide the promised remedies within a reasonable time.

23       162.    Accordingly, recovery by Plaintiffs and California Subclass members is not

24  restricted to the limited warranty promising to repair and correct FCA's defect in materials and

25  workmanship, and they seek all remedies as allowed by law.

26       163.    Also, as alleged in more detail herein, at the time FCA warranted and sold or

27  leased the Class Trucks, it knew that the Class Trucks were inherently defective and did not

28  conform to the warranties; further, FCA has wrongfully and fraudulently concealed material facts

1  regarding the Class Trucks. California Subclass members were therefore induced to purchase or

2  lease the Class Trucks under false and/or fraudulent pretenses.

3        164.   Moreover, many of the injuries flowing from the Class Trucks cannot be resolved

4  through the limited remedy of repairing and correcting FCA's defect in materials and

5  workmanship as many incidental and consequential damages have already been incurred because

6  of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure

7  to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and

8  California Subclass members' remedies would be insufficient to make them whole.

9        165.   Finally, because of FCA's breach of warranty as set forth herein, Plaintiffs and

10  California Subclass members assert, as additional and/or alternative remedies, the revocation of

11  acceptance of the goods and the return to them the purchase or lease price of all Class Trucks

12  currently owned or leased, and for such other incidental and consequential damages as allowed.

13        166.   FCA was provided reasonable notice of these issues by way of a letter sent by

14  Plaintiffs as well as the regulators' investigations.

15                              **COUNT V**
16        **Violation of the Song-Beverly Consumer Protection Act,**
                   **Breach of Express Warranty**
17                   **Cal Civ. Code § 1790, *et seq.***
                   **(On behalf of the California Subclass)**
18
     167.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully
19
   set forth herein.
20
     168.   Plaintiffs bring this claim on behalf of the California Subclass against FCA.
21
     169.   Plaintiffs and members of the California Subclass who purchased or leased the
22
   Class Trucks in California are "buyers" within the meaning of California Civil Code § 1791(b).
23
     170.   The Class Trucks are "consumer goods" within the meaning of California Civil
24
   Code § 1791(a).
25
     171.   FCA is a "manufacturer" of the Class Trucks within the meaning of California
26
   Civil Code § 1791(j).
27
     172.   FCA made express warranties to members of the California Subclass within the
28
   meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

173.    As set forth above in detail, the Class Trucks are inherently defective in that they used Emissions Control Devices and/or did not comply with emissions regulations when being driven on the road. This defect substantially impairs the use and value of the Class Trucks to reasonable consumers.

174.    FCA breached the express warranties by, among other things, failing to repair and correct FCA's defect in materials and workmanship. FCA has not repaired or adjusted the Class Trucks' materials and workmanship defects, and is unable to do so without negatively affecting the performance of the Class Trucks.

175.    As a result of FCA's breach of the express warranties, members of the California Subclass received goods whose defect substantially impairs their value to Plaintiffs and the other members of the California Subclass. Plaintiffs and members of the California Subclass have been damaged as a result of, *inter alia*, overpayment and the diminished value of FCA's products.

176.    Any opportunity to cure FCA's breach of the express warranties is unnecessary and futile.

177.    Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of the California Subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks.

178.    Pursuant to California Civil Code § 1794, Plaintiffs and the California Subclass are entitled to costs and attorneys' fees.

<u>**COUNT VI**</u>
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On behalf of the California Subclass)**

179.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

180.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

181.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

182.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

183.    The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

184.    A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

185.    The Class Trucks, when sold or leased and at all times thereafter, included illegal Emissions Control Devices and/or did not comply with emissions regulations when being driven on the road, and were therefore not fit for the ordinary purpose for which vehicles are used.

186.    FCA was provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

187.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and California Subclass members have been damaged in an amount to be proven at trial.

**COUNT VII**
**Violation of Song-Berry Consumer Warranty Act,**
**Breach of Implied Warranty**
**Cal Civ. Code § 1790, *et seq*.**
**(On behalf of the California Subclass)**

188.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

189.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

190.    Plaintiffs and members of the California Subclass who purchased Class Trucks in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

191.    The Class Trucks are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

192.   FCA is the "manufacturer" of the Class Trucks within the meaning of Cal. Civ. Code § 1791(j).

193.   FCA impliedly warranted to Plaintiffs and the other members of the California Subclass that the Class Trucks were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Trucks do not have the quality that a buyer would reasonably expect.

194.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a.   Pass without objection in the trade under the contract description.

b.   Are fit for the ordinary purposes for which such goods are used.

c.   Are adequately contained, packaged, and labeled.

d.   Conform to the promises or affirmations of fact made on the container or label.

195.   The Class Trucks would not pass without objection in the automotive trade because they share a common design defect in that they were equipped with Emissions Control Devices and/or did not comply with emissions regulations when being driven on the road, which conceals the vehicles' true performance and emissions.

196.   Class Trucks are not adequately labeled because the labeling fails to disclose the fact that they are defective.

197.   In the various channels of information through which FCA sold and marketed Class Trucks, FCA failed to disclose material information concerning the Class Trucks, which it had a duty to disclose. FCA had a duty to disclose the defect because, as detailed above: (a) FCA knew about the defect; (b) FCA had exclusive knowledge of material facts not known to the general public or the other California Subclass members; (c) FCA actively concealed material facts from the general public and California Subclass members concerning the Class Trucks' true emissions and fuel economy; and (d) FCA made partial representations about the Class Trucks that were misleading because they did not disclose the full truth. As detailed above, FCA knew

the information concerning the Emissions Control Devices at the time of advertising and selling the Class Trucks, all of which was intended to induce consumers to purchase the Class Trucks.

198.    FCA breached the implied warranty of merchantability by manufacturing and selling Class Trucks that contain illegal Emissions Control Devices. Furthermore, FCA's use of illegal Emissions Control Devices in Class Trucks has caused members of the California Subclass to not receive the benefit of their bargain and have caused the Class Trucks to depreciate in value.

199.    Plaintiffs and members of the California Subclass have been damaged as a result of, among other things, the overpayment and diminished value of the Class Trucks.

200.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and other members of the California Subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks.

201.    Under Cal. Civ. Code § 1794, Plaintiffs and the members of the California Subclass are entitled to costs and attorneys' fees.

**COUNT VIII**
**Breach of Express California Emissions Warranties**
**Cal. Civ. Code § 1793.2, *et seq*.**
**(On behalf of the California Subclass)**

202.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

203.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

204.    Each Class Truck is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

205.    The express California Emissions Warranties generally provide "that the vehicle or engine is . . . [d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id*. This provision applies without any time or mileage limitation. *See id*.

206.    The California Emissions Warranties also specifically warrant consumers of light- and medium duty vehicles against any performance failure of the emissions control system for

three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id*. The California Emissions Warranties also specifically warrant consumers of diesel-powered heavy-duty vehicles against any defect in any emission-related part for five years or 100,000 miles, whichever occurs first. Cal. Code Regs. tit. 13, § 2036.

207.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

208.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

209.    Plaintiffs and California Subclass members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because it is unnecessary and futile. Cal. Civ. Code § 1793.2(c).

210.    This Complaint is written notice of nonconformity to FCA and "shall constitute return of the goods." *Id.*

211.    Plaintiffs and California Subclass members are excused from any requirement that they allow a "reasonable number of attempts" to bring Class Trucks into conformity with their California Emissions Warranties based on futility because FCA has not repaired or adjusted the Class Trucks' materials and workmanship defects, and is unable to do so without negatively affecting the performance of the Class Trucks.

212.    In addition to all other damages and remedies, California Subclass members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1).

**COUNT IX**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.*)**
**(On behalf of the California Subclass)**

213.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

214.   Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

215.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

216.   Defendants' conduct, as described herein, was and is unfair, deceptive, and unlawful, in violation of the UCL.

217.   Defendants owed Plaintiffs and the California Subclass a duty to disclose the truth about their manipulation of the emissions systems in the Class Trucks because the Defendants:

   a.   Possessed exclusive knowledge that they manipulated the emissions system in the Class Trucks to illegally bypass, render inoperative, or otherwise reduce the effectiveness of the Class Trucks' emission control system;

   b.   Intentionally concealed the foregoing from Plaintiffs and the California Subclass; and

   c.   Made incomplete representations that the Class Trucks could and did comply with emission regulations while purposefully withholding material facts from Plaintiffs and the California Subclass members that contradicted these representations.

218.   Defendants' conduct was fraudulent in at least the following ways:

   a.   By knowingly and intentionally failing to disclose the Emissions Control Devices in the Class Trucks;

   b.   By knowingly and intentionally misrepresenting and omitting the true nature of the Class Trucks' performance, emissions, fuel economy and other material features, their compliance with emission regulations; and

c.   By knowingly and intentionally selling and leasing Class Trucks that suffer from a defective emissions control system and that emit unlawfully high levels of pollutants under normal driving conditions.

219.   Defendants' knowing and intentional misrepresentations and omissions alleged herein were intended to cause, and did cause, Plaintiffs and the California Subclass members to make their purchases or leases of their Class Trucks. Absent those misrepresentations and omissions, Plaintiffs and California Subclass members would not have purchased or leased the Class Trucks, would not have purchased, or leased these Class Trucks at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have inflated and misleading fuel economy values or issues with exhaust emissions.

220.   Accordingly, Plaintiffs and California Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations, their concealment of and failure to disclose material information, and their unlawful and unfair conduct.

221.   Additionally, Defendants' acts and practices described above are unfair under the UCL because they offend established public policy and the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and members of the California Subclass from making fully informed decisions about whether to purchase or lease the Class Trucks and/or the price to purchase or lease them.

222.   Further, Defendants' conduct, as described herein, was and is unlawful in violation of the UCL in that Defendants violated the laws alleged above, including California consumer protection laws and California laws governing vehicle emissions and emission testing requirements.

223.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the California Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal.

1  Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as may be

2  appropriate.

3  **REQUEST FOR RELIEF**

4       224.    WHEREFORE, Plaintiffs, individually and on behalf of members of the

5  Nationwide Class and California Subclass, respectfully requests that the Court enter judgment in

6  their favor and against the Defendants, as follows:

7          a.    Certification of the proposed Nationwide Class and California Subclass,

8              including appointment of Plaintiffs' counsel as Class Counsel;

9          b.    Restitution, including at the election of Class Members, recovery of the

10             purchase price of their Class Trucks, or the overpayment or diminution in

11             value of their Class Trucks;

12         c.    Damages, including punitive damages, costs, and disgorgement in an

13             amount to be determined at trial, except that monetary relief under the

14             CLRA, as stated above, shall be limited prior to completion of the

15             applicable notice requirements;

16         d.    An order requiring the Defendants to pay both pre- and post-judgment

17             interest on any amounts awarded;

18         e.    An award of costs and attorneys' fees; and

19         f.    Such other or further relief as may be appropriate.

20 **DEMAND FOR JURY TRIAL**

21      225.    Plaintiffs hereby demand a jury trial for all claims so triable.

22 Dated: December 27, 2023          Respectfully submitted,

23                         */s/ Roland Tellis*

24                         Roland Tellis (SBN 186269)
                           David B. Fernandes, Jr. (SBN 280944)

25                         Adam M. Tamburelli (SBN 301902)
                           **BARON & BUDD, P.C.**

26                         15910 Ventura Boulevard, Suite 1600
                           Encino, California  91436

27                         Telephone:  818-839-2333
                           rtellis@baronbudd.com

28                         dfernandes@baronbudd.com
                           atamburelli@baronbudd.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David S. Stellings*
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
dstellings@lchb.com

*pro hac vice* application to be filed

Elizabeth J. Cabraser (SBN 083151)
Kevin Budner (SBN 287271)
Phong-Chau G. Nguyen (SBN 286789)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
kbudner@lchb.com
pgnguyen@lchb.com

Steve W. Berman*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

*pro hac vice* application to be filed

James E. Cecchi*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*pro hac vice* application to be filed

Christopher A. Seeger*
Christopher Ayers*
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
cseeger@seegerweiss.com
cayers@seegerweiss.com

*pro hac vice* application to be filed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E. Powell Miller*
Sharon S. Almonrode*
Dennis A. Lienhardt, Jr.*
**THE MILLER LAW FIRM P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

*pro hac vice* application to be filed

Joseph F. Rice*
Ann K. Ritter*
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Phone: (843) 216-9000
Fax: (843) 216-9450
jrice@motleyrice.com
aritter@motleyrice.com

*pro hac vice* application to be filed

*Counsel for Plaintiffs*