Roland Tellis (SBN 186269)
**BARON & BUDD P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
rtellis@baronbudd.com

Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
cseeger@seegerweiss.com

*Counsel for Plaintiffs*

*[Additional counsel listed on signature page]*

David S. Stellings
**LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
dstellings@lchb.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK BIEDERMAN, JOSEPH GAMBA, TREVOR WHITEHOUSE, GARY AGOSTINI, JEFFREY HETTINGER, JILL SCOTT, CARL ANDERS TROEDSSON, MICHAEL CAPPA, FRED CHAPMAN, and DUSTEN ACKER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>*v.*<br><br>FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation,<br><br>Defendants. | Case No. 3:23-cv-06640-JSC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................ 1

II.   THE PARTIES ................................................................................. 4

    A.   Plaintiffs ............................................................................... 4

        i.    Frank Biederman ......................................................... 4

        ii.   Joseph Gamba ............................................................ 5

        iii.  Trevor Whitehouse ..................................................... 7

        iv.   Gary Agostini ............................................................ 8

        v.    Jeffrey Hettinger ........................................................ 10

        vi.   Jill Scott .................................................................... 11

        vii.  Carl Anders Troedsson ............................................... 13

        viii. Michael Cappa ........................................................... 14

        ix.   Fred Chapman ............................................................ 16

        x.    Dusten Acker .............................................................. 17

    B.   Defendants ............................................................................ 19

        i.    FCA .......................................................................... 19

        ii.   Cummins .................................................................... 20

III.  JURISDICTION AND VENUE ........................................................... 20

IV.   GENERAL FACTUAL ALLEGATIONS .............................................. 21

    A.   Federal and State Emissions Standards and Diesel Engines. ............... 21

    B.   The Class Trucks' Emissions Systems. ......................................... 25

    C.   Defeat Devices and AECDs: EPA's and CARB's Complaints and Consent Decrees Against Cummins. .......................................................... 26

        i.    The DOJ Complaint ..................................................... 27

        ii.   The CARB Complaint ................................................. 30

        iii.  The DOJ and CARB Consent Decrees ........................... 33

    D.   Emissions Recall 67A and its Material, Negative Effects on the Class Trucks. ............................................................................... 34

    E.   Defendants' Misrepresentations and Omissions In Connection with the Sale and Lease of the Class Trucks. ............................................ 42

        i.    FCA's misrepresentations and omissions: "super-clean," "emissions compliant," "lowest emitting diesel engine ever produced." ............... 42

        ii.   FCA's misrepresentations and omissions: "class-leading" fuel economy, low cost of ownership, and high-performance. ................... 46

        iii.  Cummins' Misrepresentations and Omissions. ............... 50

    F.   FCA's History and Pattern of Emissions Violations. ....................... 54

V.    TOLLING OF THE STATUTE OF LIMITATIONS ............................... 54

    A.   Fraudulent Concealment Tolling. ............................................... 54

**TABLE OF CONTENTS**

Page

B.    Discovery Rule Tolling ........................................................................ 56
C.    Estoppel .............................................................................................. 56

VI.    CLASS ALLEGATIONS ............................................................................ 57

A.    Numerosity .......................................................................................... 58
B.    Predominance of Common Issues ........................................................ 58
C.    Typicality ............................................................................................ 59
D.    Adequacy of Representation ................................................................ 59
E.    Declaratory Relief ............................................................................... 59
F.    Superiority ........................................................................................... 59

VII.   CLAIMS ................................................................................................... 60

COUNT I: Violations of the Racketeer Influenced and Corrupt Organizations Act 18
U.S.C. § 1962(c)–(d) (On behalf of the Nationwide Class against Cummins) ............... 60

COUNT II: Fraud by Concealment (On behalf of the Nationwide Class, or alternatively,
the California Subclass, against Defendants) ........................................................ 67

COUNT III: Violations of the California Consumers Legal Remedies Act Cal. Civ. Code
§ 1750, *et seq.* (On behalf of the California Subclass against Defendants) ..................... 70

COUNT IV: Violations of the California False Advertising Law Cal. Bus. & Prof. Code
§ 17500, *et seq.* (On behalf of the California Subclass against Defendants) ..................... 74

COUNT V: Breach of Express Warranty Cal. Com. Code §§ 2313 and 10210 (On Behalf
of the California Subclass against FCA) .............................................................. 77

COUNT VI: Violation of the Song-Beverly Consumer Protection Act, Breach of Express
Warranty Cal Civ. Code § 1790, *et seq.* (On behalf of the California Subclass
against FCA) ........................................................................................................ 79

COUNT VII: Breach of Implied Warranty of Merchantability Cal. Com. Code §§ 2314
and 10212 (On behalf of the California Subclass against FCA) .............................. 81

COUNT VIII: Violation of Song-Beverly Consumer Warranty Act, Breach of Implied
Warranty Cal Civ. Code § 1790, *et seq.* (On behalf of the California Subclass
against FCA) ........................................................................................................ 82

COUNT IX: Breach of Express California Emissions Warranties Cal. Civ. Code § 1793.2,
*et seq.* (On behalf of the California Subclass against FCA) .................................... 84

COUNT X: Violations of the California Unfair Competition Law Cal. Bus. & Prof. Code
§ 17200, *et seq.* (On behalf of the California Subclass against Defendants) ................... 85

i.     Defendants Violated the UCL's Fraudulent Prong ................................. 86
ii.    Defendants Violated the UCL's Unfair Prong ........................................ 88
iii.   Defendants Violated the UCL's Unlawful Prong .................................... 89

COUNT XI: Unjust Enrichment (On behalf of the California Subclass against Defendants) ...... 90

VIII.  REQUEST FOR RELIEF ......................................................................... 91

IX.    DEMAND FOR JURY TRIAL .................................................................. 92

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

For their Consolidated Amended Complaint against FCA US LLC and Cummins Inc., Plaintiffs Frank Biederman, Joseph Gamba, Trevor Whitehouse, Gary Agostini, Jeffrey Hettinger, Jill Scott, Carl Anders Troedsson, Michael Cappa, Fred Chapman, and Dusten Acker (collectively, "Plaintiffs"),[1] individually and on behalf of all others similarly situated, allege as follows based upon the investigation of counsel and a review of publicly available reports:

## I.   NATURE OF THE ACTION

1.      Defendants FCA US LLC ("FCA") and Cummins, Inc. ("Cummins") have together designed, manufactured, marketed, and sold model year ("MY") 2013-2018 Ram 2500 and 3500 diesel trucks (the "Class Trucks"), equipped with the Cummins 6.7-liter diesel engine, that have undisclosed and unauthorized emission control devices that illegally bypass, render inoperative, or otherwise reduce the effectiveness of the Class Trucks' emission control system ("Defeat Devices").

2.      These Defeat Devices allow the Class Trucks to "pass" emissions inspections while secretly emitting illegally high levels of pollutants, including nitrogen oxides ("NOx"), during real-world driving that far surpass reasonable consumer expectations.

3.      This is not the first emissions scandal in the diesel-powered vehicle market.[2] It's not even the first one involving defendant FCA's Ram trucks. In 2019, FCA paid hundreds of millions of dollars in compensation and penalties to resolve claims it had installed illegal emission control devices in MY 2014–2016 Ram 1500s and Jeep Grand Cherokees.[3]

---

[1] Pursuant to the Court's Pretrial Order No. 1 (ECF No. 70), this Complaint consolidates Case Nos. 3:23-cv-06640-JSC and 3:24-cv-00611-JSC. Given the nature of this consolidation and the extent of the additional allegations, Plaintiffs have not provided a redline pursuant to the Court's Civil Standing Order, but can do so at the Court's request.

[2] *See, e.g.*, Department of Justice Press Release, *Volkswagen to Spend Up to $14.7 Billion to Settle Allegations of Cheating Emissions Tests and Deceiving Customers on 2.0 Liter Diesel Vehicles* (June 28, 2016), available at: https://www.justice.gov/opa/pr/volkswagen-spend-147-billion-settle-allegations-cheating-emissions-tests-and-deceiving; Department of Justice Press Release, *The U.S. Reaches $1.5 Billion Settlement with Daimler AG Over Emissions Cheating in Mercedes-Benz Diesel Vehicles* (Sep. 14, 2020), available at: https://www.justice.gov/opa/pr/us-reaches-15-billion-settlement-daimler-ag-over-emissions-cheating-mercedes-benz-diesel.

[3] Department of Justice Press Release, *In Civil Settlements with the United States and California, Fiat Chrysler will Resolve Allegations of Cheating on Federal and State Vehicle Emission Tests*

*Footnote continued on next page*

4.      Defendant Cummins has had issues with its diesel engines too. In 2018, for example, Cummins issued a recall for MY 2010-2015 medium- and heavy-duty trucks, including some of the Class Trucks here, because of excess NOx emissions.[4]

5.      Defendants' latest scheme was much worse. On December 21, 2023, Attorney General Merrick Garland announced "the Justice Department reached an initial agreement with Cummins Inc. to settle claims that, over the past decade, the company unlawfully altered hundreds of thousands of engines to bypass emissions tests in violation of the Clean Air Act. As part of the agreement, the Justice Department will require Cummins to pay $1.675 billion." This is "the largest civil penalty . . . ever secured under the Clean Air Act, and the second largest environmental penalty ever secured."[5] Cummins's separate settlement with the California Attorney General requires Cummins to pay $33 million to the Attorney General and an additional $175 million to the California Air Resource Board ("CARB") for mitigation of NOx emissions in California—bringing the total amount of fines assessed to Cummins to approximately $1.883 billion.[6]

6.      These enormous fines were imposed for good reason. The scope of the scandal is massive, affecting approximately 630,000 trucks on the road nationwide. In the earlier FCA and Cummins regulatory actions, moreover, the regulators alleged simply that Defendants miscalculated expected degradation of emissions components or failed to fully disclose Auxiliary Emissions Control Devices ("AECDs"). Here, in contrast, the regulators concluded that Cummins

---

(Jan. 10, 2019), available at: https://www.justice.gov/opa/pr/civil-settlements-united-states-and-california-fiat-chrysler-will-resolve-allegations; *See also* FCA EcoDiesel Settlement Website, available at: https://www.ecodieselsettlement.com/.

[4] *See* https://ww2.arb.ca.gov/news/carb-investigation-leads-nationwide-recall-500000-cummins-heavy-duty-trucks. Notably, the 2018 recall was related to a different issue—"the faster-than-expected degradation of the catalyst"—and did involve (and therefore did not remove) the defeat devices at issue here.

[5] *See* https://www.justice.gov/opa/pr/statement-attorney-general-merrick-garland-agreement-principle-cummins-settle-alleged.

[6] *California v. Cummins, Inc.*, No. 1:24-cv-00090 (D.D.C.), ECF No. 3-1 (California Partial Consent Decree), ¶ 22; *See also* California Air Resources Board Press Release, *California Attorney General Bonta and CARB announce $372 million settlement with engine manufacturer Cummins, Inc.* (Jan. 10, 2024), https://ww2.arb.ca.gov/news/california-attorney-general-bonta-and-carb-announce-372-million-settlement-engine-manufacturer.

had engaged in deliberate, calculated fraud to cheat on emissions tests—and, by extension, to deceive their own consumers.

7.     As Attorney General Garland explained, this cheating has serious real-world consequences: "The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety. For example, in this case, our preliminary estimates suggest that defeat devices on some Cummins engines have caused them to produce thousands of tons of excess nitrogen oxide emissions. The cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections." *Id.*

8.     But that was not the only harm Defendants' misconduct caused. For years, Defendants represented and advertised the Class Trucks, and the engines therein, to be reliable, clean-burning, and emissions compliant. For obvious reasons, these representations were deceptive and misleading. Nowhere did Defendants disclose that the Class Trucks were equipped with defeat devices enabling them to cheat tests and emit far higher levels of pollutants than consumers reasonably expected. Nor did Defendants disclose that, because the disclosures to regulators were dishonest and inaccurate, the Class Trucks were not covered by valid Certificates of Conformity ("COC") or Executive Orders and were illegal to sell. Needless to say, all of this matters to reasonable consumers, including Plaintiffs and the Class. As a result, they suffered an ascertainable economic loss, including, but not limited to, out-of-pocket loss related to their overpayment for the Class Trucks at the point of sale. That loss can be measured several ways, including, at a minimum, by the premium Plaintiffs and Class Members paid for a diesel vehicle over a comparable gas vehicle.

9.     Unfortunately, the Class's injuries do not end there. To mitigate the environmental harms of their scheme, Defendants have implemented an emissions recall. As one would expect, an emissions reduction comes at the expense of other important performance metrics, including increased Diesel Exhaust Fluid ("DEF") consumption as well as decreased power, durability, fuel economy, and reliability. These reductions in the Class Trucks' performance have increased the out-of-pocket cost of owning and operating the Class Trucks and decreased their utility in

performing their intended uses. This, too, is a concrete injury.

10. Through this action, Plaintiffs and the Class Members—the end targets of Defendants' deception—seek to enjoin Defendants' misconduct and recover the economic damage they suffered from it.

## II.  THE PARTIES

### A.  Plaintiffs

#### i.  Frank Biederman

11. Plaintiff Frank Biederman (for purpose of this subsection, "Plaintiff") is an individual residing in Upper Lake, California. Plaintiff purchased a new 2017 Ram 2500 Mega Cab with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around June 2017 from an authorized FCA dealership located in Lakeport, California. Plaintiff purchased the Class Truck for personal, family, and household use.

12. Before purchasing his Class Truck, Plaintiff conducted extensive research, including on Defendants' websites. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

13. Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

14.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

15.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

16.     Plaintiff received notice that his Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff's Class Truck received the emissions recall. In the months following, Plaintiff observed that his Class Truck consumes significantly more DEF than it did before the recall. Although Plaintiff has not undertaken his own testing, he estimates based on his observations that the Class Truck's DEF consumption has roughly doubled. Plaintiff has also observed that the Class Truck's fuel economy has decreased after receiving the emissions recall. The costs and inconvenience associated with the increased fuel and DEF purchases are an additional concrete injury directly resulting from Defendants' misconduct.

### ii.     Joseph Gamba

17.     Plaintiff Joseph Gamba (for purpose of this subsection, "Plaintiff") is an individual residing in Vacaville, California. Plaintiff purchased a new 2018 Ram 2500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in 2018 from an authorized FCA dealership located in Vacaville, California. Plaintiff purchased the Class Truck for personal, family, and household use.

18.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including on Defendants' websites. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

19.     Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

20.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

21.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class

Truck or would have paid less for it.

22.     Plaintiff received notice that his Class Truck had been recalled and required a
software update to bring the vehicle into compliance with emissions regulations. Plaintiff's Class
Truck received the emissions recall. In the months following, Plaintiff observed a significant
decrease in fuel economy. Plaintiff regularly uses his Class Truck to tow his boat from his home
in Vacaville to the marinas in Berkeley and Richmond, California. Although he has not performed
any precise testing, he has noticed at least a 2-3 mile per gallon decrease on these routes. He has
also observed an increase in DEF consumption after the emissions recall, as well as decreased
power, particularly in significant inclines. The costs and inconvenience associated with the
increased fuel and DEF purchases are an additional concrete injury directly resulting from
Defendants' misconduct.

### iii.     **Trevor Whitehouse**

23.     Plaintiff Trevor Whitehouse (for purpose of this subsection, "Plaintiff") is an
individual residing in Oakley, California. Plaintiff purchased a new 2018 Ram 2500 with a
Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around April
2018 from an authorized FCA dealership located in Placerville, California. Plaintiff purchased the
Class Truck for personal, family, and household use.

24.     Before purchasing his Class Truck, Plaintiff conducted extensive research,
including reviewing FCA's website and speaking with the FCA dealer about the truck. Plaintiff
saw and relied on Defendants' representations that his Class Truck purportedly had, among other
things: strong towing and hauling capabilities, high performance, and a powerful and reliable
Cummins diesel engine. These representations were material to Plaintiff's purchasing decision.

25.     Plaintiff's research and Defendants' representations and omissions led him to form
a reasonable expectation that the Class Trucks included advanced diesel technology that provided
a clean-burning diesel system while still providing desirable performance characteristics such as
good fuel economy, lower operating costs, and other desirable traits such as towing and hauling
capabilities as compared with earlier and competing models. Plaintiff also reasonably expected
that these desirable traits would continue through the useful life of his Class Truck, and would not

be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

26.   Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

27.   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

28.   Plaintiff received notice that his Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff's Class Truck received the emissions recall. In the months following, Plaintiff observed a significant decrease in fuel economy. Although he has not performed any precise testing, he has noticed a decrease of approximately 3-4 miles per gallon in highway driving. He has also observed an increase in DEF consumption after the emissions recall. The costs and inconvenience associated with the increased fuel and DEF purchases are an additional concrete injury directly resulting from Defendants' misconduct.

### iv.   Gary Agostini

29.   Plaintiff Gary Agostini (for purpose of this subsection, "Plaintiff") is an individual residing in Discovery Bay, California. Plaintiff purchased a certified pre-owned 2016 Ram 3500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or

around November 2017 from an authorized FCA dealership located in Fairfield, California. Plaintiff purchased the Class Truck for personal, family, and household use.

30.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including reviewing information on Defendants' websites, speaking with the FCA dealership, and test-driving the vehicle. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: strong towing and hauling capabilities, high performance, good fuel economy, and a powerful and reliable Cummins diesel engine. These representations were material to Plaintiff's purchasing decision.

31.     Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as superior towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

32.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

33.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer,

Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

34.     Plaintiff received notice that his Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff attempted to schedule the recall servicing with his local FCA dealer, but the dealer has been unable to perform the recall. Plaintiff will not be able to renew the California vehicle registration for his Class Truck if the dealer cannot complete the recall.

v.     **Jeffrey Hettinger**

35.     Plaintiff Jeffrey Hettinger (for purpose of this subsection, "Plaintiff") is an individual residing in Gilroy, California. Plaintiff purchased a new 2016 Ram 3500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in 2016 from an authorized FCA dealership located in Gilroy, California. Plaintiff purchased the Class Truck for personal, family, and household use.

36.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including reviewing information on Defendants' websites and speaking with the fleet manager at the FCA dealership. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: high performance, strong towing and hauling capabilities, and a clean-burning and reliable Cummins diesel engine that consumed less DEF and polluted less than other engines on the market. These representations were material to Plaintiff's purchasing decision.

37.     Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as superior towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable

expectations were material to his purchasing decision.

38.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

39.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

40.     Plaintiff received notice that his Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff intends to complete the recall in the near future.

### vi.     <u>Jill Scott</u>

41.     Plaintiff Jill Scott (for purpose of this subsection, "Plaintiff") is an individual residing in Healdsburg, California. Plaintiff purchased a 2015 Ram 3500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around February 2016 from an authorized FCA dealership located in Placerville, California. Plaintiff purchased the Class Truck for personal, family, and household use.

42.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including reviewing specifications on Defendants' websites and speaking with the salesperson at the FCA dealership about the vehicle. Plaintiff saw and relied on Defendants' representations that the Class Truck purportedly had, among other things: good fuel economy, strong towing and hauling capabilities, and a reliable and clean-burning diesel engine. These representations were

material to Plaintiff's purchasing decision.

43.     Plaintiff's research and Defendants' representations and omissions led her to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to her purchasing decision.

44.     Plaintiff did not know at the time she purchased the Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

45.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

46.     Plaintiff's Class Truck received the emissions recall. Although Plaintiff did not receive the recall notice, she understands that the recall required a software update to bring the vehicle into compliance with emissions regulations. After receiving the recall, Plaintiff continued to experience problems with the emissions system in her Class Truck and had to get additional repairs to fix the issues.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### vii.    Carl Anders Troedsson

47.    Plaintiff Carl Anders Troedsson (for purpose of this subsection, "Plaintiff") is an individual residing in Tujunga, California. Plaintiff purchased a new 2015 Ram 2500 Laramie Crew Cab 4x4 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") on April 19, 2015, from an authorized FCA dealership located in Riverside, California. Plaintiff purchased the Class Truck for personal, family, and household use.

48.    Before purchasing his Class Truck, Plaintiff conducted extensive research, including on Defendants' websites. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

49.    Plaintiffs' research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

50.    Plaintiff's research and Defendants' representations and omissions led Plaintiff to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, durability, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class

Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to Plaintiff's purchasing decision.

51.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and

52.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or COC, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

53.     Plaintiff has not received a notice but understands that his Class Truck is subject to Emissions Recall 67A. Plaintiff intends to complete the recall in the near future.

### viii.   Michael Cappa

54.     Plaintiff Michael Cappa (for purpose of this subsection, "Plaintiff") is an individual residing in Concord, California. Plaintiff purchased a new 2016 Ram 3500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around June 2016 from an authorized FCA dealership located in Placerville, California. Plaintiff purchased the Class Truck for both personal, family, household, and business use.

55.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including on the Ram website and authorized FCA dealership websites. Plaintiff also reviewed the Class Truck vehicle brochure, and spoke to salespeople at the Thompsons Ram dealership. Plaintiff also test drove Ram trucks at a Ram dealership in Concord, California before purchasing his Class Truck. Plaintiff saw and relied on Defendants' representations that his Class Truck

purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

56.     Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

57.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

58.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or Certificate of Compliance, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

59.     Plaintiff received notice that his Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff's Class

Truck received the emissions recall, but the vehicle subsequently did not pass a smog test after the emissions recall was performed. Plaintiff has also noticed that his Class Truck has had reduced fuel economy of roughly 20% following the recall, especially while towing, and the towing performance has dropped significantly. In the months following the recall, Plaintiff also observed that his Class Truck consumed significantly more DEF than it did before the recall. The costs and inconvenience associated with the increased fuel and DEF purchases are an additional concrete injury directly resulting from Defendants' misconduct.

### ix.    Fred Chapman

60.    Plaintiff Fred Chapman (for purpose of this subsection, "Plaintiff") is an individual residing in Bay Point, California. Plaintiff purchased a new 2016 Ram 2500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around May 2016 from an authorized FCA dealership located in Antioch, California. Plaintiff purchased the Class Truck for personal, family, and household use.

61.    Before purchasing his Class Truck, Plaintiff conducted extensive research, including reviewing information on Defendants' websites and authorized FCA dealership websites. Plaintiff also saw other advertising about the Class Truck, through trade magazines and online videos showing test drives of a 2016 Ram 2500. Plaintiff also test drove Ram trucks before purchasing his Class Truck. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

62.    Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not

be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

63.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

64.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or Certificate of Compliance, was illegal to sell, and is therefore unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and would not have purchased the Class Truck or would have paid less for it.

65.     Plaintiff's Class Truck had been recalled and required a software update to bring the vehicle into compliance with emissions regulations. Plaintiff's Class Truck received the emissions recall. In the months following the recall, Plaintiff observed that his Class Truck consumed significantly more DEF than it did before the recall. Plaintiff has also noticed that the fuel economy for his Class Truck appears to have reduced by approximately 3-4 miles per gallon, depending on road conditions, following the recall. The costs and inconvenience associated with the increased fuel and DEF purchases are an additional concrete injury directly resulting from Defendants' misconduct.

### x.     Dusten Acker

66.     Plaintiff Dusten Acker (for purpose of this subsection, "Plaintiff") is an individual residing in Concord, California. Plaintiff purchased a new 2017 Ram 3500 with a Cummins diesel engine (for the purposes of this subsection, the "Class Truck") in or around October 2017 from an

authorized FCA dealership located in Woodland, California. Plaintiff purchased the Class Truck for personal, family, household, and business use.

67.     Before purchasing his Class Truck, Plaintiff conducted extensive research, including on the Ram website and authorized FCA dealership websites. Plaintiff also spoke to salespeople at the FCA dealership, and test drove the Class Truck before purchasing it. Plaintiff saw and relied on Defendants' representations that his Class Truck purportedly had, among other things: a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks; complied with emissions law and regulations; good fuel economy; low cost of ownership; and strong towing and hauling capabilities. These representations were material to Plaintiff's purchasing decision.

68.     Plaintiff's research and Defendants' representations and omissions led him to form a reasonable expectation that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities as compared with earlier and competing models. Plaintiff also reasonably expected that these desirable traits would continue through the useful life of his Class Truck, and would not be eliminated, reduced, or diminished as a result of changes required to render the Class Truck compliant with state and federal emissions regulations. Plaintiff's reasonable expectations were material to his purchasing decision.

69.     Plaintiff did not know at the time he purchased his Class Truck that it was equipped with undisclosed Defeat Devices designed to cheat emission tests and to deceive consumers, or that the Class Truck could perform as advertised only by emitting pollutants, such as NOx, at levels that are above legal limits, greater than what was advertised, and greater than emissions emitted from gasoline-powered vehicles. Defendants concealed and omitted this critical information when Plaintiff purchased the Class Truck.

70.     Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' unlawful conduct. Among other things, the Class Truck is not covered by a valid Executive Order or Certificate of Compliance, was illegal to sell, and is therefore

1   unmerchantable. Furthermore, had Defendants not concealed the Defeat Devices and disclosed

2   that the Class Truck could perform as advertised only by emitting pollutants at unlawful levels not

3   expected by a reasonable consumer, Plaintiff would have seen and reviewed such disclosures and

4   would not have purchased the Class Truck or would have paid less for it.

5          71.    Plaintiff received notice that his Class Truck had been recalled and required a

6   software update to bring the vehicle into compliance with emissions regulations. After receiving

7   the recall, a fault code appeared in Plaintiff's Class Truck, which indicated that there is an issue

8   with the emissions system. Plaintiff's Class Truck requires further servicing to resolve the fault

9   code.

10  **B.     Defendants**

11             **i.     FCA**

12         72.    Defendant FCA US LLC is a limited liability company organized and existing

13  under Delaware law and is wholly owned by holding company Stellantis N.V., a Dutch

14  corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and

15  headquarters is in Auburn Hills, Michigan.

16         73.    FCA (sometimes referred to as Fiat Chrysler) is a motor vehicle "Manufacturer"

17  and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand

18  motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands.

19  FCA engages in commerce by distributing and selling new and unused passenger cars and motor

20  vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include

21  Mopar, its automotive parts and accessories division, and SRT, its performance automobile

22  division.

23         74.    FCA's business operations in the United States include the manufacture,

24  distribution, and sale of motor vehicles and parts through its network of independent, franchised

25  motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this

26  network located in every state of the United States.

27         75.    FCA sells its trucks through FCA-franchised dealerships. FCA distributes

28  information about its Ram trucks to its dealers to communicate to consumers. FCA also

understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of its Ram products to consumers. The dealers act as FCA's agents in selling the Class Trucks and disseminating information about the Class Trucks to customers and potential customers. FCA also disseminates information about its vehicles on its website. At the point of sale, as well as in written materials and on its website, FCA could have told the truth.

76.     FCA also interacts regularly with regulators to obtain permission to sell the Class Trucks. This includes extensive interactions with the Environmental Protection Agency as well as with the California Air Resources Board to sell the Class Trucks in California.

### ii.     <u>Cummins</u>

77.     Defendant Cummins Inc. is a Fortune 500 company that designs, manufactures, and distributes diesel, natural gas, electric and hybrid powertrains and powertrain-related components including filtration, emissions systems, turbochargers, fuel systems, controls systems, air handling systems, automated transmissions, electric power generation systems, batteries, electrified power systems, hydrogen generation and fuel cell products. Cummins designs and manufactures the 6.7-liter diesel engine installed in all Class Trucks.

78.     Cummins conducts business in interstate and foreign commerce through its network of approximately 460 wholly owned, joint venture, and independent distributor locations, and more than 10,000 Cummins certified dealer locations in approximately 190 countries and territories. It is headquartered in Columbus, Indiana.

79.     Cummins participates in the regulatory approval process with both the EPA and CARB.

### III. <u>JURISDICTION AND VENUE</u>

80.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

81.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because

Plaintiffs have claims under 18 U.S.C. § 1964 (RICO).

82.     Furthermore, this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

83.     This Court has personal jurisdiction over Defendants under the California Code of Civil Procedure section 410.10.

84.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions which give rise to the claims occurred in this District, and because Defendants have caused harm to Class Members residing in this District, including Plaintiffs Frank Biederman, Trevor Whitehouse, Gary Agostini, Jeffrey Hettinger, Jill Scott, Michael Cappa, Fred Chapman, and Dusten Acker. Defendants conduct substantial business, including through numerous dealerships, and marketed, advertised, sold, and leased Class Trucks in this District.

85.     **Divisional Assignment**: This action is properly assigned to the San Francisco Division of this District pursuant to Civ. L.R. 3-2. The original complaint was initially assigned to the Eureka Division but transferred to the San Francisco Division pursuant to Civ. L.R. 3-2(g). In addition, a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by this Division and Plaintiffs Gary Agostini, Jeff Hettinger, Jill Scott, Trevor Whitehouse, Michael Cappa, Fred Chapman, and Dusten Acker, and many other Class Members purchased and/or maintain their Class Trucks in the counties served by this Division. Moreover, Defendants conduct substantial business in the counties served by this Division, have marketed, advertised, sold, and leased the Class Trucks and engines therein in those counties, and have caused harm to Class Members residing in those counties.

## IV.  GENERAL FACTUAL ALLEGATIONS

### A.    Federal and State Emissions Standards and Diesel Engines.

86.     Federal and state emission standards are in place to protect the environment and Americans from pollution and certain chemicals known to cause disease in humans. Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards). The Clean

Air Act ("CAA") requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution. As alleged in detail below, every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued Executive Order. Only vehicles that are manufactured in all material respects as described in the application for a COC or Executive Order are authorized to be sold pursuant to the COC or Executive Order purporting to cover the vehicles.

87.     There is an exceptionally good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

88.     Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions. Rather than using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust. The diesel combustion cycle can produce more power and torque than similarly sized gasoline engines.

89.     In addition to increased power, diesel engines typically offer better fuel economy than gasoline engines for several reasons: they operate at a higher compression ratio than gasoline engines, diesel fuel contains more energy than gasoline, and, unlike gasoline engines, diesel engines do not have an air intake throttle and therefore suffer no air intake throttling losses.

90.     The diesel engine also has performance and durability advantages over gasolines engines. The higher compression ratio and longer piston stroke of the diesel generates greater torque energy, which results in better vehicle acceleration performance. This performance is generally enhanced and tuned with the application of a turbo charger, which increases the power and performance across the spectrum of engine speed and load. By comparison to gasoline engines, diesel engines are sturdier in design with more robust components, so the engines tend to be more durable and longer lasting.

91.     But this greater durability, increased power, and better fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions.

92.     If not controlled, emissions from diesel engines can include higher levels of NOx and particulate matter ("PM") (*i.e.,* soot) compared to emissions from gasoline engines. A byproduct of high temperature diesel combustion are two compounds: nitric oxide and nitrogen dioxide, collectively called NOx. These compounds are formed at high temperatures in the cylinder during combustion through the dissociation of oxygen and nitrogen. NOx emissions lead to several forms of pollution. First, NOx contributes to high levels of ambient nitrogen dioxide, which by itself is a health hazard. Second, in the lower atmosphere, NOx can form tiny nitrate aerosol particulates that can be inhaled. Finally, NOx in the atmosphere reacts with hydrocarbon in the presence of sunlight to form ozone, a strong oxidizer and lung irritant. Ozone is a criteria pollutant and is regulated as part of the National Ambient Air Quality Standards. Exposure to these pollutants has been linked with harmful health issues, including asthma attacks and other respiratory illnesses severe enough to send people to the hospital. Ozone and particulate matter exposure have been linked to premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illnesses are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2 is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 concentrations at ground level can be quite high, where they can impact the health of the breathers.

93.     To limit these dangerous pollutants, modern diesel engines employ several in-cylinder and aftertreatment technologies are employed to reduce these emissions.

94.     Inside the cylinder, NOx emissions can be reduced through exhaust gas recirculation ("EGR"), a process by which exhaust gases are routed back into the intake of the engine and mixed with fresh incoming air. EGR lowers NOx by reducing the available oxygen, and by increasing the specific heat of the exhaust gas mixture which reduces maximum combustion temperatures.

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

95.     Given fundamental limits and tradeoffs in controlling NOx and PM formed during in-cylinder combustion, exhaust gas aftertreatment devices must be employed. Exhaust aftertreatment is expensive and complex; it typically includes ceramic catalyst support and filter media, catalyst coatings, sheet metal shells and tubing, sensors, and controls. The fundamental aftertreatment components include particulate filters designed to trap solid particles and catalysts designed to either oxidize or reduce pollutants, transforming them into harmless inert gases, such as nitrogen gas (N2), water (H2O), and carbon dioxide (CO2).

96.     Modern diesel engines are designed with the intent to balance tradeoffs between emissions, fuel economy, reliability/durability, and cost. Meeting emission standards is at the forefront of the challenges that must be addressed. For the EPA to designate a diesel car as a "clean" vehicle, the car manufacturer must demonstrate emission levels of PM, NOx, carbon monoxide, and hydrocarbon below certain standards. In 2000, the EPA announced stricter emissions standards requiring all diesel models starting in 2007 to emit dramatically less NOx and PM than years prior.

97.     Before Defendants could introduce the affected vehicles into the U.S. stream of commerce (or causing the same), they had to first apply for, and obtain, an EPA-administered COC certifying that the vehicles comport with the emissions standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. Moreover, the vehicles must "in all material respects be as described in the manufacturer's application for certification" to be deemed covered by a valid COC. 40 C.F.R. § 86.1848-10(c)(6). Vehicles that differ in material respects from the specifications provided in a COC application are not authorized for sale pursuant to the COC that purportedly covers them.

98.     California's emission standards are even more stringent than those of the EPA. CARB, the State of California's regulator for mobile emissions, including cars and trucks, requires a similar application from automakers to obtain an Executive Order confirming compliance with California's emission regulations before allowing the vehicle onto California's roads.

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

**B.     The Class Trucks' Emissions Systems.**

99.     The Class Trucks are equipped with a Selective Catalytic Reduction ("SCR") into which DEF is "dosed" to remove NOx from engine exhaust. The main components of the SCR/DEF system include the SCR catalyst, DEF storage tank, the DEF pump, dosage controller, and DEF injector.

100.     The subject emissions system also includes a Diesel Particulate Filter ("DPF") to trap soot. The emission system uses passive and active regeneration, depending on factors such as particulate content in the filter, to use heat to clean the DPF by converting the particulate soot into ash.

101.     The Class Trucks also can recirculate a certain portion of the exhaust gases back into the engine through its EGR valve to lower the combustion temperature and thereby reduce NOx generation.

102.     Like with most engine controls, the Class Trucks' engine Powertrain Control Module ("PCM") uses inputs from various emissions system sensors to regulate emission systems functions related to, for example, DPF regeneration cycles, recycling of exhaust gas to the engine's intake plenum, and DEF usage. The PCM is sometimes referred to as the Electronic Control Module ("ECM").

103.     Ram pickup trucks are designed to appeal to consumers who will want to use a "working truck"—*i.e.,* to haul a load or a trailer. The diesel option is attractive to consumers because diesel-powered vehicles allegedly offer better fuel economy, power, and towing capacity relative to their gasoline-powered counterparts.

104.     Defendants have had a long-standing and mutually beneficial relationship, as Cummins has been providing diesel engines for Ram-branded pickup trucks dating back to 1989. Until 2013, Cummins was the exclusive supplier to Ram of diesel engines and continues to be the only supplier for the larger 2500 and 3500 pickup truck platforms.

105.     The 2013-2018 diesel versions of the 2500 and 3500 trucks are all powered by the Cummins 6.7-liter diesel engine, containing identical or substantially similar critical emission control components. The Ram 2500 and 3500 share the same engine and differ only in the weight

class to which they are certified. On information and belief, the Defeat Devices employed in the Class Trucks are functionally identical.

**C.      Defeat Devices and AECDs: EPA's and CARB's Complaints and Consent Decrees Against Cummins.**

106.    On January 10, 2024, the EPA (through the United States Department of Justice) and CARB (through the California Attorney General) filed Complaints against Cummins in the United States District Court for the District of Columbia.[7] As detailed further below, the DOJ and CARB Complaints outlined the regulators' findings that Cummins fraudulently obtained regulatory approvals by unlawfully failing to disclose or concealing the Defeat Devices that resulted in excess NOx emissions in Ram 2500 and 3500 trucks, including the 2013–2018 model years.[8] The EPA and CARB also simultaneously filed Consent Decrees further describing the alleged violations and detailing the penalties to which Cummins agreed, including $1.675 billion in combined civil penalties as well as a mandatory recall and other requirements.[9]

107.    A "defeat device" is a part or component of a motor vehicle or engine that bypasses, defeats, or renders inoperative a vehicle's emission control device. Defeat devices can be hardware, software, or designs that allow a vehicle to pass an emission test but interfere with emissions controls in real-world driving conditions. In modern vehicles with electronic engine controls, defeat devices are typically activated by illegal software in the vehicle's engine control module—the computer that controls the operation of the engine and emission control devices. Pursuant to the Clean Air Act, it is illegal to manufacture, sell, or install a defeat device.

108.    As detailed in the DOJ and CARB Complaints and Consent Decrees, Defendants designed, manufactured, and installed the Defeat Devices in approximately 630,000 MY 2013-19

---

[7] *See United States v. Cummins Inc.*, 24-cv-00088 (D.D.C.), ECF No. 1 ("DOJ Complaint"); *State of California v. Cummins, Inc.*, 24-cv-00090 (D.D.C.), ECF No. 1 ("CARB Complaint"). The cases were then consolidated under the case number 24-cv-00088.

[8] The DOJ and EPA alleged defeat devices were also present in a subset of the MY 2019 trucks— specifically, those in EPA Test Groups KCEXD06.78VV and KCEXD06.78WV, with Software Calibration 1. Those limited 2019 vehicles were previously recalled, however, and are not included in the Class Trucks at issue in this Consolidated Amended Complaint.

[9] *See U.S. v. Cummins Inc.*, 24-cv-00088 (D.D.C.), ECF No. 2-1 (Joint EPA / CARB Consent Decree); *State of California v. Cummins, Inc.*, 24-cv-00090 (D.D.C.), ECF No. 3-1 (CARB Partial Consent Decree).

1   Ram 2500 and 3500 vehicles and sold or leased them to unwitting consumers. These Defeat

2   Devices cause the Class Trucks to emit far higher levels of pollution in real-world driving than

3   legally allowed. As a result, the Class Trucks were different in material respects from the

4   specifications provided to the regulators for the purpose of obtaining COCs or Executive Orders

5   permitting Defendants to sell the non-conforming trucks, meaning the Class Trucks, by law, were

6   not actually covered by any COC or Executive Order at the time of sale despite the formal

7   issuance of documents obtained by fraud.

8               i.      **The DOJ Complaint**

9           109.    The DOJ Complaint alleges four claims for violations of the Clean Air Act,[10] and

10  alleges that "Between 2013 and 2023, Cummins violated the Act through its production and sale

11  of diesel motor vehicle engines – along with associated engine control and emissions control

12  systems – that were installed in nearly ***one million pickup trucks*** sold in the United States under

13  the RAM 2500 and RAM 3500 model names (the 'Subject Vehicles')." DOJ Compl. ¶ 2

14  (emphasis added).

15          110.    Specifically, "Cummins' applications for EPA Certificates of Conformity ('COC')

16  for the Subject Vehicles did not disclose multiple software-based features that affect the Subject

17  Vehicles' emission control system." *Id.* As a result, "***each*** Subject Vehicle differs from the

18  specifications provided in Cummins' COC applications and ***none*** of the Subject Vehicles is

19  certified by the COC that purportedly covered it." *Id.* (emphases added). The "Subject Vehicles"

20  at issue in the DOJ Complaint are "Model Years 2013 through 2023 RAM 2500 and RAM 3500

21  pickup trucks equipped with 6.7-liter diesel engines manufactured by Cummins." *Id.* ¶ 41.

22          111.    The DOJ Complaint also specifies how Cummins fraudulently obtained the COCs

23  for the Class Trucks. The COC must list all AECDs[11] in the vehicles, and a justification for each

24  AECD, "the parameters they sense and control, a detailed justification of each AECD that results

25  in a reduction in effectiveness of the emissions control system, and a rationale for why it is not a

---

26  [10] *Id.* ¶¶ 73-91.

27  [11] An AECD is "any element of design which senses temperature, vehicle speed, engine
    [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the
28  purpose of activating, modulating, delaying, or deactivating the operation of any part of the
    emission control system." DOJ Compl. ¶ 28 (citing 40 C.F.R. § 86.1803-01).

defeat device.[12]" *Id.* ¶ 27. Defeat devices are prohibited by law in new vehicles. *Id.* ¶ 32.

112.    The "brains" that control functions of the motor vehicles are in their "electronic control modules" ("ECMs"), which use software integrated in the ECM hardware. *Id.* ¶ 12. "Manufacturers calibrate these individual software variables to establish, among other things, the motor vehicle's emissions performance. The collection of all of the manufacturer-selected values is referred to as the calibration." *Id.* ¶ 55. And "ECM software that senses inputs such as ambient temperature, engine speed, or duration of engine operation and then sends a message to control the operation of a component of the emissions control system in the motor vehicle is an AECD within the meaning of 40 C.F.R. § 86.1803-01." *Id.* ¶ 56. According to the DOJ Complaint, "Cummins calibrated the ECF software for the Subject Vehicles." *Id.* ¶ 57.

113.    During federal emissions testing, "the Subject Vehicles' ECM software functions and calibrations operate the EGR and SCR systems in a manner that produces emissions results that are compliant with emissions standards." *Id.* ¶ 63. However, "certain AECDs" in the 2013-2019 Subject Vehicles "cause a reduction in the effectiveness of the emission control system, including the after-treatment control system, resulting in increased NOx emissions. . . . These AECDs were installed in more than 630,000 2013-2019 RAMs." *Id.* ¶ 64. In addition, these AECDs were not disclosed in Cummins' COC applications for the MY 2013-2019 Subject Vehicles. *Id.* In other words, Cummins' COC applications were fraudulent, and "the Subject Vehicles therefore are not covered by a COC." *Id.* ¶ 69.[13]

---

[12] The DOJ defines a "defeat device" as an AECD that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles . . . ." DOJ Compl. ¶ 31 (citing 40 C.F.R. § 86.1803-01).

[13] There were *additional* AECDs that were not disclosed in the COC applications for the MY 2019-2023 Subject Vehicles, although the EPA did not believe they led to increased NOx emissions. These AECDs were installed in more than 330,000 MY 2019-2023 Subject Vehicles. *Id.* ¶ 66. And "[e]ach Undisclosed AECD is a design specification of the manufactured Subject Vehicles that differs in material respects from the description of the Subject Vehicles in their COC applications." Thus, although the undisclosed AECDs in the MY 2019-2023 trucks further supported the EPA's finding that the COCs were obtained fraudulently, those undisclosed AECDs were not deemed defeat devices because they were found not to have increased NOx emissions.

114.    As a result of the foregoing, "one or more of the Undisclosed AECDs installed in 2013-2019 RAMs have a *principal effect of bypassing, defeating, or rendering inoperative engine control systems and/or after-treatment control systems installed in those vehicles*." *Id.* ¶ 70 (emphasis added). "When engaged individually, or in combination with the other undisclosed AECDs, one or more of the Undisclosed AECDs installed in the 2013-2019 RAMs remove or render inoperative engine control systems and/or after-treatment control systems installed in the Subject Vehicles. *Id.* ¶ 72. And Cummins "knew or should have known that the undisclosed AECDs installed in the 2013-2019 RAMs were parts of those vehicles that were being offered for sale or installed for such use or put to such use." *Id.* ¶¶ 71, 78.

115.    Because the Class Trucks (as built) contained Defeat Devices, they were not authorized for sale pursuant to any COC. "Motor vehicles are covered by a COC only if the motor vehicles are as described in the manufacturer's application for the COC 'in all material respects.' 40 C.F.R. § 86.1848-10(c)(6)." *Id.* ¶ 24. "A new motor vehicle containing an AECD that is not disclosed in the COC application does not conform in all material respects with the COC application and, therefore, is not covered by the COC." *Id.* ¶ 30. "Each of the COCs issued by the EPA for the Subject Vehicles states on its face that the certificate covers only those new motor vehicles that confirm, in all material respects, to the design specifications provided to the EPA in the certificate application for such vehicle." *Id.* ¶ 50. "Cummins' applications for EPA Certificates of Conformity ("COC") for the Subject Vehicles did not disclose multiple software-based features that affect the Subject Vehicles' emission system. Consequently, each Subject Vehicle differs from the specifications provided in Cummins' COC applications and none of the Subject Vehicles is certified by the COC that purportedly covered it." *Id.* ¶ 2. "Each Undisclosed AECD is a design specification of the manufactured Subject Vehicles that differs in material respects from the description of the Subject Vehicles in their COC applications. [] The Subject Vehicles therefore are not covered by a COC." *Id.* ¶¶ 67, 69.

116.    The DOJ Complaint makes clear that the purpose of the regulatory action was to enforce the Clean Air Act's mandate for protecting public health and safety, and identifies why these excessive NOx emissions are harmful and even deadly to the public:

> NOx pollution contributes to the formation of harmful smog and fine particulate matter in air, exposure to which is linked to a number of **respiratory- and cardiovascular-related health effects as well as premature death**. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to smog or particulate matter exposure. Nitrogen dioxide formed by NOx emissions can aggravate respiratory diseases, particularly asthma, and may also contribute to asthma development in children.

DOJ Compl. ¶ 11 (emphasis added).

### ii.    The CARB Complaint

117.    The CARB Complaint is largely consistent with the DOJ Complaint and alleges that Cummins "sold or caused to be sold 6.7-liter diesel engines installed in model year 2013 through 2023 RAM 2500 and RAM 3500 vehicles ('Subject Vehicles') in California that failed to comply with California and federal laws and regulations covering vehicle emissions and certifications." CARB Compl. ¶ 1.[14] According to the CARB Complaint, "[a]pproximately 97,806 Subject Vehicles were sold in California," which includes sales of the 2013-2018 MY Ram trucks at issue here.

118.    Specifically, the CARB Complaint alleges that "[Cummins'] certification applications for the Subject Vehicles failed to disclose Auxiliary Emission Control Devices ('AECDs') that significantly affect the emissions control systems, making them undisclosed and unapproved. The Subject Vehicles therefore do not match the configurations specified in the certification applications submitted to CARB by Defendant. Based on these inaccurate and incomplete disclosures, [Cummins] obtained Executive Orders allowing import, offer for sale, or sell [sic] non-complaint Subject Vehicles in California." *Id.* ¶ 3.

119.    Like the EPA Complaint, the CARB Complaint also alleges that the Subject Vehicles contained Defeat Devices: "[S]ome of the undisclosed AECDs are defeat devices in

---

[14] The CARB Complaint asserted ten causes of action for violations of the Clean Air Act, 42 U.S.C. § 7604 (*Id.* ¶¶ 65-74) and various sections of California Code (*Id.* ¶¶ 75-130).

violation of California law, either operating alone or in combination with each other." *Id.* ¶ 4. "These undisclosed AECDs and defeat devices in Subject Vehicles, alone or in combination, *cause the vehicles to emit NOx at dramatically elevated levels* during certain real world driving conditions in comparison to their performance during regulated emissions tests." *Id.* ¶ 5 (emphasis added).

120.    As a result, CARB alleged that "[Cummins'] actions violated various California laws concerning vehicle certification and emissions." *Id.* ¶ 6.

121.    California law "requires that each make and model year of vehicle comply with California's emissions standards and be certified by CARB" before being offered for sale in the state. *Id.* ¶ 29. These certifications are referred to as "Executive Orders." *Id.* ¶ 31.

122.    Under the applicable California regulations, manufacturers are required to "list all AECDs installed on their vehicles, including a justification for each AECD, the parameters the AECDs sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and a rationale for why the AECD is not a defeat device. *See Id.* ¶¶ 27, 28. The regulations "prohibit the use of a defeat device in any new vehicles" and "require manufacturers to disclose AECDs and submit running changes and field fixes, respectively." *Id. See also Id.* ¶ 35.[15]

123.    The CARB Complaint alleges that "the application materials submitted by Cummins identified certain AECDs and provide some information on those AECDs. Additional AECDs, however, were either not disclosed to CARB, or, if the AECDs or parts of the AECDs were disclosed, they were not disclosed fully and accurately." *Id.* ¶ 48. "These undisclosed AECDs – operating alone or in combination with each other – detrimentally affect the emission control system of the Subject Vehicles." *Id.* ¶ 49. As a result, CARB alleges that "[o]ne or more of the AECDs in the Subject Vehicles qualify as 'defeat devices' in violation of California law" because "they reduce the effectiveness of the Subject Vehicles' emission control systems and cause the vehicles to emit increased NOx under certain real world driving conditions . . . ." *Id.*

---

[15] "Running changes and field fixes are changes to the engines that occurs [sic] after certification." *Id.* ¶ 27.

¶ 50. However, because Cummins' application materials omitted material information, those "material omissions submitted to CARB allowed the Subject Vehicles to be certified for sale and lease in California despite their non-compliance with California law." *Id.* ¶ 55. Thus, the "Subject Vehicles manufactured and sold or leased in California do not conform in all material respects with the vehicle descriptions in Defendants' applications for certification." *Id.* ¶ 57.

124.    Cummins "knew, or should have known, that its statements of compliance in each of their applications for certification were inadequate regarding their compliance with California and federal emissions laws and regulations, because, among other reasons, each statement of compliance related to a certification application that failed to disclose AECDs and defeat devices . . . and emissions standard failures." *Id.* ¶ 54. The CARB Complaint further alleges that Cummins' "actions constitute multiple willful violations of California Vehicle Code § 27156," which prohibits the sale of a "system that alters or modifies the original design or performance of the motor vehicle pollution control device or system." *Id.* §§ 85, 88. "'Willfully' 'implies simply a purpose or willingness to commit the act, or make the omission referred to.'" *Id.* § 86 (quoting Cal. Veh. Code § 27156). CARB also alleged that Cummins' "knowingly, intentionally, and/or recklessly created or assisted in the creation of a substantial and unreasonable nuisance as a result of [its] actions emission harmful excess emissions in California." *Id.* § 126.

125.    The CARB Complaint goes on to allege that the "Subject Vehicles, as manufactured, do not conform in all material respects to the design specifications described in the applications for certification that purportedly cover them, in that they (a) contain AECDs that were not disclosed or inadequately disclosed in the applications; (b) contain defeat devices; and/or (c) as a result of the AECDs that were not disclosed or inadequately disclosed in the applications, and or defeat devices, the Subject Vehicles contain undisclosed or unapproved on-board diagnostic non-compliances . . . ." *Id.* ¶ 78.

126.    California law further requires the placement of a label in all vehicles sold in California "indicating that the vehicle conforms to applicable California regulations." *Id.* ¶ 107. "However, placement of such a statement on vehicles which, in fact, do not comply with all

applicable California regulations, is prohibited." *Id.* "Defendant placed a statement on each of the Subject Vehicles representing that the vehicle conforms to applicable California regulations, but the Subject Vehicles did not in fact conform to the regulations as described in this [CARB] Complaint." *Id.* ¶ 108.

127.    The CARB Complaint, like the DOJ Complaint, also indicates that its enforcement action was undertaken to protect public health and safety. "The Subject Vehicles have emitted and continue to emit NOx emissions several times the CARB-compliant levels, depending on vehicle type, vehicle loads, and driving conditions (e.g., city or highway)." *Id.* ¶ 58. These excess emissions, CARB alleges, "have caused and are causing significant damage to the state of California, including to the health and safety of its residents and its natural resources." *Id.* ¶ 59.

128.    The CARB Complaint describes the serious impacts NOx emissions have on public health and safety. "NOx emissions, and the particulate matter and ozone pollution to which NOx contributes, are among the most regulated air pollutants in the United States and California due to the large effect these pollutants have on public health and the environment." *Id.* ¶ 60. Specifically, "NOx and particulate matter have been found by scientific studies . . . to reduce lung function and exacerbate symptoms of asthmatics. Long term, chronic conditions such as lung function, asthma, and chronic obstructive pulmonary disease are among the many adverse effects of these air pollutants." *Id.* ¶ 62.

### iii.    The DOJ and CARB Consent Decrees

129.    Concurrently with the filing of the Complaints, two Consent Decrees were filed on January 10, 2024: a joint DOJ and CARB Consent Decree, and a California Partial Consent Decree, which resolves certain aspects of California's claims not otherwise resolved through the joint consent decree. Both Consent Decrees were approved by the Court on April 9, 2024.[16]

130.    As a result of the Consent Decrees, Cummins agreed to unprecedented civil penalties to resolve the allegations against it in the DOJ and CARB Complaints. The Joint EPA / CARB Consent Decree requires Cummins to pay $1.478 billion to the United States, and $164

---

[16] *See U.S. v. Cummins Inc.*, 24-cv-00088 (D.D.C.), ECF No. 15 (Order granting motions to enter consent decrees).

million to California. *See* Joint Consent Decr. ¶ 8.

131.    In addition, the Joint EPA/CARB Consent Decree imposed additional requirements on Cummins to bring the 2013–2018 Class Trucks into compliance and prevent future violations. Among other things, the Joint Consent Decree required Cummins to carry out an "Emission Modification Program" (otherwise known as a "recall") for the purpose of "replacing the original software calibration installed in those vehicles" with an upgraded calibration Cummins certified as being free of defeat devices. *See Id.* ¶ 21. Cummins was further required to implement an extended warranty program covering certain components of the Subject Vehicles' emissions systems (*id.* ¶ 26), engage in enhanced vehicle testing (*id.* ¶ 30), alter its corporate compliance policies and practices to guard against future violations (*id.* ¶ 33) and mitigate the excess NOx emissions caused by the defeat devices (*id.* ¶ 39).[17]

**D.    Emissions Recall 67A and its Material, Negative Effects on the Class Trucks.**

132.    In November 2023, Cummins and FCA commenced an emissions recall to update the emissions control software in the Class Trucks ("Emissions Recall 67A") to comply with federal and California regulations and standards.

133.    Under Emissions Recall 67A, FCA dealers update each Class Truck's emission control software by reprogramming the Truck's Powertrain Control Module ("PCM"). To obtain the recall remedy, Class Members must present their Class Trucks to an FCA dealership whereby the process will take over an hour to complete.

134.    Cummins has made numerous representations and admissions to the public about the recall remedy's effects on Class Trucks.

135.    For example, Cummins admits that to accomplish its stated goal of improving emissions performance in Class Trucks as required by the Consent Decrees, the recall remedy increases the amount of DEF injected into Class Trucks' selective catalytic reduction ("SCR") chamber.

---

[17] CARB's partial consent decree resolved violations of California law related to the onboard diagnostics system in the Subject Vehicles and required an additional payment by Cummins of $33 million to the state of California, among other requirements. *See* Cal. Part. Consent Decr., § 24.

136.    By increasing the amount of DEF injected into the SCR chamber, the recall remedy thereby increases the rate at which the Class Trucks consume DEF. This increases the cost of operating the vehicle, and inconveniences owners who purchase DEF and refill the DEF tank more frequently than prior to the recall.

137.    Cummins also admits that after the recall remedy is performed, certain Class Trucks will experience a decrease in fuel economy under certain conditions. Although Cummins represents that the decrease in fuel economy caused by the recall remedy is expected to be up to 0.5 miles per gallon, Plaintiffs are informed and believe the reduction in fuel economy is greater than Cummins reports and impacts all Class Trucks.[18]

138.    Although Cummins admits that its recall remedy causes negative impacts on the Class Trucks' DEF and fuel consumption rates, Cummins claims that the recall remedy does not impact other aspects of the Class Trucks' performance, such as power and towing ability.

139.    Further, Cummins warns that after the recall remedy is performed, Class Trucks' "check engine" light may turn on, which would then require Class Members to go back to an FCA dealership for a diagnostic check to determine why the check engine light came on.

140.    The real-world experiences of individuals who have had Emissions Recall 67A performed on their trucks strongly suggest that Cummins dramatically understates the negative impacts of the recall remedy. Indeed, many have voiced dissatisfaction with the effects of the recall due to: (1) a significant increase in DEF consumption; (2) a decrease in fuel economy exceeding the 0.5 miles per gallon impact Cummins reported; (3) degraded vehicle performance; (4) spurious and hard-to-clear check engine lights; (5) the need to drive their trucks for hundreds or thousands of miles before they are in a "ready state" for emissions testing; and (6) the unexplained failure of emissions system component parts.

141.    For example, there are dozens of complaints on numerous online automotive and recreational forums and in YouTube videos that the recall remedy caused a significant increase in the amount of trucks' DEF consumption and a significant decrease in fuel economy. Illustrative

---

[18] *See* https://www.cummins.com/recall-information (last visited September 10, 2024). Upon information and belief, Cummins' public statements do not capture the full extent of the recall's impact on the Class Trucks.

examples of these complaints are quoted below:

        a.    "Truck went from getting very close to 18 [MPG] unloaded now 15, towing my 38 foot fifth wheel 12 to 12.8 and now its at 8 mpg with loss of power."[19]

        b.    "Had the update done and my fuel economy went from 23 on the highway to 14! It now gulps fuel towing or not, the engine temps are higher and it's blowing through [DEF] like crazy!"[20]

        c.    "I lost 1.5 MPG on diesel fuel, but that is not the worst part. I did average 450 MPG on one gallon DEF. Now I am only getting 270 MPG. All I know is that I am experiencing a more costly overhead with this mandatory update and with using more [DEF] product."[21]

        d.    "This 67A was performed. Just finished an 800-mile interstate run with a 10K trailer, I went through a full new box of DEF. My mileage was down by 2 mpg."[22]

        e.    "I have had the Cummins emissions recall done, and after towing 2000 miles I believe that the DEF consumption is increased by about 50%."[23]

        f.    ". . . it's been about 2 months since this recall was applied to my truck and I've noticed that it uses DEF faster and it seems to be going through more 'mini-Gen' cycles than before."[24]

        g.    "It took them 8 hours to get the reflash right because it kept throwing

[19] "What Do You Think the Ram Trucks Cummins Recall Was For? (comments section), https://www.youtube.com/watch?v=uThPdBuV6Is (last visited August 27, 2024).

[20] Cummins Forum, https://www.cumminsforum.com/threads/recall-67a-effects.2590938 (last visited August 27, 2024).

[21] RAMFORUMZ, https://www.ramforumz.com/threads/cummins-emissions-recall.295613 (last visited August 27, 2024).

[22] Oh No! Can't Register My Ram HD Cummins Diesel Without Dealing with This Emissions Recall (comments section), https://www.youtube.com/watch?v=Lyqo5ryXHTY&t=2s (last visited August 27, 2024).

[23] Air Forums, https://www.airforums.com/forums/f463/cummins-diesel-recall-250189.html (last visited August 27, 2024).

[24] Turbo Diesel Register, https://www.turbodieselregister.com/threads/fca-recall-67a.274537 (last visited August 27, 2024).

1  codes. I have found that I am using 50-60% more [DEF] over a set route

2  and load than before."[25]

3      h.  "Got mine done my [DEF] consumption went to almost double . . . ."[26]

4  142.  These complaints corroborate Plaintiffs' post-recall experiences, as detailed above.

5  143.  There are also numerous complaints that the recall remedy caused reductions in

6  performance, spurious and hard to extinguish check engine lights, and additional engine and

7  emissions systems problems. Illustrative examples of these complaints are quoted below:

8      a.  "The two things that I have noticed since getting [the recall] . . . is that it

9          has some rough idle spells when the engine is cold that it didn't have

10         before and I've noticed that lifting off of the throttle at slow speeds (again,

11         mostly when it's cold), my truck's forward momentum just absolutely dies

12         (like driving into the sand or something) . . . ."[27]

13     b.  "My work truck had this reflash performed last week. I've noticed less

14         power and a greater fuel consumption."[28]

15     c.  "I received the 67A recall notice so I brought in the truck for the re-flash.

16         On the way home I had a turbo problem where I had no power and it would

17         only go 5 mph. I never had a turbo problem before bringing my truck in for

18         the 67A re-flash. So, if I were you guys I would not bring my truck in for

19         this recall."[29]

20     d.  "Following the update the check engine light came on (P20e). I took it

_____

[25] Oh No! Can't Register My Ram HD Cummins Diesel Without Dealing with This Emissions Recall (comments section), https://www.youtube.com/watch?v=Lyqo5ryXHTY&t=2s (last visited August 27, 2024).

[26] What Do You Think the Ram Trucks Cummins Recall Was For? (comments section), https://www.youtube.com/watch?v=uThPdBuV6Is (last visited August 27, 2024).

[27] Turbo Diesel Register, https://www.turbodieselregister.com/threads/fca-recall-67a.274537 (last visited August 27, 2024).

[28] Oh No! Can't Register My Ram HD Cummins Diesel Without Dealing with This Emissions Recall (comments section), https://www.youtube.com/watch?v=Lyqo5ryXHTY&t=2s (last visited August 27, 2024).

[29] HDRAMS, https://hdrams.com/forum/index.php?threads/fca-2017-3500-cummins-6-7-ho-emissions-recall-67a.16033/page-2 (last visited August 27, 2024).

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

1    back to the dealer and was told they had similar problems with other trucks

2    following the recall. The dealer told me they are working with FCA to

3    rectify the issue. After the dealer had the truck for a week and a half [t]hey

4    told me I needed a new SCR [selective catalytic reduction] and DEF

5    injector."[30]

6    e.    "Had recall done and approx. 200 miles later check engine light come on

7          so took to the dealer and he tried to reset the code and then truck pops up

8          with a DEF problem and check engine problem. Made an appt. 2 days later

9          for a diagnostic to find out what is going on. Results were code U029E-lost

10         communication with NOx sensor. This is a 2016 Dodge Ram 3500 Truck

11         with 35282 miles. As it sits right now I can't use my truck because it is

12         going to go into the 5 mile per hour mode. Totally frustrated at this

13         point."[31]

14   f.    "My Ram 2500 went for the 67A recall. The minute I drove away I got

15         engine light on. Code P2201 emission related. I am hearing lots of people

16         have similar issue after performing same recall."[32]

17   g.    "Recall #67A performed and at the dealer with code P2201. NOx sensors

18         to be replaced. Over the phone FCA denied special warranty coverage per

19         settlement [with the EPA] on 01/10/2024. Contacted CARB and it appears

20         that they are aware of the issue (denied warranty) and asked me to send

21         them an e-mail with all the info."[33]

22   h.    "I had an appointment for the re-programming to comply with 67A this

23         morning (Jan-5-2024 @ 7:45 a.m.), but was greeted by several Service

24         Advisors that they had just received a message from a Regional Service

---

[30] Cummins Forum, https://www.cumminsforum.com/threads/67a-recall-problems.259075 (last visited August 27, 2024).

[31] *Id.*

[32] *Id.*

[33] *Id.*

Advisor that the current software was prone to "brick" system randomly, and that RAM Dealer says they will wait for programming updates, with the caveat promise that I can have it accomplished when I come in for my next oil change."[34]

i.  "I just had mine done . . . when I took it in for the Diesel Oil Change Program. I was in and out in two hours. Funny thing though, a week later I had it back to the selling dealer for another warranty issue and I'm five miles down the road and the DEF System service light comes on."[35]

j.  "We are approaching 4 months and I've driven my truck 7 days since the recall completed on March 11. After well over a month of pleading for help the problem was finally addressed and its be a disaster since then. Immediately after original recall, nox1 fail, after immediately replacement of nox1... nox 1 fail. Said it was a bad sensor...sure it was. After the second nox sensor I didn't even get back to the freeway before codes for the scr assembly. [Personnel] at dealer had to call in the special star team to solve and so they replaced scr. Took a month. Two days later after picking up...codes for scr assembly. The dealer says it has nothing to do with the recall which is odd since I have a direct contact to stellantis after going [to] the epa advisors from the settlement and she says oh yea we have more trucks with the issue and I'm not alone."[36]

144.    Many have also complained that the PCM's software update significantly frustrated their ability to obtain a smog certification for mandatory vehicle registration, wasting considerable time and money. Illustrative examples of these complaints are quoted below:

a.  "I had the recall done on my 2018 ram 3500 in February, my registration

---

[34] RAMFORUM.com, https://www.ramforum.com/threads/fca-emissions-recall-67a.205085/page-2 (last visited August 27, 2024).

[35] RAMFORUM.com, https://www.ramforum.com/threads/fca-emissions-recall-67a.205085/page-5 (last visited August 27, 2024).

[36] Cummins Forum, https://www.cumminsforum.com/threads/67a-recall-problems.2590753/page-15#replies (last visited August 27, 2024).

said it was required for renewal. After 1500 miles and 2 stays at the

dealership who tell me nothing is wrong keep driving it, it still will not

pass smog. I have spent $$$ of wasted fuel, hours of just driving in circles

doing all these crazy drive cycles that were never intended for consumers

to do, and are unsafe to perform on public roads and highways. [P]lease

report all problems to: Consumers Affairs, Bureau of Automotive Repairs.

www.bar.ca.gov. They know there is a problem with recall 67A but have

not had enough formal complaints to escalate for investigation."[37]

b.  "Had my 2016 2500 in for the emissions software update, now the truck

does NOT pass smog and therefore the truck can't complete it's DMV reg.

OBD is not reading the O2 sensor. Dealer says I need to drive it 1-2 K

miles. So here we are 2500 miles later, OBD is STILL not reading the O2

sensor. My cost per mile, and now a trip to DMV to get an extension to my

registration should warrant more than a 10% discount on my next oil

change. Crap like this does not bode well for future sales of Ram or

Cummins."[38]

c.  "Did recall 67A in February. Failed March 31st smog. 3 incomplete

monitors. BP, PM, HCCAT. Called dealer that did recall and was told to

drive it. I have driven 1100 miles and done all drive cycles at least 3

times."[39]

d.  "It's a problem as far as passing emissions, it has to clear all the monitors.

With my truck it takes nearly 1500 miles to clear them all. The only way

you are going to get those monitors to clear are miles, and key cycles,

---

[37] Cummins Forum, https://www.cumminsforum.com/threads/67a-recall-problems.2590753 (last visited August 27, 2024).

[38] RAMFORUM.com, https://www.ramforum.com/threads/fca-emissions-recall-67a.205085/page-2 (last visited August 27, 2024).

[39] Cummins Forum, https://www.cumminsforum.com/threads/recall-67a-effects.2590938 (last visited August 27, 2024).

1          when they clear you'll pass."[40]

2     e.     "My truck requires a smog check to complete the registration. Well, the

3            truck did not pass smog. The tech said the truck needs to be driven for at

4            least 200 miles on the highway at 70-80 mph."[41]

5     f.     "MY TRUCK WILL NOT pass SMOG AFTER RECALL!!!! 2018 Ram

6            2500 Cummins failed a California emissions test [after] Ram completed the

7            recall. A truck is about as useless as a wheelbarrow in CA without a smog

8            cert."[42]

9          145.    These complaints, many of which are supported by Plaintiffs' own experiences

10    and observations, undermine Cummins' representation that the recall remedy would come at "no

11    cost" to Class Members. The costs to operate the Class Trucks over their period of ownership or

12    lease have increased as a result of the recall remedy because the Class Trucks consume more fuel

13    and DEF than they did pre-recall. Additionally, Class Members are required to incur significant,

14    unreimbursed out-of-pocket costs to participate in the recall, especially for Class Members who

15    do not live near an FCA dealership capable of performing the recall remedy. And to the extent the

16    recall results in decreased performance—including, *e.g.*, towing power, torque, etc.—all Class

17    Members are left with vehicles that do not perform as initially represented.

18         146.    Furthermore, the considerable number of public complaints posted in high-profile

19    on-line truck forums and in videos about the many difficulties, inconveniences, and costs

20    associated with the emissions recalls—as well as the high-profile consent decree between

21    Cummins and the EPA—has reduced the resale value of the Class Trucks.

22

23

24    [40] Cummins Forum, https://www.cumminsforum.com/threads/67a-recall-problems.2590753 (last
25    visited August 27, 2024).

      [41] RAMFORUMZ, https://www.ramforumz.com/threads/did-not-pass-smog-following-cummins-
26    emissions-recall-67a.296680 (last visited August 27, 2024).

27    [42] 2013-2023 Ram 2500 & 3500 Cummins EPA emissions recall & updates latest information
      DEF MPG impact? https://www.youtube.com/watch?v=qY9hRqu8B_4 (comments section) (last
28    visited August 27, 2024).

E.    **Defendants' Misrepresentations and Omissions In Connection with the Sale and Lease of the Class Trucks.**

   i.    **FCA's misrepresentations and omissions: "super-clean," "emissions compliant," "lowest emitting diesel engine ever produced."**

147.    FCA's Marketing materials for Class Trucks repeatedly advertise the Class Trucks as featuring a "next generation Diesel Exhaust Fluid (DEF) System," at times explicitly and falsely stating that the Class Trucks' "super-clean" emissions system "lower[s] green-house gas emissions" and is "fully compliant" with federal emissions mandates.

148.    For example, the brochure for the 2013 2500/3500 Class Trucks states that: "For



2013, Cummins improves the classic Turbo Diesel in Ram Heavy Duty models with a Next-Generation Diesel Exhaust (DEF)/Select Catalytic Reduction (SCR) system that's ***fully compliant with federal mandates***."[43] (Emphasis added).

149.    Again, in 2017, FCA's promotional materials explicitly and falsely represented that all "Cummins Turbo Diesels" available in Ram 3500 pickups "meet stringent Federal emissions

---

[43] *See* brochure titled "2013 Ram 2500/3500," at 6, available at https://www.ramtrucks.com/assets/pdf/brochures/ram_2500_3500.pdf (last visited Sept. 3, 2024).

standards with an ingenious Diesel Exhaust Fluid (DEF) System."[44]



# DIESEL POWERTRAIN

## RAM 2500/3500

**6.7L CUMMINS® TURBO DIESEL:** 350 HP / 660 LB-FT OF TORQUE
The Cummins Turbo Diesel for Ram Heavy Duty pickups is available in three separate calibrations. **All feature the class-exclusive⁸ "smart" diesel exhaust brake for improved braking and control, especially on downhill grades.** The 350 / 660 version of the Cummins Turbo Diesel churns out stunning torque and ample horsepower; the powertrain configuration mates it only to the class-exclusive⁸ 6-speed manual transmission. Available for Ram 2500/3500 pickups.

## RAM 2500/3500

**6.7L CUMMINS TURBO DIESEL:** 370 HP / 800 LB-FT
This calibration translates into radically high torque output, giving Ram Heavy Duty models extra clout for the job. Like all Cummins engines, it features the "smart" diesel exhaust brake and offers **superb unaided cold-start capability in temperatures as low as −20° F.** The 370 / 800 calibration is partnered with the dependable and trusted 68RFE 6-speed automatic transmission. It's available only on Ram 2500/3500 Heavy Duty pickups.

## RAM 3500

**6.7L CUMMINS HIGH OUTPUT TURBO DIESEL:** 385 HP / 900 LB-FT
The available High Output calibration is mated only to the AISIN® 6-speed automatic. With its **stellar available torque of 900 lb-ft**, the Cummins HO gives Ram 3500 pickup models indisputable capability for the toughest towing and hauling assignments.

All Cummins Turbo Diesels meet stringent Federal emissions standards with an ingenious Diesel Exhaust Fluid (DEF) System. Available only on Ram 3500 pickups.

150. FCA's promotional brochures for the 2014-2018 Class Trucks similarly advertised the Class Trucks as featuring a "next-generation" and even "super-clean" DEF system, as exemplified in the 2018 brochure below.[45]

---

[44] *See* brochure titled *"Ram Commercial 2017 Ram Pocket Guide,"* at 6, available at https://www.ramtrucks.com/assets/pdf/brochures/US-17MY-Ram-Commercial-Spec-Insert_eBrochure.pdf (last visited Sept. 4, 2014).

[45] *See* brochure titled "2014 Ram Pickups," at 30, available at

*Footnote continued on next page*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24  https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last visited Sept. 4, 2024); brochure titled, "2015 Ram 2500/3500," available at

25  https://cdn.dealereprocess.org/cdn/brochures/ram/2015-2500.pdf (last visited Sept. 4, 2024); brochure titled "2016 Ram 2500/3500," available at

26  https://cdn.dealereprocess.org/cdn/brochures/ram/2016-2500.pdf (last visited Sept. 4, 2024); brochure titled "2017 Ram 2500/3500," available at https://www.auto-

27  brochures.com/makes/ram/Ram_US%20HD_2017.pdf (last visited Sept. 6, 2024); brochure titled

28  "2018 Ram 2500/3500" available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2018.pdf (last visited Sept. 4, 2024).

151.    Press Kits for the Class Trucks, developed and circulated by FCA's holding company Stellantis, also emphasized the quality of the Class Trucks' emissions system. For example, one 2013 Press Kit states that, "[t]he SCR-equipped diesels, which can run on B-20 biofuel, *also operate cleaner by lowering greenhouse-gas emissions* and better managed soot production than Lean NOx Trap (LNT) technology."[46] (Emphasis added).

152.    And the owner's manuals for the Class Trucks likewise represent that the Cummins diesel engine "*meets all EPA Heavy Duty Diesel Engine Emissions Standards*" (or alternatively "*all diesel emissions standards*"), and further that Cummins engine is the (or "one of the") "*lowest emitting diesel engine[s] ever produced*." [47] (Emphasis added).

153.    As required by California law, FCA also placed a label in each Class Truck representing that the vehicle conformed to applicable California regulations, including California emissions standards.

154.    These representations were deceptive and omitted material information about the Class Trucks' Defeat Devices and excessive emissions.

---

[46] *See* "Press Kit: 2013 Ram Heavy Duty – Ram's 2013 Heavy Duty Lineup Features Best-in-class Capability, New Technology and New Features," available at https://embargoed.stellantisnorthamerica.com/newsrelease.do?id=13217&mid=71 (last visited Sept. 3, 2024).

[47] *See* "2013 Owner's Manual Ram Truck Diesel Supplement," at 124, available at https://www.dezosmanuals.com/wp-content/uploads/2021/09/2013-Ram-Truck-OM-Diesel-Supplement.pdf (last visited Sept. 6, 2024); "2014 Owner's Manual Ram Truck Diesel Supplement," at 172, available at https://www.fcacanada.ca/owners/en/manuals/2014/2014E-RAM_15_25_35_45_55_Diesel-SU-6th.pdf (last visited Sept. 6, 2024); "2015 Owner's Manual Ram Truck Diesel Supplement," at 183, available at https://www.fcacanada.ca/owners/en/manuals/2015/2015E-RAM_15_25_35_45_55-Diesel-SU-4th_R1.pdf (last visited Sept. 6, 2024); "2016 Owner's Manual Ram Truck Diesel Supplement," at 166, available at https://www.fcacanada.ca/owners/en/manuals/2016/2016-RAM_15_25_35_45_55_Diesel-SU-4th_R1.pdf (last visited Sept. 6, 2024); "2017 Owner's Manual Ram Truck Diesel Supplement," at 113, available at https://www.dezosmanuals.com/wp-content/uploads/2021/09/2017-Ram-Truck-Diesel-OM-Supplement.pdf (last visited Sept. 6, 2024); "2018 Ram Truck Diesel Supplement," at 108, available at https://www.fcacanada.ca/owners/en/manuals/2018/2018E-RAM-15_25_35_45_55-Diesel_OM_SU-1st.pdf (last visited Sept. 6, 2024).

1

2

**ii.**   **FCA's misrepresentations and omissions: "class-leading" fuel economy, low cost of ownership, and high-performance.**

3

155.    FCA also heavily marketed the Class Trucks' purported high performance and low

4

cost of ownership (including low-DEF consumption and fuel economy)—features that would be

5

significantly compromised by the emissions recall necessitated by the Defeat Devices.

6

156.    In addition, FCA was particularly aware that DEF consumption was material to the

7

average consumer of diesel vehicles and regularly advertised the Class Trucks' "low cost of

8

ownership."[48]

9

157.    Press Kits for the Class Trucks, developed and circulated by FCA's holding

10

company Stellantis in 2013 and 2014 similarly claimed that the Class Trucks have a low

11

operating cost due, in part, to high fuel economy: "Operating costs are of great consideration for

12

owners who use their trucks for work. The [] Ram Heavy Duty holds class-leading features in:

13

Fuel economy with introduction of a new DEF system."[49] (emphasis added). FCA further

14

represented that the "new diesel exhaust after-treatment" "contributes to a 10 percent fuel-

15

16

[48] *See* brochure titled "2013 Ram 2500/3500," available at

17

https://www.ramtrucks.com/assets/pdf/brochures/ram_2500_3500.pdf (last visited Sept. 4, 2024); brochure titled "2014 Ram Pickups," at 30, available at

18

https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last visited Sept. 4, 2024); brochure titled "2015 Ram 2500/3500,"

19

https://cdn.dealereprocess.org/cdn/brochures/ram/2015-2500.pdf (last visited Sept. 4, 2024); brochure titled "2016 Ram 2500/3500," available at

20

https://cdn.dealereprocess.org/cdn/brochures/ram/2016-2500.pdf (last visited Sept. 4, 2024);

21

brochure titled "2017 Ram 2500/3500," available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2017.pdf (last visited Sept. 6, 2024); brochure titled

22

"2018 Ram 2500/3500" available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2018.pdf (last visited Sept. 4, 2024).

23

[49] *See* "Press Kit: 2013 Ram Heavy Duty – Ram's 2013 Heavy Duty Lineup Features Best-in-

24

class Capability, New Technology and New Features" available at

25

https://embargoed.stellantisnorthamerica.com/newsrelease.do?id=13217&mid=71 (last visited Sept. 3, 2024); "Press Kit: 2014 Ram Heavy Duty – 2014 Ram Heavy Duty – The King of

26

Capability Offers Exclusive Air Suspension and an All-new Best-in-class V-8 Engine," available at https://media.stellantisnorthamerica.com/newsrelease.do?id=14500&mid=746 (last visited

27

Sept. 4, 2014); *see also* "Press Kit: 2013 Ram Heavy Duty – The Most Capable Heavy Duty and Chassis Cab Trucks on the Market," available at

28

https://embargoed.stellantisnorthamerica.com/newsrelease.do?id=13217&fIId=13127&mid=71 (last visited Sept. 3, 2024) ("The new Ram Heavy Duty offers outstanding fuel efficiency").

economy gain."[50] (emphasis added).

158.     FCA's promotional brochures for the 2014-2018 Class Trucks similarly advertised improved fuel efficiency as a result of advanced engineering, as exemplified below.[51]



# MORE STRENGTHS THAN EVER.
# THIS IS THE YEAR OF RAM.

For 2014, the Ram pickups benchmark it all: strength for towing and hauling, exceptional fuel-efficient performance — all of it backed by the most comprehensive powertrain choices in our history.

The groundbreaking new 3.0-liter EcoDiesel V6, available for Ram 1500, is joined by the formidable 6.4-liter HEMI® V8, now available for Ram Heavy Duty. The class-exclusive[1] TorqueFlite® 8 for 1500 and AISIN® heavy-duty transmission for 3500 have long separated Ram pickups from the wannabes. And, for 2014, suspension improvements to Ram 2500 give it job-ready distinction. Your Ram truck is a muscular and toned partner willing to work.

Comfort. Connectivity and Capability so good, you're backed by a host of best-in-class attributes that let you do it all with confidence. This is the year of Ram. Get more when you click over to **RAMTRUCKS.COM**

159.     As discussed herein, however, the Class Trucks' "low cost of ownership"—a material feature to the Class—is compromised by the emission recall, which results in significantly increased DEF consumption.

160.     The same is true for the Class Trucks' purported "gains" in fuel economy. Such representations would also turn out to be false and misleading as these fuel economy "gains" could be achieved only through emissions cheating. With the emissions brought to legal limits, the fuel economy decreases significantly.

161.     FCA's representations about the Class Trucks' purportedly outstanding power and performance were misleading for the same reason—as those features too have been compromised

---

[50] *Id.*

[51] *See, e.g.*, brochure titled "Ram Pickups: Ram 1500, Ram Heavy Duty 2500/3500," at 2, available at https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickup_truck.pdf (last visited Sept. 6, 2024); "2014 Ram Pickups," at 35, available at https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last visited Sept. 4, 2024); "2017 Ram 2500/3500," at 4-5, available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2017.pdf (last visited Sept. 6, 2024); "2018 Ram 2500/3500," available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2018.pdf (last visited Sept. 4, 2024).

under the emissions recall. To be clear, these features were heavily marketed to consumers, including Plaintiffs and the Class.

162.    A Stellantis Press Kit for 2017 similarly advertised the Class Trucks' "outstanding pulling power, braking, fuel economy, comfort, and handling under extreme towing conditions," by publicizing an award given by The Fast Lane Truck.[52]

163.    In addition, FCA's advertisements for Class Trucks repeatedly emphasize the Class Trucks' performance, including best-in-class available torque and towing capacity, as exemplified below.[53]

---

[52] See "*King of the Hill – 2017 Ram Heavy Duty Wins Gold Hitch Award From The Fast Lane Truck (TFLtruck)*" available at
https://media.stellantisnorthamerica.com/newsrelease.do?id=18230&mid=71 (last visited Sept. 4, 2024).

[53] See brochure titled "2013 Ram 2500/3500," at 6 &10, available at
https://www.ramtrucks.com/assets/pdf/brochures/ram_2500_3500.pdf (last visited Sept. 4, 2024); brochure titled "2014 Ram Pickups," at 3, available at
https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last visited Sept. 4, 2024); brochure titled "2015 Ram 2500/3500,"
https://cdn.dealereprocess.org/cdn/brochures/ram/2015-2500.pdf (last visited Sept. 4, 2024); brochure titled "2016 Ram 2500/3500," available at
https://cdn.dealereprocess.org/cdn/brochures/ram/2016-2500.pdf (last visited Sept. 4, 2024); brochure titled "2017 Ram 2500/3500," available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2017.pdf (last visited Sept. 6, 2024); brochure titled "2018 Ram 2500/3500" available at https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2018.pdf (last visited Sept. 4, 2024).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2500 • 3500 POWERTRAIN

# TOP-LEVEL TORQUE.

## CUMMINS® IS IN CHARGE—WITH
## BEST-IN-CLASS[1] AVAILABLE TORQUE.





New for 2014 Ram 2500 models—and bringing them up to Ram 3500 electrical specs—are the available dual alternators with the Cummins Turbo Diesel. The optional in-tandem 220-amp units churn out an impressive 440 amps, with the invaluable "auto idle-up" automatically adjusting electrical output when greater power is needed.

Green by design: biodiesel compatibility includes full B20 operational compliance—an advantage to every Cummins engine.

Generous—and infrequent—oil-change intervals are part of the low-cost-of-ownership equation: a best-in-class[1] 15,000 miles under normal operation.

"Low-slung"-positioned charge air cooler and faster-sequenced water pumps ramp up efficiency.

## THE 6.7L CUMMINS TURBO DIESEL

**385** HORSEPOWER   **850** LB-FT OF TORQUE

RAM BEST-IN-CLASS '14

**AVAILABLE FOR RAM 2500/3500.** There's one diesel engine designed to play a pivotal role in the heavy-duty world: the Cummins Turbo Diesel. Virtually indestructible in design, the 6.7L Cummins Turbo Diesel is engineered to the tolerances, quality and durability to power semi-class big rigs. As the available diesel engine for Ram 2500 and 3500 Heavy Duty, the Cummins for 2014 is calibrated specifically for ideal job-rated use and optimal transmission output. The results for Ram Heavy Duty once again culminate in best-in-class[1] available torque for Ram 3500—the working measure for towing and hauling.

Cummins has been a leader in Turbo Diesel technology for decades—and the most recent iterations of Cummins engines prove why. Here's where you'll find three distinctive power outputs for 2014 Ram Heavy Duty. A next-generation Diesel Exhaust Fluid (DEF) System. A super-efficient Diesel Cooling System with 11-blade fan. A class-exclusive[1] "smart" diesel exhaust brake. And, of course, a Cummins High Output version that gives Ram 3500 best-in-class[1] available torque of 850 lb-ft.

Cummins + Ram Heavy Duty. The combination actually adds up to more than two million applications—the growing figure that sums up the enduring quality of this working partnership.

• **Best-in-class**[1] **towing** for Ram 3500 is part of the Cummins legacy. Equip your truck with the available Cummins High Output Turbo Diesel, and take advantage of 850 lb-ft of torque and 385 horsepower, with towing rated at 30,000 lb. (All towing figures apply to trucks that have been properly equipped.)

• Incredible torque for Ram 2500 comes from the available Cummins rated at 370 hp and 800 lb-ft of torque, mated to the proven 68RFE 6-speed automatic; this beefed-up powertrain configuration is also available for 2014 Ram 3500 models.

• **The class-exclusive**[1] **G56 6-speed manual** transmission is the standard powertrain partner to the 350 hp/660 lb-ft Cummins Turbo Diesel. The 6-speed manual offers exceptional control when towing and hauling, and its availability for Ram 2500/3500 clearly separates Ram Heavy Duty from the contenders.

• A recently revised Diesel Cooling System includes a revised Dual Radiator System; the modified engineering reduces heat by some 25% over the previous design.

1
2
3
4
5
6
7
8
9
10
11
12
13
14





15

16      164.    Notably, FCA's marketing materials for Class Trucks routinely emphasize the

17  strong partnership and cooperation between FCA and Cummins, and the benefits thereof. For

18  example, the brochure for 2015 Ram 2500/3500 Heavy Duty trucks, states, "Cummins + Ram

19  Heavy Duty. It's a working combination that's now in excess of two million applications – the

20  ever-growing figure that sums up the enduring quality of this working partnership."[54] Similar

21  statements can be found throughout FCA's marketing.

22          **iii.    Cummins' Misrepresentations and Omissions.**

23      165.    Cummins has similarly represented that the 6.7-liter engine used in Class Trucks

24  meets federal and CARB emission standards or otherwise results in cleaner emissions. At the

25  same time, Cummins advertised the 6.7-liter engine used in Class Trucks as increasing both fuel

26  efficiency and performance.

27  ────────────────

28  [54] *See* brochure titled "2015 Ram 2500/3500,"
    https://cdn.dealereprocess.org/cdn/brochures/ram/2015-2500.pdf (last visited Sept. 4, 2024).

166.     The Cummins 2012-2013 Sustainability Report, for example, includes an article titled "Ram-Cummins partnership celebrates major milestones: Enduring relationships pass the test of time whether it's a marriage, a friendship or a business relationship. That's certainly true of the Ram Truck-Cummins diesel partnership." The article further claims that the 2013 Cummins-powered Ram HD trucks feature "[a] 10 percent fuel economy improvement," "[b]est-in-class 850 lb-ft of torque" and "[i]mproved towing thanks to a "Smart" exhaust break."

167.     Cummins 2013-2014 Sustainability Report states that for the 2013 6.7-liter model year, "Cummins began adding Selective Catalytic Reduction (SCR) after-treatment" "***to reduce emissions and improve fuel efficiency***." Further claiming that "[t]he 6.7L Turbo Diesels with SCR have seen fuel economy increases of 10 percent or more while still providing best-in-class towing capacity to Ram owners." In the same report, Cummins again touts its relationship with Ram, noting that the "2014 Cummins powered Ram represents a 25-year partnership between Chrysler and Cummins."

168.     In August 2014, Cummins announced that its 6.7-Liter Turbo Diesel engine that powers the Ram Heavy-Duty lineup "***was the first diesel engine in a medium-duty vehicle certified to meet Low Emission Vehicle III standards from the California Air Resources Board (CARB)***." Jeff Caldwell, General Manage – Global Pickup and Van Business, explained that:

> Being the first in this segment to certify to these new standards ***demonstrates our commitment to the environment and meeting more stringent requirements*** without hardware changes allows us to maintain the proven capability and reliability that our customers have grown to expect.

169.     In 2015, Cummins website advertised its 6.7-liter engine in Ram Heavy Duty Trucks, stating:

> Working closely to integrate with Ram, a more aggressive calibration for the Cummins 6.7L Turbo Diesel produces an additional 15 lb.-ft. of torque. This improvement places the coveted engine ahead of the competition with 865 lb.-ft. of torque, ***while maintaining performance and EPA compliance***.

170.     In 2016, Cummins published an article on its website titled, "Follow the Liter – The Evolution of the Cummins 5.9L to the 6.7L Pickup Engine." In the article, Cummins stated that the model-year 2013.5 engine introduced "a number of performance and environmental

enhancements." Cummins further represented that:

a.  "The edition of SCR (Select Catalyst Reduction) technology **delivered a 10% boost to fuel efficiency and another increase in peak torque**, while doubling the 6.7L's oil change intervals."

b.  "The new 6.7L Turbo Diesel retains the familiar cast iron block and cylinder heads of the 5.9L, but advances in fuel and air delivery change nearly everything else, especially power ratings and maintenance intervals – now at 15,000 miles. The 6.7L produces up to 900 lb-ft torque and 385 HP. Plus, full torque is reached at a low 1,700 RPM. This makes the ride in today's Cummins-powered RAM 2500 and 3500 models quieter, smoother and more powerful than ever before. Beyond the benefits of increased displacement, advances in **Cummins technology continue to set the bar for power, fuel economy, durability and clean emissions**."

171.  That same year, Cummins published another article on its website titled "DOES Cummins Make the World's Best Diesel Engines?" The article similarly touted the power of the 6.7-liter engine in Class Trucks:

> Cummins is dedicated to giving our customers the power they need to get the job done. Our diesel engines are engineered to maximize torque and horsepower. From efficient 49-horsepower (37 kW) off-highway engines to mammoth 4400-horsepower (3132 kW) rail engines, we design every Cummins diesel to deliver exactly what's needed for your specific application. In the pickup truck market, our 6.7-liter inline six-cylinder boasts 385 horsepower (287 kW) and 900 pound-feet (1220 Nm) of best-in-class torque, 50 pound-feet (68 Nm) more than the competition. For tough jobs, there's no substitute for power.

172.  Cummins website for the "6.7L Cummins Turbo Diesel (2018) for Pickup Truck continues to state that:

a.  "The Model Year (MY) 2018 Cummins 6.7L Turbo Diesel engine is a featured option for 2018 RAM 2500 and 3500 pickups and RAM 3500, 4500, and 550 chassis cabs. This dynamic incline 6-cylinder gives Ram class-leading power and towing capacity, producing up to 385 horsepower

1                  and 930 pound-feet torque."

2          b.     "The MY 2013.5+Cummins 6.7L Turbo Diesel reduces operating costs in

3                 today's RAM trucks with a new Selective Catalytic Reduction (SCR) after

4                 treatment that uses Diesel Exhaust (DEF), ***contributing to a 10 percent***

5                 ***increase in fuel economy and best-in-class 15,000-mile oil-change***

6                 ***intervals, keeping more of your hard-earned money in your pocket.***"

7          c.     "Another feature is the "smart" exhaust brake. The VGT™ Variable

8                 Geometry Turbo is enhanced through the addition of a brake feature that

9                 electronically controls the exhaust braking to maintain a set vehicle speed

10                 while descending a grade."

11       173.     In 2019, Cummins published an article titled "Decades of Service Go into

12 Cummins-Powered RAM Trucks," in which Cummins, in recognition of its production of the "3-

13 millionth diesel engine for Ram Trucks," "the latest milestone in a partnership that spans more

14 than three decades." The article includes the following quote from Reid Bigland, Head of Ram

15 Brand:

16         The relationship that Ram Truck has with Cummins is one of the
industry's most enduring, and continues to raise the bar for power

17         and durability... Both companies have benefitted from this
partnership, but Ram customers truly get to enjoy the toughness and

18         best-in-class capability that a Cummins-powered Ram Heavy Duty
truck delivers.

19

20       174.     In addition to omissions and misrepresentation concerning the specific engine used

21 in Class Trucks, Cummins represents throughout its numerous sustainability reports that the

22 company is dedicated to complying with emissions standards globally.

23       175.     For example, Cummins' 2016 GRI Data Book represents that "***Cummins products***

24 ***meet the most stringent emission regulations around the world***" and that "Cummins products

25 consistently achieve fuel economy gains that reduce greenhouse gases."

26       176.     Cummins 2017 and 2018 Product Stewardship Sustainability Reports also claim

27 that "Cummins works collaboratively and proactively with emission regulators globally ***to ensure***

28 ***emission standards are clear, appropriately stringent and enforceable***, in an effort to ensure our

products deliver on our commitments to our customers and the environment in real world use every day."

177. Cummins' representations and omissions above are in direct conflict with their "10 Statements of Ethical Principles," which include: "[1] **We will follow the law everywhere**," … "*[5] We will demand that everything we do leads to a **cleaner, healthier and safer environment**,*" … and "[10] We will create a culture where all employees take responsibility for **ethical behavior**."

**F.     FCA's History and Pattern of Emissions Violations.**

178. The EPA issued a Notice of Violation against Fiat Chrysler Automobiles N.V. (a.k.a. Stellantis N.V.) and FCA US LLC on January 12, 2017, for failing to justify or disclose defeat devices in MY 2014-2016 Ram 1500 EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles.

179. The EPA found that FCA did not disclose or justify various control devices in their COC applications, as required by EPA regulations, and that FCA was in violation of the Clean Air Act each time it sold, offered for sale, introduced in commerce, or imported approximately 103,828 of these EcoDiesel vehicles.

**V.   <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>**

180. All statutes of limitations applicable to Plaintiffs' claims are subject to tolling under the doctrines of fraudulent concealment tolling, the discovery rule, and/or equitable estoppel due to Defendants' ongoing misrepresentations and omissions alleged throughout Plaintiffs' Complaint regarding the Class Trucks, and their ongoing scheme to knowingly and intentionally conceal from Plaintiffs and Class Members the fact that the Class Trucks contain Defeat Devices. Plaintiffs could not have independently discovered the Defeat Devices in their Class Trucks either before they purchased or leased the Class Trucks, or until the U.S. Department of Justice's announcement in December 2023.

**A.     Fraudulent Concealment Tolling**

181. As alleged in detail above, throughout the relevant time period, Defendants actively concealed and failed to disclose the Defeat Devices to Plaintiffs, consumers, the EPA,

1    and CARB, which prevented Plaintiffs and Class Members from learning the truth about the

2    emissions from their Class Trucks.

3         182.   Additionally, throughout the relevant time period, Defendants knew that the Class

4    Trucks emitted pollutants at many times the level a reasonable consumer would expect and in

5    excess of that allowed by law. Nevertheless, Defendants purposefully and knowingly engaged in,

6    or conspired to engage in, pervasive and ubiquitous false and misleading marketing and

7    advertising campaigns that portrayed the Class Trucks as having clean diesel emissions systems,

8    complying with U.S. emissions standards, able to be legally operated within the U.S., and would

9    retain all of its operating characteristics throughout their useful life, including high fuel economy.

10        183.   Defendants knew that disclosing the Defeat Devices to consumers and/or federal

11   and state regulators would have the ultimate effect of reducing the sales and leases of the Class

12   Trucks, as well as the sale and lease prices thereof, or eliminating the sales and leases altogether

13   if it was known that the Class Trucks violated U.S. emissions standards.

14        184.   Further, at the time Defendants made, helped make, or conspired to make false and

15   misleading representations to federal and state regulators regarding the Class Trucks' actual real

16   world emissions, they knew that disclosing the truth would ultimately result in, *inter alia*,

17   regulators disclosing or requiring Defendants to disclose the defects to the public, thereby causing

18   Plaintiffs and Class Members to not purchase or lease the Class Trucks or pay less for them.

19        185.   Had Defendants disclosed the Defeat Devices and the fact that the Class Trucks

20   actually emitted pollutants at a much higher level than gasoline vehicles and other diesel-powered

21   trucks do and at a much higher level than a reasonable consumer would expect, Plaintiffs and

22   Class Members would have reviewed these disclosures and would not have purchased or leased

23   the Class Trucks, or would have paid less for them, and would not have paid a premium.

24        186.   Indeed, Plaintiffs and Class Members reviewed Defendants' representations

25   through various sources, including FCA's website, marketing and advertising materials for the

26   Class Trucks, labels on the Class Trucks, and by discussing Class Trucks with salespeople at

27   dealerships.

28        187.   Defendants intended that Plaintiffs and Class Members rely on their

misrepresentations, omissions, and concealment regarding the emissions of the Class Trucks described above by actively concealing that the Class Trucks contained Defeat Devices. Plaintiffs justifiably relied on these misrepresentations, omissions, and concealment to their detriment.

188.    Given the highly technical nature of Defeat Devices and the specialized and technical knowledge needed to discover them, Plaintiffs could not have independently discovered the Defeat Devices until the U.S. Department of Justice's announcement in December 2023.

189.    Accordingly, Plaintiffs and Class Members were damaged by Defendants' false and misleading representations and fraudulent concealment described herein.

**B.      Discovery Rule Tolling**

190.    At the time they purchased or leased their Class Trucks, due to Defendants' conduct described herein, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Defeat Devices and misrepresenting the true emission qualities of the Class Trucks.

191.    Plaintiffs and Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the true emissions of the Class Trucks, which was discovered by Plaintiffs only shortly before this action was filed.

192.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Trucks.

**C.      Estoppel**

193.    Defendants were under a continuous duty to disclose to Plaintiffs, Class Members, and federal and state regulators the true character, quality, and nature of emissions from the Class Trucks, their emissions systems, and the Defeat Devices.

194.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, performance, and character of the emissions systems, and the emissions, of the Class Trucks.

195.    Even if some Plaintiffs were aware or could have been aware of the facts giving rise to their causes of action within the limitations period of their claims, their inability to timely file their claims are the direct result of Defendants' willful and intentional misconduct described above. It would be unconscionable to enforce the limitation period against Plaintiffs, and gross injustice would result from doing so.

196.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations or warranty mileage and age limitations in defense of this action.

## VI.  CLASS ALLEGATIONS

197.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclass (collectively, the "Class"):

        a.     **The Nationwide Class:** All persons or entities in the United States who own, owned, lease, and/or leased a Class Truck as of December 23, 2023. Class Trucks include 2013 to 2018 Ram 2500 and Ram 3500 trucks equipped with a Cummins 6.7-Liter diesel engine.

        b.     **The California Subclass:** All persons or entities in the state of California who own, owned, lease, and/or leased a Class Truck as of December 23, 2023.

198.    Excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

199.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

200.    This action has been brought and may be properly maintained on behalf of the Class and subclass proposed herein under Federal Rule of Civil Procedure 23.

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

1

**A.      Numerosity**

2        201.      Federal Rule of Civil Procedure 23(a)(1): Class Members are so numerous and

3    geographically dispersed that individual joinder of all Class Members is impracticable.

4    Approximately 630,000 Class Trucks[55] were sold in the United States, and the precise number

5    may be ascertained from Defendants' books and records. Class Members may be notified of the

6    pendency of this action by recognized, Court-approved notice dissemination methods, which may

7    include U.S. Mail, electronic mail, Internet postings, and/or published notice.

8

**B.      Predominance of Common Issues**

9        202.      Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common

10   questions of law and fact, which predominate over any questions affecting individual Class

11   Members, including, without limitation:

12                    a.      Whether Defendants engaged in the conduct alleged herein;

13                    b.      Whether Defendants designed, marketed, distributed, leased, sold, or

14                            otherwise placed Class Trucks into the stream of commerce in the United

15                            States;

16                    c.      Whether Defendants knew about the comparatively and unlawfully high

17                            emissions and, if so, how long Defendants have known;

18                    d.      Whether Defendants designed, manufactured, marketed, and distributed

19                            Class Trucks with Defeat Devices and/or undisclosed AECDs;

20                    e.      Whether Defendants' conduct violates RICO and consumer protection

21                            statutes, and constitutes breach of contract and fraudulent concealment as

22                            asserted herein;

23                    f.      Whether Plaintiffs and Class Members overpaid for their Class Trucks; and

24                    g.      Whether Plaintiffs and Class Members are entitled to damages and other

25                            monetary relief and, if so, in what amount.

26

27

---

28   [55] This figure is likely a slight overestimate as it incorporates a small subset of 2019 vehicles not
     included in the Class.

1

## C.   Typicality

2

203.   Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of Class

3

Members' claims because, among other things, all Class Members were comparably injured

4

through Defendants' wrongful conduct as described above.

5

## D.   Adequacy of Representation

6

204.   Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class

7

representatives because their interests do not conflict with the interests of the other Class

8

Members they seek to represent; Plaintiffs have retained counsel competent and experienced in

9

complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The

10

Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

11

## E.   Declaratory Relief

12

205.   Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act

13

on grounds generally applicable to Plaintiffs and the other Class Members, thereby making

14

appropriate declaratory relief, with respect to each Class Member as a whole.

15

## F.   Superiority

16

206.   Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other

17

available means for the fair and efficient adjudication of this controversy, and no unusual

18

difficulties are likely to be encountered in managing this class action. The damages or other

19

financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the

20

burden and expense that would be required to litigate their claims against Defendants

21

individually, so it would be impracticable for Class Members to seek redress for Defendants'

22

wrongful conduct individually. Even if Class Members could afford individual litigation, the

23

court system could not.

24

207.   Individualized litigation creates a potential for inconsistent or contradictory

25

judgments and increases the delay and expense to all parties and the court system. By contrast,

26

the class action device presents far fewer management difficulties and provides the benefits of

27

single adjudication, economy of scale, and comprehensive supervision by a single court.

28

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

# VII. CLAIMS

## COUNT I
### Violations of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c)–(d)
### (On behalf of the Nationwide Class against Cummins)

208. Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

209. Plaintiffs bring this Count on behalf of the Nationwide Class against Cummins, Inc.

210. At all relevant times, Cummins, along with FCA and other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Trucks and the engines therein, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed to obtain EPA COCs, as well as CARB Executive Orders, and to mislead, deceive, and induce members of the public to purchase the Class Trucks throughout the United States. Through this enterprise, hereinafter referred to as the "Emissions Fraud Enterprise," Cummins conducted and directed a pattern of racketeering activity under 18 U.S.C. § 1961(4).

211. The Emissions Fraud Enterprise constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Cummins conducted its pattern of racketeering activity in the United States.

212. Cummins conducted the Emissions Fraud Enterprise by, among other activities, designing, developing, supplying, advertising, promoting, and distributing the 6.7-liter diesel engine installed in all Class Trucks with FCA as its partner.

213. Although not a RICO Defendant, FCA participated in and was a crucial element of the Emissions Fraud Enterprise by, among other activities with Cummins as its partner, designing, developing, supplying, advertising, and promoting the Class Trucks into which Cummins installed its 6.7–liter diesel engines.

214. Without FCA's involvement, none of the Class Trucks would have been sold to consumers, and at a minimum, FCA recklessly disregarded that the Class Trucks it was selling to

unwitting consumers contained illegal Defeat Devices and emitted illegal amounts of pollution which exceeded the amounts consumers reasonably expected based upon Cummins' and FCA's representations and omissions regarding the Class Trucks' performance.

215. Cummins may not have applied for or received COCs from regulators for the Class Trucks, but it was aware that such applications were made and received by FCA as a part of the Emissions Fraud Enterprise.

216. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

217. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."

218. At all relevant times, Cummins has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, a "legal or beneficial interest in property."

219. Cummins is liable under 18 U.S.C. § 1962(c) because it conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity.

220. As a direct and proximate result of its fraudulent scheme and common course of conduct described throughout this Complaint, the Emissions Fraud Enterprise managed to extract billions of dollars from Plaintiffs and Class Members. As explained in detail below, Cummins' years-long misconduct violated 18 U.S.C. § 1962(c) & (d).

221. Cummins conducted and relied upon FCA to further the Emissions Fraud Enterprise by and among the following manner and means:

    a. Designing, manufacturing, distributing, and selling Class Trucks that emit more pollution than allowed under the applicable regulations and expected by reasonable consumers;

    b. Misrepresenting and omitting material information regarding (or causing

1        such misrepresentations and omissions to be made) unlawfully high

2        emissions of the Class Trucks;

3        c.     Illegally selling and/or distributing the Class Trucks which were not

4        authorized for sale pursuant to a valid COC and/or Executive Order; and

5        d.     Collecting revenues and profits from the sale of the Class Trucks.

6        222.    At all relevant times, the Emissions Fraud Enterprise: (a) had an existence separate

7 and distinct from Cummins; (b) was separate and distinct from the pattern of racketeering in

8 which Cummins engaged; and (c) was an ongoing organization consisting of legal entities,

9 including Cummins, and other entities and individuals associated for the common purpose of

10 designing, manufacturing, distributing, testing, and selling the Class Trucks through fraudulent

11 COCs and Executive Orders, false emissions tests, deceptive and misleading marketing and

12 materials, and deriving profits and revenues from those activities, such as FCA.

13        223.    The Emissions Fraud Enterprise functioned by selling vehicles, including Class

14 Trucks, and their component parts to the consuming public. Many components of these products

15 are legitimate, but Cummins and its co-conspirators, through the Emissions Fraud Enterprise,

16 engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase

17 revenue for Cummins and the other entities and individuals associated-in-fact with the

18 Enterprise's activities through the illegal scheme to sell the Class Trucks through fraud and

19 deception.

20        224.    The Emissions Fraud Enterprise engaged in, and its activities affected, interstate

21 and foreign commerce, because it involved commercial activities across state boundaries, such as

22 the marketing, promotion, advertisement, and sale or lease of the Class Trucks throughout the

23 country, and the receipt of monies from the sale of the same.

24        225.    Within the Emissions Fraud Enterprise, there was a common communication

25 network by which co-conspirators shared information on a regular basis. The Emissions Fraud

26 Enterprise used this common communication network for the purpose of designing,

27 manufacturing, marketing, testing, and selling the Class Trucks equipped with the Cummins 6.7-

28 liter engine to the public nationwide.

226.    While Cummins conducted the Emission Fraud Enterprise, it has a separate existence from the Enterprise, including distinct a distinct status, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

227.    Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, Cummins directed the unit with the purpose of furthering the illegal scheme and the common purposes of increasing their revenues and market share, and minimizing losses, through the illegal sale of the Class Trucks through fraud and deception.

228.    Through the Emission Fraud Enterprise, Cummins engaged in a pattern of racketeering activity to increase revenue and profits by using and/or partnering with FCA to sell the Class Trucks in interstate and foreign commerce, and to increase the emissions credits they earned, thereby allowing them to sell dirty vehicles as well, all for an additional profit. The Emissions Fraud Enterprise involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Class Trucks throughout the country, and the receipt of monies from the sale of the same.

229.    Cummins worked together with FCA, within the Emissions Fraud Enterprise through the following means:

        a.    Designing, manufacturing, distributing, and selling the Class Trucks that, unknown to consumers, emitted greater pollution than permitted under the applicable regulations or expected by reasonable consumers;

        b.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on the Class Trucks' COC and Executive Order applications;

        c.    Introducing the Class Trucks into the stream of U.S. commerce which were not authorized for sale pursuant to a valid COC and/or Executive Order;

        d.    Concealing the unlawfully high emissions from consumers and regulators;

1              e.       Collecting revenues and profits from the sale of the Class Trucks.

2          230.    To carry out, and attempt to carry out, the scheme to defraud, Cummins knowingly

3    conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise

4    through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) &

5    1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343

6    (wire fraud).

7          231.    Specifically, Cummins has committed, conspired to commit, and/or aided and

8    abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.,* violations of

9    18 U.S.C. §§ 1341 & 1343), within the past ten years. The multiple acts of racketeering activity

10   were related to each other, posed a threat of continued racketeering activity, and therefore

11   constitute a "pattern of racketeering activity." The racketeering activity was made possible by

12   Cummins' regular use of the facilities, services, distribution channels, and employees of the

13   Emissions Fraud Enterprise. Cummins knowingly and intentionally carried out the scheme to

14   defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or

15   foreign commerce.

16         232.    Cummins devised and knowingly carried out a material scheme and/or artifice to

17   defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the

18   Nationwide Class using materially false or fraudulent pretenses, representations, promises, or

19   omissions of material facts.

20         233.    Cummins' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not

21   limited to:

22              a.       **Mail Fraud**: Cummins violated 18 U.S.C. § 1341 by sending and

23                       receiving, and by causing to be sent and/or received, materials via U.S.

24                       Mail or commercial interstate carriers for the purpose of executing the

25                       unlawful scheme to design, manufacture, market, and sell the Class Trucks

26                       by means of false pretenses, misrepresentations, promises, and omissions.

27              b.       **Wire Fraud**: Cummins violated 18 U.S.C. § 1343 by transmitting and/or

28                       receiving, and by causing to be transmitted and/or received, materials by

1    wire to execute the unlawful scheme to defraud and obtain money on false

2    pretenses, misrepresentations, promises, and omissions.

3    234.    Cummins' use of the mails and wires includes, but is not limited to, the

4 transmission, delivery, and shipment of the following by the Emissions Fraud Enterprise or third

5 parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

6    a.    Application for COCs submitted to the EPA and CARB and Approved

7    Applications received in the mail for each model year of the Class Trucks;

8    b.    The Class Trucks, including all essential hardware and accessories;

9    c.    Documents facilitating the manufacture and sale of the Class Trucks,

10    including but not limited to invoice, shipping records, bills of lading, and

11    related correspondence;

12    d.    False and misleading emissions tests shared by and among the Emissions

13    Fraud Enterprise;

14    e.    False and misleading emissions tests submitted for each model year of the

15    Class Trucks;

16    f.    False or misleading communications to regulators and the public;

17    g.    Sales and marketing materials, owners' manuals, and warranty information

18    booklets which concealed or otherwise misrepresented the true nature of

19    the Class Trucks;

20    h.    Payments to Cummins and deposits of proceeds.

21    235.    The Emission Fraud Enterprise also communicated by U.S. Mail, by interstate

22 facsimile, and by interstate electronic mail with various other affiliates, regional offices,

23 divisions, dealerships, and other third-party entities in furtherance of the scheme.

24    236.    The mail and wire transmissions described herein were made in furtherance of

25 Cummins' scheme to deceive consumers and lure consumers into purchasing the Class Trucks,

26 which the Emission Fraud Enterprise knew or recklessly disregarded as emitting excessive

27 amounts of pollution and/or otherwise failing to comply with legal requirements.

28    237.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate

wire facilities are hidden from Plaintiffs and Class Members and cannot be alleged without access to Cummins' and FCA's books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred.

238.    In violation of 18 U.S.C. § 1962(d), Cummins used the Emissions Fraud Enterprise to violate 18 U.S.C. § 1962(c), as described herein. In addition to FCA, various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with Cummins in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Cummins and its unnamed co-conspirators throughout the illegal scheme and common course of conduct.

239.    Cummins knew and intended that Plaintiffs and Class Members would rely on the material misrepresentations and omissions made by the Emissions Fraud Enterprise about the Class Trucks. Cummins knew and intended that consumers would incur damages as a result.

240.    Plaintiffs and the Nationwide Class relied upon the Emissions Fraud Enterprises' misrepresentations, omissions, and concealment. Plaintiffs' reliance is made evident by the fact that they purchased Class Trucks that did not comply with emissions regulations, emitted pollutants at a rate which exceeded their reasonable expectations based upon Defendants' representations and omissions regarding the Class Trucks' capabilities, and which never should have been introduced into the U.S. stream of commerce because the Class Trucks, as manufactured, were not covered by a valid COC and/or EO.

241.    The predicate acts, going back at least a dozen years, all generated significant revenue and profits for Cummins at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by Cummins through its direction of the Emissions Fraud Enterprise and furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class Members' funds and avoiding the expenses associated with remediating the Class Trucks.

242.    By reason of and as a result of the conduct of the Emission Fraud Enterprise, and in particular its pattern of racketeering activity, Plaintiffs and Class Members have been injured in

1  multiple ways, including but not limited to:

2      a.    Overpayment at the time of purchase for Class Trucks, in that Plaintiffs and

3            Class Members overpaid for their Class Trucks whose value was

4            artificially inflated by the conduct described herein. Plaintiffs would not

5            have purchased or would have paid significantly less for their Class Trucks

6            if Cummins or FCA had truthfully disclosed the vehicles were unlawfully

7            on the road and/or did not deliver improved emissions and fuel

8            performance over gasoline-powered vehicles; and

9      b.    Increased operating costs and out-of-pocket expenses after obtaining the

10           emissions recall, as well as decreased resale value for the Class Trucks.

11     243.   Cummins' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately

12  caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members

13  are entitled to bring this action for three times their actual damages, as well as

14  injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

15                                    **COUNT II**
                                 **Fraud by Concealment**
16      **(On behalf of the Nationwide Class, or alternatively,**
                   **the California Subclass, against Defendants)**
17

18     244.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

19  set forth herein.

20     245.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or,

21  alternatively, on behalf of the California Subclass, against Defendants.

22     246.   Defendants are liable for both fraudulent concealment and nondisclosure. *See, e.g.*,

23  Restatement (Second) of Torts §§ 550-51 (1977).

24     247.   Specifically, Defendants committed fraud by equipping the Class Trucks with

25  undisclosed unlawful Defeat Devices, attesting that the Class Trucks complied with applicable

26  emissions laws and regulations, altering the PCM and emission control systems to make it appear

27  as though the Class Trucks released much less harmful pollutants during emissions testing than

28  they actually did under real-world driving conditions, installing defective emissions and engine

control software in the Class Trucks, and by a sustained campaign of concealing all of this material information from regulators, Plaintiffs and the Class.

248.    A reasonable customer would not have expected that the Class Trucks they paid for operated differently during normal driving conditions than they did during emissions testing, did not comply with emissions laws and regulations, emitted significantly more pollutants than represented by Defendants to regulators, Plaintiffs, and the Class, and contain defective and unlawful engine control software.

249.    Defendants knew that these undisclosed facts about the Class Trucks would be materially important to customers who were evaluating whether to purchase or lease the vehicles. Defendants ensured that Plaintiffs and the Class did not discover this information through actively concealing it. Defendants intended for Plaintiffs and the Class to rely on their omissions and concealment of facts—which they did by purchasing or leasing the Class Trucks.

250.    Defendants had a duty to disclose the Defeat Devices and that the Class Trucks emitted higher levels of harmful pollutants during normal driving operation. These important facts were known and/or accessible only to the Defendants, including due to their involvement in the design, installment, testing, and certification of the 6.7-liter engine and associated emissions control system in the Class Trucks. Defendants also knew that these technical facts—especially the emissions defeat software loaded on the Class Trucks' PCM—were not known to or reasonably discoverable by Plaintiffs and the Class.

251.    Defendants also concealed the fact they knew that Emissions Recall 67A would eventually be necessary to bring the Class Truck into compliance with emissions standards and that this inevitable modification to the PCM' emissions control logic would degrade the performance of the Class Truck to include, but not limited to, an increase in diesel fuel and DEF consumption. Defendants knew or should have known that an emissions recall would subject Plaintiffs and the Class to increased operating expenses and significant inconvenience associated with having the recall remedy performed on their Class Trucks. Finally, Defendants knew that the increased dosage rate of DEF, as implemented by Emissions Recall 67A, would increase the wear-and-tear on the DEF system components (*i.e.*, DEF pump and injector) thereby decreasing

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

1    Class Truck reliability and increasing maintenance and repair costs.

2            252.    Defendants also had a duty to disclose the truth about the Class Trucks in light of

3    their affirmative false statements about the Class Trucks with respect to complying with

4    emissions standards. In uniform advertising and marketing materials provided with each Class

5    Truck, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the

6    Class that the Class Trucks emitted significantly more pollution on the road than in regulatory

7    testing. Defendants' wrongful employment of the Defeat Devices was so opaque that it was not

8    discovered by any experts researching and creating content about the Class Trucks and the

9    Cummins 6.7-liter engine for automotive magazines, blogs, and websites.

10           253.    Defendants knew that affirmative statements claiming the Class Trucks complied

11   with all federal and California emissions regulations and standards were misleading, deceptive,

12   and incomplete without disclosing the additional facts set forth above regarding the existence of

13   the Defeat Devices. Because they volunteered to provide information about the Class Trucks that

14   they offered for sale to Plaintiffs and to the Class, Defendants had a duty to disclose the whole

15   truth about the Class Trucks' emission control systems and the actual levels of pollutants emitted

16   by the vehicles during normal driving. They did not.

17           254.    Defendants did not fulfill their duties to disclose material facts about the Class

18   Trucks' emissions control systems Defeat Devices to Plaintiffs and the Class. Instead, they

19   actively concealed the truth and profited from this orchestrated concealment.

20           255.    Defendants suppressed and concealed the facts about the existence of the Defeat

21   Devices and their unlawful function with the intention that Plaintiffs and the Class would be

22   misled about the true condition of the Class Trucks and the 6.7-liter Cummins engine and

23   emission control system with which they were equipped.

24           256.    Defendants' deceptive actions harmed Plaintiffs and the Class. Because

25   Defendants fraudulently concealed the truth about the Class Trucks' emissions characteristics,

26   Class members who purchased or leased Class Trucks suffered ascertainable economic losses.

27   Plaintiffs and the Class suffered damages including but not limited to additional operating costs

28   directly resulting from increased consumption of diesel fuel and DEF after Defendants were

forced to remove the Defeat Devices. Accordingly, Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

257. Defendants' sustained acts of concealment were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich themselves at the expense of the Class. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter similar unlawful behavior by FCA and Cummins and by other manufacturers of diesel engines and diesel-powered vehicles.

258. There are no true conflicts among states' laws that would preclude proceeding on a classwide basis.

**COUNT III**
**Violations of the California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, _et seq._**
**(On behalf of the California Subclass against Defendants)**

259. Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

260. Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

261. California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 _et seq._, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

262. The Class Trucks are "goods" as defined in Cal. Civ. Code § 1761(a).

263. Plaintiffs and the other California Subclass members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California Subclass members, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

264. The purchase and leases of Class Trucks by Plaintiffs and the Class Members constitute "transactions" as defined in Cal. Civ. Code § 1761(e).

265. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the CLRA. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment,

suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Trucks.

266.    As alleged above, Defendants knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose material facts concerning the functionality, reliability, efficiency, performance, safety, and other material features of the Class Trucks and engines, including the Defeat Devices, as well as the negative effects of Emissions Recall 67A, which misled Plaintiffs and the California Subclass.

267.    The necessity of Emissions Recall 67A, and the negative impacts of that recall, including reduced fuel efficiency, increased DEF consumption, and adverse impact on the reliability and durability of the Class Trucks, was a foreseeable result of Defendants' misconduct with respect to the Defeat Devices alleged above.

268.    Defendants' conduct, as described hereinabove, was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

a.    Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods;

b.    Cal. Civ. Code § 1770(a)(3): Misrepresenting the certification by another;

c.    Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

d.    Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

e.    Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

f.    Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

269.    Defendants knew or should have known that their conduct violated the CLRA and would mislead consumers about the true nature of the emissions, performance, durability, and costs to operate the Class Trucks.

270.   In the various channels of information through which Defendants sold and marketed Class Trucks and their engines, Defendants concealed, and failed to disclose material information to Plaintiffs and the California Subclass, which it had a duty to disclose. Defendants owed Plaintiffs and the California Subclass a duty to disclose the truth about their emissions systems manipulation and the negative effects of Emissions Recall 67A because Defendants:

    a.   Possessed exclusive knowledge that they manipulated the emissions system in the Class Trucks to turn off or limit effectiveness in normal driving conditions;

    b.   Possessed exclusive knowledge that Emissions Recall 67A would be necessary and would negatively affect the Class Trucks' fuel efficiency, performance, durability, and reliability, and would result in increased costs to operate and maintain them;

    c.   Intentionally concealed the foregoing from Plaintiffs and the California Subclass; and/or

    d.   Made, helped make, or conspired to make misleading and incomplete representations regarding the emissions system in the Class Trucks and about the effects of Emissions Recall 67A, while purposefully withholding material facts from Plaintiffs and the California Subclass that contradicted these representations.

271.   Defendants' misrepresentations, concealment, and omissions were designed and intended to induce consumers to believe that the Class Trucks were adequately designed, compliant with the law, included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities compared with earlier and competing models, and were reliable so that consumers would purchase and lease the Class Trucks. Reasonable consumers would consider these factors important and material to their purchasing or leasing decision.

272.   Plaintiffs and members of the California Subclass were exposed to and relied on

the misrepresentations, concealment, and/or omissions of Defendants. That reliance was

reasonable, as they had no way of discerning that Defendants' representations regarding the

complex, technical details of the Class Trucks' emissions system and the effects of Emissions

Recall 67A were false and misleading, or otherwise learning the facts that Defendants had

concealed or failed to disclose. Plaintiffs and California Subclass did not, and could not, unravel

Defendants' deception on their own.

273.    Had Defendants adequately disclosed the truth about the Class Trucks, Plaintiffs

and the California Subclass would have seen those disclosures and would not have purchased or

lease the Class Trucks or would have paid less to buy or lease them.

274.    All Plaintiffs seek equitable relief, including restitution. Plaintiffs also seek an

injunction enjoining Defendants' misconduct as alleged herein. Plaintiffs, the California Subclass,

and members of the public will suffer irreparable injury without an injunction. They have an

interest in buying vehicles in the future, often see marketing for Defendants vehicles and diesel

engines, and will consider purchasing FCA vehicles equipped with the Cummins diesel engines,

but have no way of determining whether the vehicles with the Cummins engine are compliant

with emissions laws and regulations, or otherwise perform as advertised.

275.    Furthermore, Defendants are on notice of the issues raised in this count and this

Complaint by way of investigations conducted by governmental regulators. Additionally, on

December 27, 2023, Plaintiffs Biederman and Troedsson sent a notice letter to Defendants in

accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged

violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct

the actions described therein within thirty (30) days of the notice letter. Because Defendants

failed to adequately remedy their unlawful conduct within the requisite time period, Plaintiffs

Biederman and Troedsson seek all compensatory and monetary damages to which they and the

California Subclass members are entitled. Plaintiffs Biederman and Troedsson also seek punitive

damages for Plaintiffs and the Subclass against FCA because its conduct was malicious, willful,

reckless, wanton, fraudulent and in bad faith.

276.    On September 6, 2024, Plaintiffs Joseph Gamba, Trevor Whitehouse, Gary

1  Agostini, Jeffrey Hettinger, Jill Scott, Michael Cappa, and Dusten Acker sent another notice letter

2  to Defendants in accordance with Cal. Civ. Code § 1782(a) of the CLRA, further notifying

3  Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that

4  Defendants correct or agree to correct the actions described therein. If Defendants fail to do so

5  within thirty (30) days of the notice letter, Plaintiffs Joseph Gamba, Trevor Whitehouse, Gary

6  Agostini, Jeffrey Hettinger, Jill Scott, Michael Cappa, and Dusten Acker will seek compensatory

7  and monetary damages to which Plaintiffs and California Subclass members are entitled under the

8  CLRA.

9       277.   Attached hereto as Exhibit A is the Venue Declaration of Plaintiff Biederman

10  required by Cal. Civ. Code § 1780(d).

11       278.   Plaintiffs plead this claim separately as well as in the alternative to their claims for

12  damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiffs have no adequate remedy at law

13  for the future unlawful acts, methods, or practices as set forth above absent an injunction.

14  Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or

15  prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to

16  prevent.

17                               **COUNT IV**
                 **Violations of the California False Advertising Law**
18                   **Cal. Bus. & Prof. Code § 17500, *et seq.***
                 **(On behalf of the California Subclass against Defendants)**
19

20       279.   Plaintiffs incorporate by reference paragraphs 1-207 above as though fully set

21  forth herein.

22       280.   Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

23       281.   Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation …

24  with intent directly or indirectly to dispose of real or personal property … to induce the public to

25  enter into any obligation relating thereto, to make or disseminate or cause to be made or

26  disseminated … from this state before the public in any state, in any newspaper or other

27  publication, or any advertising device, … or in any other manner or means whatever, including

28  over the Internet, any statement … which is untrue or misleading, and which is known, or which

by the exercise of reasonable care should be known, to be untrue or misleading."

282.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, the statements described herein that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other California Subclass members.

283.    Defendants have violated § 17500 because the misrepresentations, omissions, and incomplete representations alleged above regarding the functionality, reliability, efficiency, performance, safety, and other features of the Class Trucks and their engines, as well as the effects of Emissions Recall 67A, were material and likely to deceive a reasonable consumer.

284.    Additionally, the necessity of Emissions Recall 67A, and the negative impacts of that recall, including reduced fuel efficiency, increased DEF consumption, and adverse impact on the reliability and durability of the Class Trucks, was a foreseeable result of Defendants' misconduct with respect to the Defeat Devices alleged above.

285.    All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

286.    Defendants' concealed facts, omissions, and false or misleading representations to Plaintiffs and the California Subclass, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Trucks or to pay a lesser price.

287.    Plaintiffs and the California Subclass reasonably relied on Defendants' false and misleading representations and omissions. Had Plaintiffs and the California Subclass members known about the true nature of the Class Trucks, they would not have purchased or leased the Class Trucks or would have paid less for them.

288.    Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of FCA's deceptive advertising. In paying for

their Class Trucks, Plaintiffs and Subclass Members relied on Defendants' misrepresentations and omissions regarding the functionality, reliability, efficiency, performance, safety, durability and other features of the Class Trucks and their engines. Had Plaintiffs and the California Subclass members known the truth, they would not have purchased or leased their Class Trucks or paid as much for them. Accordingly, Plaintiffs and the California Subclass overpaid for their Class Trucks and did not receive the benefit of their bargain.

289.    Plaintiffs, individually and on behalf of the other California Subclass members, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the other California Subclass members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for any other relief as may be appropriate.

290.    Plaintiffs and the California Subclass seek equitable relief, including restitution, and any other just and proper relief available under the FAL. Plaintiffs also seek an injunction enjoining Defendants' misconduct as alleged herein. Plaintiffs, the California Subclass, and members of the public will suffer irreparable injury without an injunction. They have an interest in buying vehicles in the future, often see marketing for Defendants vehicles and diesel engines, and will consider purchasing FCA's vehicles equipped with the Cummins diesel engines but have no way of determining whether the vehicles with the Cummins engine are compliant with emissions laws and regulations, or otherwise perform as advertised.

291.    Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiffs have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

## COUNT V
### Breach of Express Warranty
### Cal. Com. Code §§ 2313 and 10210
### (On Behalf of the California Subclass against FCA)

292.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

293.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

294.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

295.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

296.    The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

297.    In connection with the purchase or lease of each one of its new Class Trucks, FCA provided an express base vehicle warranty to repair the vehicle in the case of "defects in material and workmanship."

298.    Additionally, the EPA mandates that FCA provide a general emission-related warranty that covers the design and manufacture of all parts of the Class Trucks' emission system, ensuring that the emissions system: (1) is designed, built, and equipped so it conforms with the law at the time of sale to the ultimate purchaser; and (2) is free from defect in materials and workmanship that cause the vehicle to fail to conform with the law. 40 C.F.R. § 1037.120. This warranty provides protection for the for five years or 50,000 miles, whichever comes first. *Id.* FCA provided this additional express warranty for the Class Trucks.

299.    FCA also provided purchasers and lessees of the Class Trucks with a Federal Emission Warranty that covered all catalysts, powertrain control modules, and transmission control modules for a period of eight years or 80,000 miles, whichever comes first.

300.    Furthermore, FCA provided purchasers and lessees of the Class Trucks with a Long-Term Emission Control System Defects Warranty as required by the California Air

Resources Board. This warranty provided that certain enumerated parts in the Class Trucks'
emissions system are free from defects, and FCA would repair them at no cost for seven years or
70,000 miles.

301.    FCA's warranties formed a basis of the bargain that was reached when consumers
purchased or leased Class Trucks. However, FCA knew or should have known that the warranties
were false and/or misleading.

302.    Despite the existence of warranties, FCA failed to inform Plaintiffs and California
Subclass members that the Class Trucks were defectively designed and manufactured to emit
more pollution and achieve worse performance on the road than what was disclosed to regulators
and represented to consumers who purchased or leased them. This design and the Defeat Devices
that effectuate it are defects.

303.    FCA breached the express warranty promising to repair and correct FCA's defect
in materials and workmanship. FCA has not repaired the Class Trucks' materials and
workmanship defects and is unable to do so without negatively affecting the performance of the
Class Trucks.

304.    Affording FCA a reasonable opportunity to cure their breach of written warranties
would be unnecessary and futile here.

305.    Furthermore, the limited warranty promising to repair and correct FCA's defect in
materials and workmanship fails in its essential purpose because the contractual remedy is
insufficient to make California Subclass members whole and because FCA has failed and/or has
refused to adequately provide the promised remedies within a reasonable time.

306.    Accordingly, recovery by Plaintiffs and California Subclass members is not
restricted to the limited warranty promising to repair and correct FCA's defect in materials and
workmanship, and they seek all remedies as allowed by law.

307.    Also, as alleged in more detail herein, at the time FCA warranted and sold or
leased the Class Trucks, it knew that the Class Trucks were inherently defective and did not
conform to the warranties; further, FCA has wrongfully and fraudulently concealed material facts
regarding the Class Trucks. California Subclass members were therefore induced to purchase or

lease the Class Trucks under false and/or fraudulent pretenses.

308.    Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting FCA's defect in materials and workmanship as many incidental and consequential damages have already been incurred because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and California Subclass members' remedies would be insufficient to make them whole.

309.    Finally, because of FCA's breach of warranty as set forth herein, Plaintiffs and California Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

310.    Notice of breach is not required because Plaintiffs and the California Subclass did not purchase or lease their automobiles directly from FCA. Plaintiff and the other California Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Trucks to Plaintiff and the California Subclass. Regardless, FCA was provided reasonable notice of these issues by way of a letter Plaintiffs sent on December 27, 2023, as well as the regulators' investigations.

**COUNT VI**
**Violation of the Song-Berverly Consumer Protection Act,**
**Breach of Express Warranty**
**Cal Civ. Code § 1790, *et seq.***
**(On behalf of the California Subclass against FCA)**

311.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

312.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

313.    Plaintiffs and members of the California Subclass who purchased the Class Trucks in California are "buyers" within the meaning of California Civil Code § 1791(b).

314.    Members of the California Subclass who leased the Class Trucks were "lessees" and FCA was a "lessor" under California Civil Code § 1791(h)-(i).

315.    The Class Trucks are "consumer goods" within the meaning of California Civil

1    Code § 1791(a).

2         316.    FCA is a "manufacturer" of the Class Trucks within the meaning of California

3    Civil Code § 1791(j).

4         317.    FCA made express warranties to members of the California Subclass within the

5    meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

6         318.    As set forth above in detail, the Class Trucks are inherently defective in that they

7    used Defeat Devices and/or did not comply with emissions regulations when being driven on the

8    road. This defect substantially impairs the use and value of the Class Trucks to reasonable

9    consumers.

10        319.    FCA breached the express warranties by, among other things, failing to repair and

11   correct FCA's defect in materials and workmanship. FCA has not repaired the Class Trucks'

12   materials and workmanship defects and is unable to do so without negatively affecting the

13   performance of the Class Trucks.

14        320.    As a result of FCA's breach of the express warranties, members of the California

15   Subclass received goods whose defect substantially impairs their value to Plaintiffs and the other

16   members of the California Subclass. Plaintiffs and members of the California Subclass have been

17   damaged as a result of, *inter alia*, overpayment and the diminished value of FCA's products.

18        321.    Any opportunity to cure FCA's breach of the express warranties is unnecessary

19   and futile.

20        322.    Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of

21   the California Subclass are entitled to damages and other legal and equitable relief including, at

22   their election, the purchase price of their Class Trucks, or the overpayment or diminution in value

23   of their Class Trucks.

24        323.    Pursuant to California Civil Code § 1794, Plaintiffs and the California Subclass

25   are entitled to costs and attorneys' fees.

26        324.    Notice of breach is not required because Plaintiffs and the California Subclass did

27   not purchase or lease their automobiles directly from FCA. Plaintiff and the other California

28   Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-

1    certified/authorized retailers who sold or leased the Class Trucks to Plaintiff and the California

2    Subclass. Regardless, FCA was provided reasonable notice of these issues by way of a letter

3    Plaintiffs sent on December 27, 2023, as well as the regulators' investigations.

### COUNT VII
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On behalf of the California Subclass against FCA)**

7    325.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

8    set forth herein.

9    326.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

10    327.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles

11    under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under

12    § 2103(1)(d).

13    328.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor

14    vehicles under Cal. Com. Code § 10103(a)(16).

15    329.    The Class Trucks are and were at all relevant times "goods" within the meaning of

16    Cal. Com. Code §§ 2105(1) and 10103(a)(8).

17    330.    A warranty that the Class Trucks were in merchantable condition and fit for the

18    ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code

19    §§ 2314 and 10212.

20    331.    The Class Trucks, when sold or leased and at all times thereafter, included illegal

21    Defeat Devices and/or did not comply with emissions regulations when being driven on the road,

22    and were therefore not fit for the ordinary purpose for which vehicles are used.

23    332.    Notice of breach is not required because Plaintiffs and the California Subclass did

24    not purchase or lease their automobiles directly from FCA. Plaintiff and the other California

25    Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-

26    certified/authorized retailers who sold or leased the Class Trucks to Plaintiff and the California

27    Subclass. Regardless, FCA was provided reasonable notice of these issues by way of a letter

28    Plaintiffs sent on December 27, 2023, as well as the regulators' investigations.

333.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and California Subclass members have been damaged in an amount to be proven at trial.

**COUNT VIII**
**Violation of Song-Beverly Consumer Warranty Act,**
**Breach of Implied Warranty**
**Cal Civ. Code § 1790, *et seq*.**
**(On behalf of the California Subclass against FCA)**

334.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

335.    Plaintiffs bring this claim on behalf of the California Subclass against FCA.

336.    Plaintiffs and members of the California Subclass who purchased Class Trucks in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

337.    The Class Trucks are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

338.    FCA is the "manufacturer" of the Class Trucks within the meaning of Cal. Civ. Code § 1791(j).

339.    FCA impliedly warranted to Plaintiffs and the other members of the California Subclass that the Class Trucks were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Trucks do not have the quality that a buyer would reasonably expect.

340.    Under Cal. Civ. Code § 1791.1(a), "implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

        a.    Pass without objection in the trade under the contract description.

        b.    Are fit for the ordinary purposes for which such goods are used.

        c.    Are adequately contained, packaged, and labeled.

        d.    Conform to the promises or affirmations of fact made on the container or label.

341.    The Class Trucks would not pass without objection in the automotive trade

because they share a common design defect in that they were equipped with Defeat Devices and/or did not comply with emissions regulations when being driven on the road, which conceals the vehicles' true performance and emissions. This defect renders the Class Trucks when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

342.    Class Trucks were also not adequately labeled because the labeling fails to disclose the fact that they are defective.

343.    In the various channels of information through which FCA sold and marketed Class Trucks, FCA misrepresented and failed to disclose material information concerning the Class Trucks, which it had a duty to disclose. FCA had a duty to disclose the defect because, as detailed above: (a) FCA knew about the defect; (b) FCA had exclusive knowledge of material facts not known to the general public or the other California Subclass members; (c) FCA actively concealed material facts from the general public and California Subclass members concerning the Class Trucks' true emissions and fuel and DEF economy; and (d) FCA made partial representations about the Class Trucks that were misleading because they did not disclose the full truth. As detailed above, FCA knew the information concerning the Defeat Devices at the time of advertising and selling the Class Trucks, all of which was intended to induce consumers to purchase the Class Trucks.

344.    FCA breached the implied warranty of merchantability by manufacturing and selling Class Trucks that contain undisclosed and illegal Defeat Devices. Furthermore, FCA's use of illegal Defeat Devices in Class Trucks has caused members of the California Subclass to not receive the benefit of their bargain and have caused the Class Trucks to depreciate in value.

345.    Notice of breach is not required because Plaintiffs and the California Subclass did not purchase or lease their automobiles directly from FCA. Plaintiff and the other California Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Trucks to Plaintiff and the California Subclass. Regardless, FCA was provided reasonable notice of these issues by way of a letter Plaintiffs previously sent on December 27, 2023, as well as the regulators' investigations.

346.    Plaintiffs and members of the California Subclass have been damaged as a result

of, among other things, the overpayment and diminished value of the Class Trucks.

347.     Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and other members of the California Subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks.

348.     Under Cal. Civ. Code § 1794, Plaintiffs and the members of the California Subclass are entitled to costs and attorneys' fees.

**COUNT IX**
**Breach of Express California Emissions Warranties**
**Cal. Civ. Code § 1793.2, *et seq*.**
**(On behalf of the California Subclass against FCA)**

349.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

350.     Plaintiffs bring this claim on behalf of the California Subclass against FCA.

351.     Each Class Truck is covered by express California Emissions Warranties as a matter of law. See Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

352.     The express California Emissions Warranties generally provide "that the vehicle or engine is . . . [d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id.* This provision applies without any time or mileage limitation. See *Id.*

353.     The California Emissions Warranties also specifically warrant consumers of light- and medium duty vehicles against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See Id.* The California Emissions Warranties also specifically warrant consumers of diesel-powered heavy-duty vehicles against any defect in any emission-related part for five years or 100,000 miles, whichever occurs first. Cal. Code Regs. tit. 13, § 2036.

354.     California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

355.     Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. See Cal. Civ. Code § 1793.2(d)(2).

356.     Plaintiffs and California Subclass members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because it is unnecessary and futile. Cal. Civ. Code § 1793.2(c).

357.     This First Amended Complaint, as well as the original Complaint and the pre-suit letters described above, are written notice of nonconformity to FCA and "shall constitute return of the goods." *Id.*

358.     Plaintiffs and California Subclass members are excused from any requirement that they allow a "reasonable number of attempts" to bring Class Trucks into conformity with their California Emissions Warranties based on futility because FCA has not repaired the Class Trucks' materials and workmanship defects, and is unable to do so without negatively affecting the performance of the Class Trucks.

359.     In addition to all other damages and remedies, Plaintiffs and California Subclass members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1).

**COUNT X**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of the California Subclass against Defendants)**

360.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

361.     Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

362. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

363. Defendants' conduct, as described herein, was and is unfair, deceptive, and unlawful, in violation of the UCL.

### i.      Defendants Violated the UCL's Fraudulent Prong

364. As alleged above, Defendants knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose material facts concerning the functionality, reliability, efficiency, performance, safety, and other material features of the Class Trucks and engines, including the Defeat Devices, as well as the effects of Emissions Recall 67A, which misled Plaintiffs and the California Subclass.

365. The necessity of Emissions Recall 67A, and the negative impacts of that recall, including reduced fuel efficiency, increased DEF consumption, and adverse impact on the reliability and durability of the Class Trucks, was a foreseeable result of Defendants' misconduct with respect to the Defeat Devices alleged above.

366. Defendants owed Plaintiffs and the California Subclass a duty to disclose the truth about their manipulation of the emissions systems in the Class Trucks because Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Class Trucks to illegally bypass, render inoperative, or otherwise reduce the effectiveness of the Class Trucks' emission control system;

b. Possessed exclusive knowledge that Emissions Recall 67A would be necessary and would negatively affect the Class Trucks' fuel efficiency, performance, durability, and reliability, and would result in increased costs to operate and maintain them;

c. Intentionally concealed the foregoing from Plaintiffs and the California Subclass; and

d. Made, helped to make, or conspired to make incomplete representations regarding the emissions systems in the Class Trucks and about the impact

1       of Emissions Recall 67A while purposefully withholding material facts

2       from Plaintiffs and the California Subclass members that contradicted these

3       representations.

4   367. Defendants' conduct was fraudulent in at least the following ways:

5      a. By knowingly and intentionally failing to disclose the Defeat Devices in

6       the Class Trucks;

7      b. By knowingly and intentionally misrepresenting and omitting the true

8       nature of the Class Trucks' performance, emissions, fuel economy and

9       other material features, their compliance with emission regulations;

10      c. By making affirmative representations that the Class Trucks fully met

11       relevant federal and California emissions limits;

12      d. By knowingly and intentionally omitting that Emissions Recall 67A would

13       be necessary and would negatively impact the Class Trucks' fuel

14       efficiency, performance, durability, and reliability, and would result in

15       increased costs to operate and maintain them and

16      e. By knowingly and intentionally selling and leasing Class Trucks that suffer

17       from a defective emissions control system and that emit unlawfully high

18       levels of pollutants under normal driving conditions.

19   368. Defendants' misrepresentations, concealment, and omissions were designed and

20 intended to induce consumers to believe that the Class Trucks were adequately designed, were

21 compliant with the law, included advanced diesel technology that provided a clean-burning diesel

22 system while still providing desirable performance characteristics such as good fuel economy,

23 lower operating costs, and included other desirable traits such as towing and hauling capabilities

24 compared with earlier and competing models, and were reliable so that consumers would

25 purchase and lease the Class Trucks. Reasonable consumers would consider these factors

26 important and material to their purchasing or leasing decision.

27   369. Plaintiffs and members of the California Subclass were exposed to and relied on

28 the misrepresentations, concealment, and/or omissions of Defendants. That reliance was

reasonable, as they had no way of discerning that Defendants' representations regarding the complex, technical details of the Class Trucks' emissions system and the effects of Emissions Recall 67A were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and California Subclass did not, and could not, unravel Defendants' deception on their own.

370. Defendants' acts and practices deceived Plaintiffs and the California Subclass in violation of the UCL. Defendants breached their duty to disclose material information about the true emissions and performance of the Class Trucks, and their deception caused injuries to Plaintiffs and the California Subclass.

371. Had Defendants adequately disclosed the truth about the Class Trucks, Plaintiffs and the California Subclass would have seen those disclosures and would not have purchased or lease the Class Trucks or would have paid less to buy or lease them.

**ii.      Defendants Violated the UCL's Unfair Prong**

372. Defendants' acts and practices described above are unfair under the UCL because (a) the gravity of harm to Plaintiffs and the California Subclass from Defendants' acts and practices far outweighs any legitimate utility of that conduct; (b) the conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the proposed Class; (c) the injury is not one that consumers reasonably could have avoided; (d) the conduct undermines or violates the stated public policies underlying the laws alleged herein.

373. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and members of the California Subclass from making fully informed decisions about whether to purchase or lease the Class Trucks and/or the price to purchase or lease them.

374. The injuries suffered by Plaintiffs and the California Subclass are not outweighed by any potential countervailing benefit to consumers or to competition, and Plaintiffs and California Subclass members could not have reasonably avoided those injuries in light of Defendants' conduct.

375. Defendants' conduct, as alleged herein, is immoral, unethical, oppressive,

unscrupulous, unconscionable, and substantially injurious to Plaintiffs and the California Subclass. There is no utility to Defendants' conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by their conduct alleged herein.

### iii.    Defendants Violated the UCL's Unlawful Prong

376.    Defendants' conduct, as described herein, was and is unlawful in violation of the UCL in that Defendants violated the laws alleged above, including RICO, California consumer protection laws, and California laws and regulations governing vehicle emissions and emission testing requirements.

377.    Defendants' conduct, as described herein, also violates California public policy, including public policy as reflected in California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, California Commercial Code § 2313, and California common law.

*        *        *

378.    Plaintiffs and California Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations, their concealment of and failure to disclose material information, and their unlawful and unfair conduct.

379.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the California Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for any other relief that may be appropriate.

380.    Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiffs have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

381.    Plaintiffs, on behalf of themselves and the California Subclass, further seek an

1    award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

2                                            **COUNT XI**
                                          **Unjust Enrichment**
3                        **(On behalf of the California Subclass against Defendants)**

4        382.    Plaintiffs incorporate by reference paragraphs 1-207 above as though fully set

5    forth herein.

6        383.    Plaintiffs bring this claim on behalf of the California Subclass against Defendants.

7        384.    By reason of their conduct, Defendants caused damages to Plaintiffs and members

8    of the California Subclass. Plaintiffs and the California Subclass conferred a benefit on

9    Defendants by overpaying for Class Trucks at prices that were artificially inflated by Defendants'

10   misrepresentations, concealment, and omissions alleged above regarding the Class Trucks, their

11   true emissions, and the Defeat Devices therein, as well as the foreseeable necessity of Emissions

12   Recall 67A, and the negative impacts of that recall, including reduced fuel efficiency, increased

13   DEF consumption, and adverse impact on the reliability and durability of the Class Trucks.

14       385.    As a result of Defendants' fraud and deception, Plaintiffs and members of the

15   California Subclass were not aware of the true facts concerning the Class Trucks.

16       386.    Plaintiffs and members of the California Subclass did not benefit from the

17   Defendants' misconduct.

18       387.    Defendants knowingly benefitted from their unjust conduct. They sold and leased

19   the Class Trucks for more than what the vehicles were worth, and/or accepted the inflated

20   benefits from the sale and lease of the Class Trucks, at the expense of Plaintiffs and the California

21   Subclass.

22       388.    Plaintiffs and the California Subclass conferred tangible and material economic

23   benefits upon Defendants when they purchased or leased the Class Trucks. Defendants profit

24   from sales of Class Trucks, including sales made through FCA's dealership network and sales

25   brokered through its financing and leasing arms.

26       389.    Defendants readily accepted and retained these benefits from Plaintiffs and the

27   California Subclass. Plaintiffs and the California Subclass would not have purchased or leased the

28   Class Truck, or would have paid less for them, had they known of the truth about these vehicles at

the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Trucks to the detriment and expense of Plaintiffs and the California Subclass.

390.    It is inequitable and unconscionable for Defendants to retain these benefits because (a) they misrepresented or conspired to misrepresent that the Class Trucks were legally compliant at the time of sale and that the Class Trucks included advanced diesel technology that provided a clean-burning diesel system while still providing desirable performance characteristics such as good fuel economy, lower operating costs, and other desirable traits such as towing and hauling capabilities compared with earlier and competing models; and (b) they intentionally concealed, suppressed, and failed to disclose the Defeat Devices or the foreseeable necessity of Emissions Recall 67A and its negative impacts to consumers. Plaintiffs and members of the California Subclass would not have purchased or leased the Class Trucks or would have paid less for them, had Defendants not engaged in these misrepresentations, concealment, and omissions.

391.    Plaintiffs and the California Subclass do not have an adequate remedy at law.

392.    Equity cannot in good conscience permit Defendants to retain the benefits that they derived from Plaintiffs and the California Subclass through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of Defendants' unjust enrichment is necessary.

393.    Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3).

## VIII.    REQUEST FOR RELIEF

394.    WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and California Subclass, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

    a.    Certification of the proposed Nationwide Class and California Subclass, including appointment of Plaintiffs' counsel as Class Counsel;

    b.    Restitution, including, at the election of Class Members, recovery of the purchase price of their Class Trucks, or the overpayment or diminution in value of their Class Trucks;

1           c.      Damages, including punitive damages, costs, and disgorgement in an

2                amount to be determined at trial, except that monetary relief under the

3                CLRA, as stated above, shall be limited prior to completion of the

4                applicable notice requirements;

5           d.      An order enjoining Defendants from continuing the unlawful, deceptive,

6                fraudulent, harmful, and unfair business conduct and practices alleged in

7                this Complaint;

8           e.      An order requiring Defendants to pay both pre- and post-judgment interest

9                on any amounts awarded;

10          f.      An award of costs and attorneys' fees; and

11          g.      Such other or further relief as may be appropriate.

## IX.  DEMAND FOR JURY TRIAL

395.    Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: September 10, 2024          Respectfully submitted,

*/s/ Roland Tellis*
Roland Tellis (SBN 186269)
David B. Fernandes, Jr. (SBN 280944)
Adam M. Tamburelli (SBN 301902)
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  818-839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com
atamburelli@baronbudd.com

David S. Stellings (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
dstellings@lchb.com

Elizabeth J. Cabraser (SBN 083151)
Kevin Budner (SBN 287271)
Phong-Chau G. Nguyen (SBN 286789)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

1   San Francisco, CA 94111
    Telephone: 415.956.1000
2   Facsimile: 415.956.1008
    ecabraser@lchb.com
3   kbudner@lchb.com
    pgnguyen@lchb.com

4
    Steve W. Berman*
5   **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Second Avenue, Suite 2000
6   Seattle, WA 98101
    Telephone: (206) 623-7292
7   steve@hbsslaw.com

8   *pro hac vice* application to be filed

9   James E. Cecchi (*pro hac vice*)
    **CARELLA, BYRNE, CECCHI,**
10  **BRODY & AGNELLO, P.C.**
    5 Becker Farm Road
11  Roseland, NJ 07068
    Telephone: (973) 994-1700
12  jcecchi@carellabyrne.com

13  Christopher A. Seeger*
    Christopher Ayers*
14  **SEEGER WEISS LLP**
    77 Water Street
15  New York, NY 10005
    Telephone: (212) 584-0700
16  cseeger@seegerweiss.com
    cayers@seegerweiss.com
17
    *pro hac vice* application to be filed
18
    E. Powell Miller (*pro hac vice*)
19  Sharon S. Almonrode*
    Dennis A. Lienhardt, Jr. (*pro hac vice*)
20  **THE MILLER LAW FIRM P.C.**
    950 W. University Drive, Suite 300
21  Rochester, MI 48307
    Telephone: (248) 841-2200
22  epm@millerlawpc.com
    ssa@millerlawpc.com
23
    *pro hac vice* application to be filed
24
    Joseph F. Rice*
25  Ann K. Ritter*
    **MOTLEY RICE LLC**
26  28 Bridgeside Boulevard
    Mount Pleasant, South Carolina 29464
27  Phone: (843) 216-9000
    Fax: (843) 216-9450
28  jrice@motleyrice.com

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC

1

aritter@motleyrice.com

2

*pro hac vice* application to be filed

3

Rosemary M. Rivas (SBN 209147)
Amy M. Zeman (SBN 273100)

4

Rosanne L. Mah (SBN 242628)
**GIBBS LAW GROUP LLP**

5

1111 Broadway, Suite 2100
Oakland, CA 94607

6

Telephone: (510) 350-9700
Facsimile: (510) 350-9701

7

rmr@classlawgroup.com
amz@classlawgroup.com

8

rlm@classlawgroup.com

9

10

*Counsel for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 3:23-CV-06640-JSC