1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    FRANK BIEDERMAN, et al.,              Case No.  23-cv-06640-JSC

8                   Plaintiffs,

9            v.                             **ORDER RE DEFENDANTS' MOTIONS
                                            TO DISMISS THE CONSOLIDATED
10   FCA US LLC, et al.,                     AMENDED CLASS ACTION
                                            COMPLAINT**
11                Defendants.
                                            Re: Dkt. Nos. 78, 80
12

13          This putative class action arises from alleged "defeat devices" in diesel engines

14   manufactured by Defendant Cummins Inc. and installed in RAM 2500 and 3500 pick-up trucks

15   ("Class Trucks") by Defendant FCA US LLC.  Plaintiffs bring the putative class action alleging

16   Defendants' representations about the Class Trucks' performance and compliance with regulatory

17   standards were false and misleading since the vehicles could only perform as advertised while

18   emitting pollutants beyond established limits.  Further, Plaintiffs allege the emissions recall

19   ("Recall 67A")—issued by Defendants to bring the Class Trucks into regulatory compliance—

20   reduced vehicle performance beyond Defendants' representations.

21          Plaintiffs assert eleven causes of action: 1) violation of 18 U.S.C. § 1962(c)-(d) (civil

22   RICO) by Cummins; 2) fraud by concealment by both Defendants; 3) violation of the California

23   Consumer Legal Remedies Act ("CLRA") by both Defendants; 4) violation of the California False

24   Advertising Law ("FAL") by both Defendants; 5) breach of express warranty under California

25   Commercial Code § 2313 by FCA; 6) breach of express warranty under the Song-Beverly

26   Consumer Protection Act by FCA; 7) breach of the implied warranty of merchantability under

27   California Commercial Code § 2314 by FCA; 8) breach of the implied warranty of

28   merchantability under the Song-Beverly Consumer Protection Act by FCA; 9) breach of express

California emissions warranties under California Civil Code § 1793.2 by FCA; 10) violation of the California Unfair Competition Law ("UCL") by both Defendants; and 11) unjust enrichment by both Defendants.  Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).

After considering the parties' submissions, and with the benefit of oral argument on January 16, 2025, the Court GRANTS in part and DENIES in part the motions to dismiss for failure to state a claim.

## DISCUSSION

The standard for adjudicating a motion under Rule 12(b)(6) is well established.  In reviewing the complaint, a district court must assume the plaintiffs' allegations are true and draw all reasonable inferences in their favor.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A court need not, however, construe as true conclusory statements or unreasonable inferences.  *Id.*

Additionally, Plaintiffs' misrepresentation claims sound in fraud, and per Federal Rule of Civil Procedure 9(b), must be pled with particularity.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)) (holding 9(b)'s heightened pleading requirement applies to California consumer protection statute claims sounding in fraud).  So, a district court considers whether the complaint properly alleges "the time, place, and specific content of [any] false representations as well as the identities of the parties to the misrepresentation."  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).

## I.    CIVIL RICO CLAIM AGAINST DEFENDANT CUMMINS

Cummins argues Plaintiffs lack statutory standing to bring a RICO claim under 18 U.S.C. § 1964(c) because they are "indirect purchasers," and therefore, the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars their claim.

In *Illinois Brick*, the Supreme Court considered whether, under Section 4 of the Clayton Act, an indirect purchaser plaintiff had statutory standing.  431 U.S. at 726.  There, the defendant company engaged in an alleged price-fixing scheme to inflate the price of concrete blocks.  *Id.* at 726-27.  These blocks were purchased by masonry contractors to build structures, which were then

2

incorporated into buildings by general contractors, and ultimately sold to the plaintiffs.  *Id*. at 726.  The Court rejected the plaintiffs' "pass-on theory" of injury, *i.e.* that the overcharge for concrete blocks was "passed on" from the direct purchasers (masonry contractors) to the indirect purchasers (plaintiffs who purchased buildings).  *Id*. at 728.  "*Illinois Brick* sets out a bright-line rule: . . . if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A."  *Apple, Inc. v. Pepper*, 587 U.S. 273, 280 (2019); *see also In re ATM Fee Antitrust Litig*., 686 F.3d 741, 748 (9th Cir. 2012) ("[A] a bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations.").

RICO's civil enforcement provision, 18 U.S.C. § 1964(c), is nearly identical to that of the Clayton Act.  And, the Supreme Court has noted that Congress modeled RICO's enforcement provision on the Clayton Act's Section 4.  *See Holmes v. Sec. Inv. Prot. Corp*., 503 U.S. 258, 268 (1992) (citation omitted); *see also Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1168 (9th Cir. 2002) (explaining RICO "is quite similar to the antitrust statute granting standing to 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws,' 15 U.S.C. § 15(a), and consequently the two have been interpreted in tandem").  So, argues Cummins, *Illinois Brick* applies to RICO, and, as it is undisputed Plaintiffs did not purchase anything directly from Cummins, they do not have statutory standing to pursue a RICO claim.

While the Ninth Circuit has not directly addressed this issue, every federal court of appeals to have considered whether *Illinois Brick* applies to civil RICO has held that it does.  *See Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 604 (6th Cir. 2024) (holding the *Illinois Brick* indirect-purchaser rule applies to civil RICO claims); *McCarthy v. Recordex Serv., Inc*., 80 F.3d 842, 844 (3d Cir. 1996) (holding the plaintiffs lacked standing to bring a RCIO treble-damages claim because they were not "direct purchasers," as required by *Illinois Brick*); *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985) ("We conclude that [under RICO] the directly injured party should receive a complete recovery, no matter what; an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief."); *Humana, Inc. v. Indivior, Inc*., No. 21-2573, 2022 WL 17718342, at *1 (3d Cir. Dec. 15, 2022) (applying *McCarthy*); *see also Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1169 (9th Cir. 2002) (observing

in a non-indirect purchaser case that "potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory [RICO] standing"). The Court is persuaded that the identical language present in RICO and the Clayton Act must be interpreted the same, and therefore, indirect purchasers may not sue.

So, Plaintiffs fail to plausibly allege statutory standing to bring a civil RICO claim against Cummins, since they purchased the Class Trucks from a retailer, not directly from Cummins. Further, Plaintiffs allege "an ascertainable economic loss, including, but not limited to, out-of-pocket loss related to their overpayment for the Class Trucks at the point of sale." (Dkt. No. 75 ¶ 8.)[1] This injury amounts to an "overcharge," analogous to an antitrust claim. *Illinois Brick*'s bright-line rule does away with the thorny process of determining how this overcharge may have been distributed between consumers and the dealerships that sold the Class Trucks. Accordingly, Plaintiffs' civil RICO claim against Cummins cannot advance.

Plaintiffs do not dispute that if *Illinois Brick* applies to civil RICO, their RICO claim fails; instead, they urge *Illinois Brick* should not apply. But their arguments do not persuade the Court it should be the first to so hold. To begin, Plaintiffs rely on *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), and argue the indirect-purchaser rule should not apply because the Supreme Court has "rejected efforts to impose on RICO the 'strict requirements on questions such as "standing to sue" and "proximate cause"' that are 'appropriate [only] in a purely antitrust context.'" (Dkt. No. 81 at 14 (quoting *Sedima*, 473 U.S. at 498) (alterations in original).) But *Sedima* did not address *Illinois Brick* or the role of proximate cause in RICO standing. Rather, the Court decided not to import a "racketeering injury" requirement into RICO—similar to the "antitrust injury" concept—since the statute already limits the predicate acts that can form the basis of a RICO claim. *Sedima*, 473 U.S. at 495-97. Further, in *Holmes*, the Court narrowed the applicability of the legislative history cited by Plaintiffs:

> . . . there is no merit in [Respondent's] reliance on legislative history
> to the effect that it would be inappropriate to have a "private litigant
> . . . contend with a body of precedent—appropriate in a purely

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

antitrust context—setting strict requirements on questions such as 'standing to sue' and 'proximate cause.'" 115 Cong.Rec. 6995 (1969) (American Bar Association comments on S. 2048). ***That statement is rightly understood to refer only to the applicability of the concept of "antitrust injury" to RICO, which we rejected in Sedima* . . . .**

503 U.S. at 270 n.15 (emphasis added). Plaintiffs read *Sedima* to establish a presumption against applying principles from the antitrust context to RICO. But this reading fails to account for the later-decided *Holmes*, which emphasized the identical language in both the Clayton Act and 18 U.S.C. § 1964(c) as well as limited *Sedima* to the issue decided there. *See also Mendoza*, 301 F.3d at 1168 (explaining RICO "is quite similar to the antitrust statute granting standing to 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws,' 15 U.S.C. § 15(a), and consequently the two have been interpreted in tandem").

Next, Plaintiffs argue the underlying goals and rationales of antitrust law and civil RICO differ; therefore, the concerns animating the indirect-purchaser rule do not apply here. (Dkt. No. 81 at 14-15.) Citing *Schacht v. Brown*, Plaintiffs assert: "antitrust law and policy are increasingly concerned primarily with market efficiency rather than the deleterious effects of concentrated market power itself," and so, "analogies to [the RICO] body of law become increasingly irrelevant . . . ." 711 F.2d 1343, 1358 (7th Cir. 1983). Even so, this difference in rationale does not implicate the indirect-purchaser rule, which is not driven by "market efficiency" concerns. Rather, the rule exists to preserve judicial economy by preventing conflicting claims from direct and indirect purchasers, which "not only burdens the courts, but also undermines the effectiveness of treble-damages suits." *Assoc. Gen'l Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 545 (1983). Plaintiffs offer no reason why that judicial economy concern does not equally apply to this RICO action, where both retailers and downstream consumers may allege an overcharge injury by a manufacturer. But even if they did, such an inquiry would ultimately be beside the point, since "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Pepper*, 587 U.S. at 285 (citation omitted).

Last, Plaintiffs cite two district court cases addressing civil RICO claims by consumers against manufacturers who allegedly installed defeat devices in vehicles: *In re Chrysler-Dodge-*

*Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018), and *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 349 F. Supp. 3d 881 (N.D. Cal. 2018).  Neither disturbs the Court's reasoning.  In *Ecodiesel*, the court permitted a civil RICO claim against the manufacturer to advance after considering whether "there [was] a 'sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury.'"  295 F. Supp. 3d at 967 (citation omitted).  However, the opinion did not address *Illinois Brick*'s applicability.  Though the court considered the question of how to apportion damages, the parties did not argue about passed-on overcharges from dealerships to consumers.  Rather, they focused on the difficulty in apportioning damages *among the defendants* in the alleged enterprise. *Id*. at 968-69.  Since *Ecodiesel* was not presented with the relevant question here, the case is inapposite.

In *Clean Diesel*, the court similarly allowed a civil RICO claim against the manufacturer to advance after performing a proximate cause analysis under *Mendoza*.  349 F. Supp. 3d at 906 (citing *Mendoza*, 301 F.3d at 1169).  There, the court considered whether the dealerships that sold the vehicles were more directly injured than consumers.  *Id*. at 906-07.  Though the court did not ultimately grant the motion to dismiss, it noted the defendants could renew their proximate cause challenge if discovery revealed the dealerships absorbed some of the alleged overcharge.  *Id*. at 907.  But, in any event, as in *Ecodiesel*, the parties did not argue, and the Court did not address, the applicability of the *Illinois Brick* indirect-purchaser rule.

Consequently, the Court GRANTS the motion to dismiss the civil RICO claim against Cummins for lack of statutory standing.

## II.     MISREPRESENTATION CLAIMS AGAINST BOTH DEFENDANTS

Plaintiffs assert four causes of action based on Defendants' alleged misrepresentations and omissions: fraudulent concealment (Count II), violation of the CLRA (Count III), violation of the FAL (Count IV), and violation of the UCL (Count X).  Defendants move to dismiss these claims on four grounds: 1) Plaintiffs lack standing to assert a fraud claim on behalf of a nationwide class; 2) Certain theories of misrepresentation are preempted by federal legislation; 3) Plaintiffs have failed to plead with particularity the alleged fraud under Federal Rule of Civil Procedure 9(b); and

1    4) Defendants' alleged representations constitute puffery. The Court addresses each argument
2    below.

3        **A.    Plaintiffs' Standing for Nationwide Fraud Claim**

4        Count II of the Complaint asserts a cause of action for fraudulent concealment on behalf of
5    a nationwide class of consumers, or in the alternative, on behalf of a California state class. (Dkt.
6    No. 75 ¶ 245.) However, Named Plaintiffs are all California residents, who purchased the Class
7    Trucks in California. As such, they do not have standing to bring fraud claims under the laws of
8    other states to which they have no alleged connection.

9        The Court addressed this question in *Soo v. Lorex Corp.*, No. 20-cv-01437, 2020 WL
10   5408117, at \*10 (N.D. Cal. Sept. 9, 2020), noting that "district courts in this Circuit routinely
11   hold" plaintiffs do not "have standing to pursue class claims under the common laws of states to
12   which the named plaintiffs have no connection . . . ." This has remained the prevailing approach
13   among the district courts since *Soo*. *See, e.g.*, *Humphrey v. J.M. Smucker Co.*, No. 22-cv-06913,
14   2023 WL 3592093, at \*6 (N.D. Cal. May 22, 2023) ("[P]laintiffs do not have standing to bring
15   claims under the laws of states where they have alleged no injury, residence, or other pertinent
16   connection.").

17       In response, Plaintiffs rely on *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), to argue
18   this standing question is more appropriately reserved for the class certification stage. (Dkt. No. 82
19   at 16.) The Court disagrees. Indeed, the Court considered *Melendres* in the context of *Soo* and
20   determined the Ninth Circuit's opinion did not preclude dismissal for lack of standing prior to
21   class certification. 2020 WL 5408117, at \*11 (citing *Jones v. Micron Tech Inc.*, 400 F. Supp. 3d
22   897, 909 (N.D. Cal. 2019)).

23       Therefore, the Court GRANTS the motions to dismiss the fraud claim brought on behalf of
24   the nationwide class.

25       **B.    Preemption**

26       Defendants assert the Clean Air Act and Energy Policy and Conservation Act ("EPCA")
27   preempt Plaintiffs' claims to the extent they rely on misrepresentations about the Class Trucks'
28   compliance with regulatory standards.

United States District Court
Northern District of California

United States District Court
Northern District of California

"Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990). When the statute includes a provision with express preemptive language, a court's task is to "identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (internal quotation marks omitted). As for implied preemption, courts recognize two distinct theories: field preemption and conflict preemption. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Field preemption occurs where "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). Whereas conflict preemption occurs "when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law." *Id.* Further, "[i]mplied conflict preemption can exist even when Congress has chosen to include an express preemption clause in a statute." *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir. 2002) (citation omitted). Under any theory of preemption, "[t]he purpose of Congress is the ultimate touchstone . . . ." *Cipollone*, 505 U.S. at 516 (alteration in original).

Cummins identifies three alleged misrepresentations impliedly preempted by the Clean Air Act. These include statements that Class Trucks were "emissions compliant," (Dkt. No. 75 ¶ 12), were "certified to meet Low Emission Vehicle III standards from [CARB]," (*id.* ¶ 168), and were covered by valid Certificates of Conformity or Executive Orders, (*id.* ¶ 15). (Dkt. No. 80-1 at 26.) FCA takes a broader position, arguing Plaintiffs' claims relying on misrepresentations about "fuel economy, emissions levels, [and] performance" are expressly and impliedly preempted by the Clean Air Act and EPCA. (Dkt. No. 78 at 16.)

The Court addresses these preemption arguments under each statute.

### 1.    Clean Air Act

#### a.    Express Preemption

The Clean Air Act includes an express preemption provision:

8

United States District Court
Northern District of California

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). Though FCA argues this provision bars Plaintiffs' claims, it fails to explain how. Instead, FCA relies on several cases discussing *implied*—rather than *express*— preemption. (Dkt. No. 78 at 16-17 (citing *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 866 (6th Cir.), *cert. denied sub nom. LLoyd v. Ford Motor Co.*, 144 S. Ct. 332 (2023) ("[W]e hold that plaintiffs' fraud-on-the-agency claims against Ford are impliedly preempted as conflicting with federal law."); *Bledsoe v. FCA US LLC*, No. 4:16-cv-14024, 2024 WL 445334, at *8 (E.D. Mich. Jan. 26, 2024) (same); *Counts v. Gen. Motors, LLC*, 681 F. Supp. 3d 778, 784 (E.D. Mich. 2023) (same), *reconsideration denied*, No. 1:16-cv-12541, 2024 WL 472331 (E.D. Mich. Feb. 7, 2024).) Absent relevant authority or an explanation on the effect of 42 U.S.C. § 7543(a) here, the Court disregards FCA's conclusory argument and proceeds to the implied preemption analysis.

### b.    Field Preemption

Turning to field preemption, there exists a presumption against preemption when a court "deal[s] with an area in which states have traditionally acted." *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010). Various potential "fields" overlap in the instant case, including consumer protection, air pollution, and vehicle emissions. While "[c]ontract and consumer protection laws have traditionally been in state law enforcement hands," *id.*, air pollution and vehicle emissions present a more complicated regulatory framework. The district court in *Ecodiesel*, 295 F. Supp. 3d at 1001, confronted this same question and provided a persuasive analysis. There, the court surveyed various cases and concluded the presumption against preemption applied to consumer misrepresentation claims about vehicle emissions. *Id.* Looking to the analysis in *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040 (N.D. Cal. 2017), the court observed that "although environmental regulation 'traditionally has

9

been a matter of state authority,' the Clean Air Act and amendments have made 'the States and the Federal Government partners in the struggle against air pollution.'" *Ecodiesel*, 295 F. Supp. 3d at 1001 (citing *Clean Diesel*, 264 F. Supp. 3d at 1049). But, even though "the regulation of motor-vehicle emissions has become 'a principally federal project,'" the court determined the presumption applied "not only because air pollution and health and safety are at issue, but also because the case concerns consumer protection, another area falling within the traditional powers of the state." *Id.* The Court adopts the *Ecodiesel* analysis and proceeds with a presumption against preemption of Plaintiffs' claims.

Here, FCA fails to identify any Clean Air Act language manifesting Congress' intent to preempt consumer protection claims that refer to vehicle emissions. Indeed, both cases upon which FCA relies are distinguishable. For instance, in *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, No. 1:14-cv-3722, 2015 WL 4591236, at *1 (D.N.J. July 29, 2015), the court considered the defendant's Clean Air Act implied preemption defense to the plaintiffs' consumer protection claims based on defective diesel engines. Though the court acknowledged "the breadth of federal regulation" in the emissions field, it ultimately held "the text of the [Clean Air Act] explicitly contemplates continued state involvement in the regulation of motor vehicles." *Id.* at *14. So, *In re Caterpillar* ultimately cuts against FCA's argument.

FCA also cites *Washington v. Gen. Motors Corp.*, for the proposition that "Congress has largely pre-empted the field with regard to 'emissions from new motor vehicles . . . .'" 406 U.S. 109, 114 (1972). Yet, the Supreme Court did not make a preemption ruling in *Washington*. Rather, the case involved a motion by 18 states for leave to file a bill of complaint pursuant to the Court's original jurisdiction. *Id.* at 111. Though the Court agreed jurisdiction would be proper, it nonetheless declined to grant the motion given "the availability of the federal district court as an alternative forum and the nature of the relief requested . . . ." *Id.* at 114. The decision ultimately did not require the parties to brief or argue a preemption issue. For this reason, courts have recognized this language as *dicta*. *See, e.g.*, *Ecodiesel*, 295 F. Supp. 3d at 1002 (noting "[t]he Supreme Court [in *Washington*] was never called upon to make and never made a preemption ruling . . . "); *Exxon Corp. v. New York*, 548 F.2d 1088, 1095 n.12 (2d Cir. 1977) (same). But

1   even if the statement were not *dicta*, Congress "largely" preempting the field of vehicle emissions

2   does not establish preemption of the entire field.  Nor does *Washington* speak to consumer

3   protection claims based on alleged misrepresentations regarding emissions.  Given the

4   presumption against preemption, FCA fails to show Plaintiffs' claims are barred.

5                          c.      **Conflict Preemption**

6          For the reasons stated in the Court's analysis above, the presumption against preemption

7   also applies to the implied conflict preemption analysis.  In assessing whether a claim is subject to

8   conflict preemption, the court considers whether the state law "creates an 'obstacle to the

9   accomplishment and execution of the full purposes and objectives of Congress.'"  *Chae*, 593 F.3d

10  at 943 (citation omitted).  To discern Congress' objectives regarding the Clean Air Act, the court

11  "examin[es] the federal statute as a whole and identif[ies] its purpose and intended effects."  *Id*.

12  Per the Supreme Court's opinion in *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 353

13  (2001), state-law "claims [that] exist solely by virtue of [federal agency] disclosure requirements"

14  are conflict preempted.  So, the Court considers whether Plaintiffs' state-law misrepresentation

15  claims "exist solely by virtue of" Defendants' disclosure requirements to the EPA.  That said,

16  nearly all of Plaintiffs' alleged misrepresentations do not.

17         To give effect to this standard, the Court considers whether Plaintiffs' allegations could

18  plausibly state a misrepresentation claim absent EPA regulation.  Here, Plaintiffs allege

19  Defendants misrepresented the Class Trucks had: 1) "a clean-burning DEF system that made it so

20  it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks;" 2)

21  "good fuel economy;" 3) "low cost of ownership;" and 4) "strong towing and hauling

22  capabilities."  (*See, e.g*., Dkt. No. 75 ¶ 12.)  Further, Plaintiffs allege Defendants did not disclose

23  the existence of "defeat devices" in the Class Trucks, which could only perform as advertised

24  while emitting pollutants beyond the legal limit, consumer expectations, and a comparable

25  gasoline-powered vehicle.  (*Id*. ¶ 14.)  As observed in *Clean Diesel*, these "claims require proof of

26  both more and less than what is required to enforce the federal standards."  349 F. Supp. 3d at 910.

27  For instance, to succeed on a CLRA claim, Plaintiffs must prove Defendants' statements would

28  mislead a reasonable consumer and that Plaintiffs relied on those misrepresentations.  *See*

United States District Court
Northern District of California

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010) (discussing elements of CLRA claim). No such requirements exist to establish an EPA emissions violation. Additionally, Plaintiffs need not prove an actual violation of EPA emissions standards or the presence of a "defeat device" as defined by federal regulation. Rather, Plaintiffs could prove Defendants "installed and concealed software in the cars that reasonable consumers would have wanted to know about." *Clean Diesel*, 349 F. Supp. 3d at 911. Accordingly, Plaintiffs' claims based on these alleged misrepresentations are not conflict preempted.

FCA's arguments to the contrary are unavailing. First, FCA asserts allowing these claims to advance would "hinder the federal government's objective of providing ***uniform*** emissions standards" and would allow Plaintiffs to enforce EPA regulations. (Dkt. No. 78 at 18 (emphasis in original).) However, as explained above, Plaintiffs' claims do not necessarily rely upon any EPA regulatory violation. Such claims do not threaten to upend emissions standards simply because Plaintiffs allege regulatory violations as additional support for their case. Indeed, the Ninth Circuit in *McClellan v. I-Flow Corp.*, 776 F.3d 1035 (9th Cir. 2015), was confronted with, and disposed of, a similar argument. There, the court considered whether certain jury instructions regarding plaintiffs' medical device product liability claims were preempted. *Id*. at 1037. In rejecting I-Flow Corp's preemption argument, the court held: "The appellees would have us conclude that any use of federal law to establish a standard of care is an attempt to enforce the underlying federal provisions, but we do not accept that proposition." *Id*. at 1041. Mere reference to regulatory standards, such as EPA emissions levels, does not alone infringe on the regulatory scheme. Since Plaintiffs' misrepresentation claims do not require a regulatory violation to succeed, they are not conflict preempted.

Second, FCA relies on *Buckman*, 531 U.S. 341 (2001), to argue Plaintiffs' claims are preempted since they "are essentially 'predicated on deceit against [the] EPA during new-vehicle certification." (Dkt. No. 78 at 19 (quoting *Clean Diesel*, 264 F. Supp. 3d at 1054) (alterations in original).) But the facts of *Buckman* materially differ from those here. There, plaintiffs alleged the defendant—an organization that helped the manufacturer of the at-issue medical device obtain FDA approval—submitted fraudulent information to the agency. *Buckman*, 531 U.S. at 343. The

United States District Court
Northern District of California

1    plaintiffs did not allege any misrepresentations directed to them; instead, they premised their

2    claims on the defendant's fraud on the agency, which was a but-for cause of the ultimate harm

3    they experienced from the medical device.  *Id*.  Here, Plaintiffs do not assert fraud-on-the-agency

4    claims, but rather fraud-on-the-consumer claims.  Regardless of the information supplied to the

5    EPA, Plaintiffs allege Defendants failed to disclose to consumers the actual emissions and

6    performance capabilities of the Class Trucks.

7           Setting aside the emissions and performance allegations, Cummins argues a smaller subset

8    of alleged misrepresentations are conflict preempted.  These allegations pertain to advertisements

9    that the Class Trucks complied with EPA and California Air Resources Board regulations.  (*See*

10   Dkt. No. 80-1 at 26.)  The Court agrees that claims based on these allegations alone are

11   preempted.  Unlike the alleged misrepresentations regarding performance, these claims "exist

12   solely by virtue of" EPA regulations.[2]  *Buckman*, 531 U.S. at 353.  As above, the Court considers

13   whether Plaintiffs could plausibly state a misrepresentation claim based on these allegations

14   absent EPA regulation.  Plaintiffs cannot.  If the alleged false statement is the Class Trucks

15   "complied with emissions law and regulations," then plaintiffs could not prove their case absent a

16   finding that Defendants violated EPA regulations.[3]  (Dkt. No. 75 ¶ 12.)  To hold otherwise would

---

[2] Alleged misrepresentations regarding the Class Trucks' compliance with California Air Resources Board ("CARB") regulations are similarly preempted.  The Clean Air Act provides that its express preemption provision may be waived by the EPA Administrator for certain state emissions regulations, such as those administered by CARB.  *See* 42 U.S.C. § 7543(b).  A waiver may only be granted by the Administrator if the state standards are "at least as protective of public health and welfare as applicable federal standards," and those standards must be consistent with Clean Air Act standards in 42 U.S.C. § 7521(a).  *Id*.  Therefore, Executive Orders issued by CARB for vehicle emissions exist only by the EPA's permission and approval.  In so far as Plaintiffs' claims related to the Class Trucks' regulatory compliance are preempted for conflicting with the Clean Air Act, the same reasoning applies to claims related to CARB compliance, which derive from that same federal power.

[3] Other courts addressing virtually identical claims have found them preempted.  *See, e.g.*, *Clean Diesel*, 349 F. Supp. 3d at 911 ("[T]o prove that VW lied when it represented in advertising that its vehicles 'me[t] the strictest EPA standards in the U.S.' [], Plaintiffs would need to prove the opposite—that the class vehicles did not meet EPA standards. If Plaintiffs proceed by basing their claims on statements like this one, their claims get closer to the line of 'attempting to enforce' standards relating to the control of emissions from new motor vehicles."); *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 596 (6th Cir. 2024) (holding plaintiffs' claims were preempted since they "would require a showing that, contrary to the EPA's decision, the [Class] Trucks failed to meet EPA standards").

United States District Court
Northern District of California

1    impermissibly allow a state consumer-protection claim to step into the EPA's shoes and enforce

2    federal emissions standards.

3        Further, Plaintiffs do not benefit from the same presumption against preemption applicable

4    to their other theories of liability.  As noted in *Buckman*, "the relationship between a federal

5    agency and the entity it regulates is inherently federal in character because the relationship

6    originates from, is governed by, and terminates according to federal law."  531 U.S. at 347.

7    Claims based on Defendants' compliance with federal regulations, therefore, do not involve an

8    area in which states have typically acted.  For these reasons, Plaintiffs' misrepresentation claims

9    are preempted to the extent they rely solely on allegations of Defendants' noncompliance with

10   federal regulations.

11       Plaintiffs counter that since the EPA determined Cummins committed fraud, there are no

12   concerns about a jury second-guessing the agency's determinations.  (Dkt. No. 81 at 29-30.)  This

13   argument does not persuade the Court.  As an initial matter, Cummins denied the EPA's

14   allegations and any related liability regarding the alleged defeat devices.  Proposed Consent

15   Decree at 3, *United States v. Cummins Inc*., No. 1:24-cv-00088, ECF No. 2 (D.D.C. Jan 10, 2024).

16   Therefore, the Consent Decree relied on by Plaintiffs does not definitively establish fraud on the

17   agency.  But even if it did, Plaintiffs' argument ultimately cuts against their position.  For

18   example, a fact finder presented with Plaintiffs' claims regarding Defendants' regulatory

19   noncompliance could very well determine Defendants *did* comply with EPA regulations.  In that

20   scenario, a jury would essentially contest the allegations raised by the EPA against Cummins.

21   Such disagreement between the regulator and state law claims would allow state law to supersede

22   the federal power wielded by the EPA.  Conflict preemption exists to prevent just that and ensure

23   "state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S.

24   70, 76 (2008) (citation omitted).

25       Last, Plaintiffs argue their claims are not preempted since they do not challenge the

26   validity of the EPA's Certificates of Compliance ("COC") for the Class Trucks.  Rather, Plaintiffs

27   assert they did not receive a vehicle built to the specifications of an otherwise valid COC, since the

28   Class Trucks contained undisclosed defeat devices.  (Dkt. No. 81 at 28 (citing 40 C.F.R. §

86.1848-10).)  But this distinction does not ultimately change the preemption analysis.  In either case, Plaintiffs' misrepresentation claims are preempted because they "depend entirely upon a [Clean Air Act] violation."  *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 596 (6th Cir. 2024).  Even if Plaintiffs do not themselves contest the COC's validity, their misrepresentation claims could not succeed absent a fact finder's determination that the Class Trucks did not conform to the COC.  As the Court noted previously, a fact finder could very well find the Class Trucks do conform to the COC, placing the state law claims in opposition to the EPA's charge to enforce emissions standards.  *See* 42 U.S.C. § 7543(a) ("No State or any political subdivision thereof shall adopt ***or attempt to enforce*** any standard relating to the control of emissions from new motor vehicles . . . ." (emphasis added)).  The Clean Air Act already provides the EPA with significant tools to investigate motor vehicle manufacturers and police fraud in the regulatory process.  *See, e.g.*, 42 U.S.C. § 7524(c) (providing the EPA Administrator with the power to assess civil penalties); 42 U.S.C. § 7542(b) (permitting EPA officers to inspect manufacturer premises and records); 40 C.F.R. § 86.1850-01 (providing authority to revoke COCs based on inaccurate representations to the agency or void a COC *ab initio* based on fraud); 40 C.F.R. § 1068.601 (providing the EPA may conduct hearings).  Permitting Plaintiffs' claims which are premised solely on regulatory violations would "exert an extraneous pull on the scheme established by Congress, and [are] therefore pre-empted by that scheme."  *Buckman*, 531 U.S. at 353.

For the reasons stated above, the Court holds Plaintiffs' claims are preempted by the Clean Air Act to the extent they rely solely on allegations the Class Trucks were "emissions compliant," (Dkt. No. 75 ¶ 12), were "certified to meet Low Emission Vehicle III standards," (*id.* ¶ 168), and were covered by valid Certificates of Conformity or Executive Orders, (*id.* ¶ 15).  Plaintiffs' remaining bases for the misrepresentation claims are not preempted.

### 2.    Energy Policy and Conservation Act

Defendant FCA separately asserts the EPCA also preempts Plaintiffs' misrepresentation claims.  (Dkt. No. 78 at 16.)  Though FCA does not identify which theory of preemption applies, their reliance on *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, suggests they argue for implied preemption.  65 F.4th 851, 860 (6th Cir.) ("We begin and

end with implied preemption."), *cert. denied sub nom. LLoyd v. Ford Motor Co*., 144 S. Ct. 332

(2023).  The Court determines *In re Ford* is inapposite here, and the EPCA does not impliedly

preempt Plaintiffs' claims.

To start, *In re Ford* involved a multidistrict litigation in which various classes of

consumers alleged "defendant Ford Motor Company intentionally submitted false fuel economy

testing figures for certain vehicles" to the EPA.  *Id*. at 854.  To establish fuel economy estimates,

the EPA "mandate[s] that manufacturers follow a complex testing methodology" in order "[t]o

produce testing data that the EPA uses in its own fuel economy calculation . . . ."  *Id*.  After

various stages of data collection and review, the EPA then "adopts [the manufacturer's fuel

economy calculation] as its own."  *Id*. at 856.  The consumers' claims arose from their

independent testing of the Ford vehicles and allegations that the testing data Ford submitted to the

EPA was fraudulent.  Affirming dismissal of the claims, the Sixth Circuit held plaintiffs' theory of

liability was impliedly preempted under *Buckman*, 531 U.S. 341, as a fraud-on-the-agency claim.

*Id*. at 862.  Much like the plaintiff in *Buckman*, the *In re Ford* plaintiffs based their claims on

deception in the regulatory process between Ford and the EPA—a process already governed by an

extensive federal scheme.  *Id*.  Further, since the EPA adopted the testing data and fuel economy

estimate as its own, there were no direct misrepresentations made by Ford to consumers.  *Id*.

("And, ultimately, the fuel economy figure is the EPA's own; it is not adopted or published

unilaterally by Ford (or by any other manufacturer).").  However, unlike the *In re Ford* plaintiffs,

Plaintiffs here do not challenge the fuel economy testing process directly.

As alleged, Plaintiffs base their misrepresentation claims on Defendants' failure to disclose

the existence of an alleged defeat device in the Class Trucks.  (Dkt. No. 75 ¶ 14.)  Their challenge

is not to the fuel economy estimate, but rather that Defendants materially misrepresented that the

Class Trucks' performance could only be achieved by emitting greater amounts of pollutants than

a reasonable consumer would expect for a diesel vehicle.  (*See, e.g*., ¶¶ 14, 20, 26, 32, 38, 44, 51,

57, 63, 69.)  Further, Plaintiffs also allege Cummins misrepresented the true effects of Recall 67A,

which mentioned potential fuel economy decreases but did not state the true magnitude of the

decrease.  (*Id*. ¶¶ 137, 140.)  These claims do not contest the EPA's fuel economy estimate for the

1  Class Trucks, nor must Plaintiffs prove deception in fuel economy testing to prevail.  Rather, the

2  crux of Plaintiffs' claims is that Defendants deceived them about negative consequences related to

3  the fuel economy rating, that is, the Class Trucks would emit more $NO_x$ than consumers expected.

4  And Plaintiffs allege Defendants' own representations about fuel economy decreases (not the EPA

5  figure) were misleading.

6      These facts depart from those underlying the holding in *In re Ford*, as well as the

7  subsequent district court decisions that rely on it.  *See, e.g.*, *Bledsoe*, 2024 WL 445334, at *8;

8  *Counts*, 681 F. Supp. 3d at 784.  Since the reasoning in *In re Ford* provides the sole basis for

9  FCA's argument, the Court holds the EPCA does not impliedly preempt Plaintiffs' claims.

10      **C.    Sufficiency of the Allegations**

11      Federal Rule of Civil Procedure 9(b) requires fraud to be pled with particularity so a

12  defendant "can defend against the charge and not just deny that they have done anything wrong."

13  *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citation

14  omitted) (internal quotation omitted).  Rule 9(b) "does not require absolute particularity or a

15  recital of the evidence," and therefore, "statements of the time, place and nature of the alleged

16  fraudulent activities are sufficient."  *Id.* (citations omitted).  Here, Plaintiffs advance two theories

17  of fraud under the FAL, CLRA, UCL, and common law: misrepresentation and omission.  The

18  Court considers the sufficiency of Plaintiffs' allegations as to both.

19          **1.    Misrepresentation Claims**

20      Plaintiffs' misrepresentation claims under the FAL, CLRA, and UCL arise from the same

21  factual allegations.  Therefore, the claims rise or fall together based on the plausibility of those

22  allegations.  *See Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017)

23  ("Because the same standard for fraudulent activity governs [the UCL, FAL, and CLRA], courts

24  often analyze the three statutes together."); *see also Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th

25  Cir. 2016) (analyzing California consumer protection statutes together since they share the same

26  "reasonable consumer" test).  A common law fraud claim, while similar to the consumer

27  protection statutes, requires certain additional elements, such as knowledge of falsity.  *See Small v.*

28  *Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003) (establishing the elements of a fraud claim);

*Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1160 (N.D. Cal. 2011) ("California courts have also suggested that while claims of common law fraud require a deception 'known to be false by the perpetrator,' this element is not required to state a claim under the fraudulent prong of the UCL." (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009)). The parties' dispute regarding Rule 9(b), however, does not involve the differences in elements between common law fraud and the California consumer protection statutes. Accordingly, the Court addresses the misrepresentation claims as the parties do—collectively.

Here, Plaintiffs allege with particularity "the time, place and nature of the alleged fraudulent activities." *United Healthcare Ins. Co.*, 848 F.3d at 1180. As the Court discussed in the preemption analysis, Plaintiffs allege Defendants FCA and Cummins misrepresented the Class Trucks had: 1) "a clean-burning DEF system that made it so it would emit less pollutants than earlier models and/or equivalent gasoline-powered trucks;" 2) "good fuel economy;" 3) "low cost of ownership;" and 4) "strong towing and hauling capabilities." (*See, e.g.*, Dkt. No. 75 ¶ 12.) These representations were misleading, Plaintiffs allege, because the Class Trucks could only perform as advertised while emitting pollutants beyond the legal limit, consumer expectations, and a comparable gasoline-powered vehicle. (*Id.* ¶ 14.) Additionally, Plaintiffs allege they viewed these misrepresentations on the FCA and Cummins websites. (Dkt. No. 75 ¶¶ 12, 18, 24, 30, 36, 42, 48, 55, 61, 67.) As to timing, Plaintiffs allege they viewed the statements before they purchased their vehicles. (*Id.* ¶¶ 12, 18, 24, 30, 36, 42, 48, 55, 61, 67.)

Plaintiffs must also plausibly allege reliance on the misrepresentations to advance their claims. *See, e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th at 326 ("Reliance is an essential element of fraud," including under the UCL. (citation omitted) (cleaned up).). "To satisfy the requirement of pleading actual reliance, or causation, in connection with false advertising for purposes of the UCL and the false advertising law, a plaintiff need only allege a misrepresentation of a material fact." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 229 (2013). Materiality is typically a question of fact "unless the misrepresentation was so obviously unimportant that the trier of fact could not reasonably conclude that a reasonable person would have been influenced by it." *Id*. Plaintiffs plausibly allege reliance on Defendants' purported misrepresentations since they claim

they conducted "extensive research" prior to purchasing the Class Trucks and considered the performance representations about the vehicle and diesel engine to be "desirable traits" that influenced their purchase.  (*See, e.g.*, Dkt. No. 75 ¶¶ 12, 13, 18, 19, 24, 25.)  Such allegations are not "so obviously unimportant" as to make reliance implausible.

Last, Plaintiffs must plausibly allege Defendants' knowledge with respect to the fraudulent scheme.  "While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally*." Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).  Furthermore, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge."  *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 567 (9th Cir. 2017) (citing *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)).  In the instant case, Plaintiffs allege FCA and Cummins knew of the "defeat device" installed in the Class Trucks and that such information would "be materially important to customers."  (Dkt. No. 75 ¶¶ 247, 249.)  Plaintiffs also allege the FCA-Cummins partnership dates back to 1989, and Cummins remains the exclusive supplier of diesel engines for the 2500 and 3500 pickup trucks.  (*Id.* ¶¶ 104, 164.)  When reviewing similar allegations, the district court in *Ecodiesel* persuasively reasoned:

> [T]he thrust of the complaint is that there was purposeful manipulation of the system by the various defendants involved in the design and manufacturing process to achieve the deceptive result (*i.e.*, ability to pass the emissions tests but no proper emissions control under normal driving conditions). Given the allegation of specific manipulation, it is reasonable to infer knowledge on the part of Defendants.

295 F. Supp. 3d at 1012.  Drawing all reasonable inferences in favor of the non-movant, Plaintiffs have plausibly alleged FCA's and Cummins' knowledge of the defeat device prior to selling the Class Trucks to consumers.

Defendants raise five arguments in favor of dismissal—none is persuasive.[4]  First, Defendants argue the Complaint fails to differentiate between FCA and Cummins as to the alleged

---

[4] Defendant FCA appears to abandon its argument with respect to the CLRA's 30 days' notice requirement (Dkt. No. 78 at 26), as Plaintiffs' response to the argument was not addressed on reply.

United States District Court
Northern District of California

1    fraudulent conduct.  (Dkt. No. 78 at 21.)  But there is a difference between failing to specify which

2    Defendant engaged in certain conduct and alleging both Defendants engaged in that conduct.  In

3    Defendants' cited authority, *Wanetick v. Mel's of Modesto, Inc*., 811 F. Supp. 1402, 1405 (N.D.

4    Cal. 1992), the plaintiff failed to differentiate between four defendants and their specific roles in

5    the alleged fraud.  Unlike the plaintiff in *Wanetik*, Plaintiffs here have described the role of both

6    FCA and Cummins in the manufacturing, regulatory approval, and sale of the Class Trucks with

7    alleged defeat devices.  (*See, e.g.*, Dkt. No. 75 ¶¶ 212, 213, 247.)

8           Second, Defendants argue Plaintiffs fail to allege they actually saw or relied upon the

9    advertisements included in the Complaint.  (Dkt. No. 78 at 22.)  True, Plaintiffs do not allege each

10   saw the representative advertisements included at paragraphs 147 to 177 of the Complaint.

11   Disregarding those allegations, Plaintiffs still plausibly allege material misrepresentations they

12   each viewed on Defendants' websites.  (*See, e.g.,* Dkt. No. 75 ¶¶ 12, 18, 24, 30, 36 42, 48, 55, 61,

13   67.)  Such allegations are "specific enough to give defendants notice of the particular misconduct

14   which is alleged to constitute the fraud."  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir.

15   2001) (citation omitted).

16          Third, Defendants assert Plaintiffs fail to allege pre-sale knowledge of the defeat devices.

17   (Dkt. No. 78 at 23.)  In support, they cite district court cases such as *In re Volkswagen "Clean*

18   *Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig*., No. MDL 2672 CRB, 2019 WL 4581340 (N.D.

19   Cal. Sept. 20, 2019), and *Shu v. Toyota Motor Sales USA, Inc*., 669 F. Supp. 3d 888 (N.D. Cal.

20   2023), *appeal dismissed*, No. 23-15717, 2023 WL 5125075 (9th Cir. July 20, 2023)—but both are

21   distinguishable.  The court in *In re Volkswagen* noted the plaintiffs failed to differentiate between

22   the knowledge of four defendants and merely stated the defendants "approved, authorized,

23   directed, ratified, and/or participated in the acts complained of herein."  2019 WL 4581340 at *6.

24   Further, the court observed the group knowledge pleading was implausible because at least one of

25   the individual defendants was not CEO of Audi AG at the time of certain allegations.  *Id*.  So,

26   those allegations against "the defendants" collectively could not have applied to each individual.

27   *Id*.  Conversely, Plaintiffs here specify FCA's and Cummins' knowledge of the defeat devices

28   prior to sale.  (*See, e.g*., Dkt. No. 75 ¶¶ 247, 249.)  In *Shu*, the operative complaint included "no

allegations" regarding the function and role of one defendant in the purported scheme, aside from "the conclusory allegation that the defendants are a joint venture." 669 F. Supp. 3d at 897. Again, this differs from the allegations here, which articulate the role of both Cummins and FCA in the alleged scheme as well as their knowledge of the defeat devices. Moreover, the full array of actions taken by each defendant in the alleged scheme is uniquely "within the [defendant's] knowledge," and so the Rule 9(b) requirement is relaxed here. *Rubenstein*, 687 F. App'x at 567.

Fourth, Defendants claim Plaintiffs fail to allege "they actually 'saw and relied on' any specific misrepresentation before their purchase." (Dkt. No. 78 at 24.) However, as the Court explained above, that is not the case. Indeed, Plaintiffs allege which statements constitute misrepresentations, and further allege they viewed this information on the Cummins and FCA websites prior to purchasing the Class Trucks. (*See* Dkt. No. 75 ¶¶ 12, 18, 24, 30, 36, 42, 48, 55, 61, 67.)

Fifth, Defendants cite *Sonner v. Premier Nutrition Corp*., 971 F.3d 834 (9th Cir. 2020), to argue Plaintiffs cannot pursue equitable relief under the California consumer protection statutes because they fail to plead an inadequate remedy at law. The Court disagrees. The majority of district courts in the Ninth Circuit have not interpreted *Sonner* to require dismissal of equitable claims at the pleading stage. *See, e.g*., *In re Natera Prenatal Testing Litig*., 664 F. Supp. 3d 995, 1012 (N.D. Cal. 2023) (collecting cases). As explained in *Baton v. Ledger SAS*, courts typically "'decline[] to trim out Plaintiff's equitable restitution claim at [the motion to dismiss] stage' but [the] 'Plaintiff's entitlement to seek the equitable remedy of restitution may be revisited at a later stage.'" 740 F. Supp. 3d 847, 905 (N.D. Cal. 2024) (citation omitted). Here, Plaintiffs are permitted to plead in the alternative a lack of available remedies at law, and the Court will address the effect of *Sonner* at a later time as needed.

### 2. Omission Claim

A misrepresentation claim based on omission requires either that the omission was "contrary to a representation actually made by the defendant," or "the defendant was obliged to disclose" the information. *Hodsdon v. Mars, Inc*., 891 F.3d 857, 861 (9th Cir. 2018). Here, the alleged omission is Defendants' failure to disclose the existence of defeat devices in the Class

1    Trucks.  (*See, e.g.*, Dkt. No. 75 ¶ 14.)  Since Plaintiffs do not allege Defendants represented there

2    were no defeat devices, the analysis proceeds under the second theory of fraudulent omission—

3    namely, Defendants were "obliged to disclose" the existence of the devices.  Under California law,

4    there are four scenarios in which a defendant is obligated to disclose information:

6    > (1) when the defendant is in a fiduciary relationship with the plaintiff;
> (2) when the defendant had exclusive knowledge of material facts not
> known to the plaintiff; (3) when the defendant actively conceals a
> material fact from the plaintiff; and (4) when the defendant makes
> partial representations but also suppresses some material facts.

9    *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).  Here, Plaintiffs have plausibly alleged

10    "the defendant had exclusive knowledge of material facts not known to the plaintiff."

11    A fact is material "if a reasonable consumer would attach importance to it *or* if 'the maker

12    of the representation knows or has reason to know that its recipient regards or is likely to regard

13    the matter as important in determining his choice of action.'"  *Hinojos v. Kohl's Corp.*, 718 F.3d

14    1098, 1107 (9th Cir. 2013) (emphasis in original), *as amended on denial of reh'g and reh'g en*

15    *banc* (July 8, 2013).  Moreover, as the Court previously noted, "materiality is generally a question

16    of fact" not appropriate for disposition on a motion to dismiss.  *Kwikset Corp. v. Superior Ct.*, 51

17    Cal. 4th 310, 333 (2011).  The Complaint addresses the materiality through allegations that

18    Plaintiffs would not have purchased the Class Trucks or would have paid less had they known

19    about the defeat devices. (*See, e.g.*, Dkt. No. 75 ¶¶ 12-13, 15.)  Additionally, the EPA's regulatory

20    scheme and the Clean Air Act's prohibition on defeat devices, 42 U.S.C. § 7522(a)(3)(B), further

21    suggest the presence of such devices in vehicles is material to consumers.  *See, e.g., Kwikset*

22    *Corp.*, 51 Cal. 4th at 333 (holding certain product information was "material" where the

23    Legislature had enacted regulations governing the representation at issue).  As to Defendants'

24    knowledge of the material fact, the Court reiterates its analysis of Plaintiffs' knowledge allegations

25    above.  *See* Part II.C.1., *supra*.  To wit: Plaintiffs plausibly allege FCA and Cummins knew of the

26    defeat devices prior to selling the Class Trucks, and such information was material to consumers.

27    In support of dismissal, Defendants assert three points.  First, they renew their argument

28    that Plaintiffs fail to differentiate between FCA and Cummins in their allegations.  (Dkt. No. 78 at

22.)  For the reasons already stated above, the Court rejects this argument.  *See* Part II.C.1., *supra*.  Second, Defendants argue Plaintiffs do not allege reliance on the omitted information.  (Dkt. No. 78 at 23.)  However, reliance may be presumed where the allegedly omitted fact is material.  *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("That one would have behaved differently can be presumed, or at least inferred, when the omission is material.").  Even without this presumption, Plaintiffs plausibly allege reliance since—as noted above—they would not have purchased the Class Trucks or would have paid less had they known about the defeat devices.  (Dkt. No. 75 ¶¶ 12-13, 15.)

Last, Defendants cite *Hodsdon*, 891 F.3d at 862, for the proposition that Plaintiffs must also plausibly allege the omitted fact "affects the central functionality" of the product.  As observed by the district court in *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, the *Hodsdon* opinion does not make clear whether the central functionality requirement is in addition to the *LiMandri* factors, or is an alternative basis for creating a disclosure obligation.  534 F. Supp. 3d 1067, 1102 (N.D. Cal. 2021).  Regardless, Plaintiffs also plausibly allege the omitted information regarding defeat devices went to the central functionality of the Class Trucks.

A defect goes to the central functionality of a product when it "prevent[s] the product from 'performing a critical or integral function,' or render[s] the product 'incapable of use.'"  *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1086 (N.D. Cal. 2022) (citing *Knowles v. ARRIS Int'l PLC*, 847 F. App'x 512, 513-14 (9th Cir. 2021)).  "[T]he central functionality of the product is not based on subjective preferences about a product," but rather the effect on a core function of the product.  *Hodsdon*, 891 F.3d 857, 864 (9th Cir. 2018) (noting examples of central functionality such as "[a] computer chip that corrupts the hard drive, or a laptop screen that goes dark").  Here, Plaintiffs plausibly allege the defeat device affects the central functionality of the Class Trucks, specifically the ability to drive them.  Per California Vehicle Code § 27156(b), it is illegal to "operate or leave standing upon a highway a motor vehicle that is required to be equipped with a motor vehicle pollution control device . . . unless . . . [the device] is correctly installed and in operating condition."  Because of the undisclosed defeat device, Plaintiffs allege the Class Trucks cannot be legally driven in California until the emissions controls are corrected.

United States District Court
Northern District of California

1  Therefore, the alleged presence of defeat devices in the Trucks prevents them from "performing

2  [the] critical function" of transportation.  *Hammerling*, 615 F. Supp. 3d at 1086.

3         **D.     Puffery**

4         Defendants' final ground for dismissal of the misrepresentation claims asserts many of the

5  alleged deceptive statements are non-actionable puffery.  (Dkt. No. 78 at 24; Dkt. No. 80-1 at 24.)

6  "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance.

7  Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or

8  generality of the claim." *Demetriades v. Yelp, Inc*., 228 Cal. App. 4th 294, 311 (2014).  General

9  or subjective claims about a product may constitute puffery, but where a statement "is

10 quantifiable" and "makes a claim as to the specific or absolute characteristics of a product," it

11 "may be an actionable statement of fact." *Newcal Indus., Inc. v. Ikon Off. Sol*., 513 F.3d 1038,

12 1053 (9th Cir. 2008) (cleaned up).  Here, the alleged misrepresentations by Defendants are not

13 mere puffery.

14        Defendants point to statements from the Complaint such as "world's best engine" (Dkt.

15 No. 75 ¶ 171), "class-leading" power and towing capability (*id*. ¶ 172a), and "raise[ing] the bar for

16 power and durability" (*id*. ¶ 173), as examples of subjective puffery.  However, these statements

17 come from advertisements that Plaintiffs do not allege they viewed.  Whether such claims amount

18 to puffery is irrelevant, since Plaintiffs' claims are based on different alleged misrepresentations.

19 (*See* Dkt. No. 75 ¶¶ 12, 18, 24, 30, 36 42, 48, 55, 61, 67.)  As to those representations, Plaintiffs

20 allege quantifiable, specific claims, *i.e.* Defendants failed to disclose that the advertised

21 performance capabilities of the Class Trucks could only be accomplished by emitting pollutants

22 beyond legal limits, consumer expectations, and comparable gasoline-powered vehicles.  (*See,*

23 *e.g*., *id*. ¶ 14.)  Whether the alleged defeat devices altered vehicle emissions, and whether Recall

24 67A ultimately reduced performance, are both claims as to specific characteristics of the Class

25 Trucks.  Accordingly, the Court determines the alleged misrepresentations Plaintiffs claim to have

26 seen do not constitute puffery.

27                                       * * *

28        Based on the foregoing reasons, the Court DENIES the motions to dismiss Plaintiffs'

1    misrepresentation claims (Counts II, III, IV, and X).

2    **III.    WARRANTY CLAIMS AGAINST DEFENDANT FCA**

3        Defendant FCA moves to dismiss both Plaintiffs' express and implied warranty claims. As

4    to the express warranty claims, FCA argues the Complaint fails to allege an essential element,

5    namely that each plaintiff permitted more than a single repair attempt of the Class Trucks.  For the

6    implied warranty of merchantability claims, FCA advances two arguments: 1) Plaintiffs fail to

7    plausibly allege the Class Trucks were unmerchantable under both the California Commercial

8    Code and Song-Beverly Act, and 2) the California Commercial Code claim fails for the

9    independent reason that Plaintiffs have not alleged vertical privity between themselves and FCA.

10   The Court considers each argument in turn.

11       **A.    Express Warranty per the California Commercial Code and Song-Beverly Act**

12       Plaintiffs advance three express warranty claims, one under California Commercial Code

13   § 2313 and two under the Song-Beverly Act.  To state a claim for breach of an express warranty, a

14   plaintiff must plausibly allege three elements: "(1) the vehicle had a nonconformity covered by the

15   express warranty that substantially impaired the use, value or safety of the vehicle (the

16   nonconformity element); (2) the vehicle was presented to an authorized representative of the

17   manufacturer of the vehicle for repair (the presentation element); and (3) the manufacturer or his

18   representative did not repair the nonconformity after a reasonable number of repair attempts (the

19   failure to repair element)."  *Oregel v. Am. Isuzu Motors, Inc*., 90 Cal. App. 4th 1094, 1101 (2001);

20   *see also Weinstat v. Dentsply Internat., Inc*., 180 Cal. App. 4th 1213, 1227 (2010) (detailing the

21   different elements of a breach of express warranty under the California Commercial Code).

22   Before pursuing the action, a consumer must present the defective good to the seller and permit

23   more than one attempt to repair the good.  *See Robertson v. Fleetwood Travel Trailers of*

24   *California, Inc*., 144 Cal. App. 4th 785, 799 (2006) (Under Song-Beverly, "[t]he reasonableness of

25   the number of repair attempts is a question of fact to be determined in light of the circumstances,

26   but at a minimum there must be more than one opportunity to fix the nonconformity."); *Philippine*

27   *Nat. Oil Co. v. Garrett Corp*., 724 F.2d 803, 808 (9th Cir. 1984) (Under the Commercial Code,

28   "the law is that a repair or replace remedy fails of its essential purpose only if repeated repair

United States District Court
Northern District of California

25

1  attempts are unsuccessful within a reasonable time.").  Plaintiffs do not allege any of the Named

2  Plaintiffs presented their Class Truck for repair more than one time.  (Dkt. No. 75 ¶¶ 16, 22, 28,

3  34, 40, 46, 53, 59, 65, 71.)  Therefore, Plaintiffs' express warranty claims cannot advance.

4        In response, Plaintiffs argue they are excused from presentment because FCA's repair

5  attempts would have been futile.  This argument is unavailing.[5]  District courts in this Circuit are

6  split on whether a futility exception to the presentment element exists, and after review of those

7  decisions, the Court agrees with the courts finding no such exception.  *See Pereda v. Gen. Motors

8  LLC*, No. 21-cv-06338, 2022 WL 19975388, at *13 (N.D. Cal. Dec. 9, 2022) (collecting cases).

9  The district court in *Pereda* explained the state of the law persuasively:

> Not only is there is no controlling authority [establishing the
> exception], but the cases the Court has located finding such an
> exception do not identify the precise elements a plaintiff must plead,
> or how to define the threshold a plaintiff must cross – i.e., the amount
> of "futility" the plaintiff must have experienced – before the exception
> has been adequately pleaded.

14 *Id.*  But even if there were an exception, Plaintiffs have not plausibly alleged futility.  Indeed, in

15 Plaintiffs' cited authority, the defendant had either refused to repair the vehicle under warranty,

16 *Johnson v. Nissan N. Am., Inc.*, No. 17-cv-00517, 2018 WL 905850, at *4 (N.D. Cal. Feb. 15,

17 2018), or the offered fix would only temporarily solve the problem, *Benkle v. Ford Motor Co.*,

18 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017).  Here, Plaintiffs do not allege FCA declined

19 to perform the Recall 67A repair on the Class Trucks or stated the repair could not resolve

20 emissions or performance problems.  Some Plaintiffs did not even bring in their vehicle for repair.

21 (*See, e.g.*, Dkt. No. 75 ¶ 40.)  On these spare allegations, a breach of express warranty claim must

22 be dismissed.

23        Accordingly, the Court GRANTS the motion to dismiss the breach of express warranty

24 claims (Counts V, VI, and IX).

25 _____

26 [5] Plaintiffs also argue "failure of essential purpose" under California Commercial Code § 2719(2)
   as an exception to pleading the presentation element. (Dkt. No. 82 at 31.)  To the extent this differs

27 from Plaintiffs' futility argument, Plaintiffs have not plausibly alleged "failure of essential
   purpose," as this too requires the consumer to permit the seller multiple repair attempts.  *See*

28 *Philippine Nat. Oil Co.*, 724 F.2d at 808 ("[T]he law is that a repair or replace remedy fails of its
   essential purpose only if repeated repair attempts are unsuccessful within a reasonable time.")

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.    Implied Warranty of Merchantability under the California Commercial Code**

As for the Commercial Code implied warranty claim, the parties dispute whether Plaintiffs must plausibly allege vertical privity with FCA to advance their claim.  Though Plaintiffs do not dispute the existence of the privity requirement, they argue exemption from that requirement as third-party beneficiaries to the contract between FCA and the dealerships selling the Class Trucks. (Dkt. No. 82 at 33.)  The Court is not persuaded.

The Ninth Circuit's decision in *Clemens v. DaimlerChrysler Corp*., 534 F.3d 1017 (9th Cir. 2008), addressed a nearly identical set of facts.  There, the plaintiff purchased a Dodge vehicle from a dealership, determined there was a problem with a feature of the vehicle (the head gasket), and sued the manufacturer for breach of the implied warranty of merchantability.  *Id*. at 1012-22. Discussing the existing exceptions to the vertical privity requirement, *id*. at 1023, the court determined none applied, and affirmed dismissal of the claim, *id*. at 1024.  Subsequently, district courts have split as to whether *Clemens* permits a third-party beneficiary exception to the vertical privity requirement in this scenario.  After considering those analyses, the Court reads *Clemens* as controlling precedent that does not permit a third-party beneficiary exception in the instant case.

The district courts to recognize this exception typically rely on *Gilbert Fin. Corp. v. Steelform Contracting Co*., 82 Cal. App. 3d 65 (1978).  In *Gilbert*, the plaintiff entered into a construction contract with a company, who then subcontracted a portion of that work to the defendant.  *Id*. at 67.  After realizing the workmanship was defective, the plaintiff sued the subcontractor-defendant.  *Id*.  The court concluded a third-party beneficiary may sue for breach of an implied warranty absent privity "if he is more than incidentally benefitted by the contract."  *Id*. at 70.  *Clemens* did not expressly address *Gilbert,* and some district courts have thus narrowed the holding of *Clemens* with respect to a third-party beneficiary exception.  *See, e.g.*, *In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 984 (N.D. Cal. 2014) ("In light of *Gilbert* and the lack of a clear holding to the contrary in *Clemens*, the Court concludes that the third-party beneficiary exception remains viable under California law."); *Luong v. Subaru of Am., Inc.*, No. 17-cv-03160, 2018 WL 2047646, at *8 (N.D. Cal. May 2, 2018).  But, Ninth Circuit precedent interpreting state law is "binding in the absence of any subsequent indication from the California

27

1   courts that [the Ninth Circuit's] interpretation was incorrect." *AGK Sierra De Montserrat, L.P. v.*

2   *Comerica Bank*, 109 F.4th 1132, 1136 (9th Cir. 2024).  *Gilbert* was decided before *Clemens*, so it

3   cannot be the basis for a different interpretation of California law.  For this reason, the Court

4   aligns with those district court decisions recognizing *Clemens* precludes a breach of implied

5   warranty claim on these facts.  *See, e.g.*, *Xavier v. Philip Morris USA Inc*., 787 F.Supp.2d 1075

6   (N.D. Cal. 2011); *Long v. Graco Children's Prods., Inc*., No. 13–cv–01257, 2013 WL 4655763

7   (N.D.Cal. Aug. 26, 2013); *In re Seagate Tech. LLC Litig*., 233 F. Supp. 3d 776, 787 (N.D. Cal.

8   2017); *Quackenbush v. Am. Honda Motor Co*., Inc., 650 F. Supp. 3d 837, 844 (N.D. Cal. 2023),

9   *appeal transferred*, No. 23-16223, 2024 WL 1342752 (9th Cir. Jan. 3, 2024).

10      Consequently, the Court GRANTS the motion to dismiss the breach of the implied

11  warranty of merchantability claim under the California Commercial Code.

12          **C.**      **Implied Warranty of Merchantability under the Song-Beverly Act**

13      Unlike the California Commercial Code, the Song-Beverly Act does not require vertical

14  privity between the parties as an element of an implied warranty claim.  Beginning with the text of

15  the Act:

16          Unless disclaimed in the manner prescribed by this chapter, every sale
            of consumer goods that are sold at retail in this state ***shall be***
17          ***accompanied by the manufacturer's and the retail seller's implied***
            ***warranty that the goods are merchantable***. The retail seller shall
18          have a right of indemnity against the manufacturer in the amount of
            any liability under this section.
19

20  Cal. Civ. Code § 1792 (emphasis added).  The Song-Beverly Act's language differs from the

21  Commercial Code in that it explicitly provides for a warranty of merchantability by both the retail

22  seller and the manufacturer.  Further, California courts of appeal have relied on this language to

23  similarly hold the Act does not contain a vertical privity requirement.  *Mega RV Corp. v. HWH*

24  *Corp*., 225 Cal. App. 4th 1318, 1333 n.11 (2014), *as modified on denial of reh'g* (May 20, 2014)

25  ("Of course, under the Act, the buyer can sue 'the manufacturer' for breach of the implied

26  warranty of merchantability despite a lack of privity.").  "In the absence of a pronouncement by

27  the highest court of a state, the federal courts must follow the decision of the intermediate

28  appellate courts of the state unless there is convincing evidence that the highest court of the state

United States District Court
Northern District of California

would decide differently." *AGK Sierra De Montserrat, L.P.*, 109 F.4th at 1136 (quoting *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983)).  Additionally, this interpretation comports with the purpose of the Act, which increased protections for consumers beyond existing Commercial Code remedies.  *See Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1304 (2009) ("To 'the extent that the [Song–Beverly] Act gives rights to the buyers of consumer goods, it prevails over conflicting provisions of the Uniform Commercial Code.'").  Plaintiffs, then, need not plead vertical privity with FCA to advance their Song-Beverly Act claim.

Even so, FCA asserts the claim should be dismissed for a separate reason—namely, that Plaintiffs fail to allege a cognizable theory of unmerchantability.  (Dkt. No. 78 at 31.)  Per Section 1791.1(a), the implied warranty of merchantability requires goods: "(1) Pass without objection in the trade under the contract description[;] (2) Are fit for the ordinary purposes for which such goods are used[;] (3) Are adequately contained, packaged, and labeled[; and] (4) Conform to the promises or affirmations of fact made on the container or label."  Cal. Civ. Code § 1791.1(a).  This language indicates "[t]he core test of merchantability is fitness for the ordinary purpose for which such goods are used."  *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26 (2007).  As applied to automobiles, "the implied warranty of merchantability will be breached by 'a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation,'" but lesser defects may also suffice.  *Benipayo v. Volkswagen Grp. of Am., Inc.*, No. 15-md-02672-CRB, 2020 WL 553884, at *4 (N.D. Cal. Feb. 4, 2020) (citation omitted).  Indeed, "[d]efects that render a car unsafe or particularly unpleasant to drive, but not inoperable, may nonetheless violate the warranty of merchantability."  *Id.* (citation omitted).  Here, Plaintiffs have plausibly alleged the Class Trucks were unmerchantable.

Relying on *Benipayo*, 2020 WL 553884, FCA argues the mere allegation that the Class Trucks failed to comply with regulatory standards does not render them unmerchantable, since the Trucks were fully operable.  (Dkt. No. 78 at 31.)  The court in *Benipayo* noted vehicles were merchantable because "the defeat devices and increased emissions did not render Plaintiffs' cars inoperable, pose an immediate danger to Plaintiffs, their passengers, or anyone else, or affect the cars' performance in any way Plaintiffs were aware of before the emissions scandal came to light."

*Benipayo*, 2020 WL 553884 at *4.  However, FCA fails to consider the entirety of the *Benipayo*

opinion.  The district court went on to observe:

> This does not mean that a legal violation could never make an automobile unmerchantable. If, for example, a car could not legally be driven because it was not in compliance with applicable regulations, it would be effectively inoperable and might therefore be unmerchantable.

*Id*. at *5.  Such is the case here, where Plaintiffs have cited California Vehicle Code § 27156(b),

which makes it illegal to "operate or leave standing upon a highway a motor vehicle that is

required to be equipped with a motor vehicle pollution control device . . . unless . . . [the device] is

correctly installed and in operating condition."  As alleged, Plaintiffs could not legally drive the

Class Trucks in California, and therefore, the vehicles were unfit for the ordinary purpose of

transportation.

Based on the foregoing, the Court DENIES the motion to dismiss the breach of the implied

warranty of merchantability claim under the Song-Beverly Act.

## IV.    UNJUST ENRICHMENT CLAIM AGAINST BOTH DEFENDANTS

"The Ninth Circuit has recognized that while 'there is not a standalone cause of action for

'unjust enrichment'' in California, the term 'describe[s] the theory underlying a claim that a

defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request.'"

*Soo v. Lorex Corp*., No. 20-cv-01437, 2020 WL 5408117, at *8 (N.D. Cal. Sept. 9, 2020) (citing

*Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753, 762 (9th Cir. 2015)).  Through this method of

pleading, a "plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-

contract theory (an election referred to at common law as 'waiving the tort and suing in

assumpsit')."  *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004).  Plaintiffs' unjust

enrichment claim arises from the same alleged conduct as their fraudulent misrepresentation

claims, and accordingly, must be pled with particularity under Rule 9(b).  *See Smith v.*

*GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 660 F. Supp. 3d 863, 875 (N.D. Cal.

2023) (applying Rule 9(b) to an unjust enrichment claim sounding in fraud).

Defendants assert the unjust enrichment claim fails for two reasons: 1) Plaintiffs fail to

allege the specific amount of the price premium paid for the Class Trucks over another vehicle;

United States District Court
Northern District of California

1    and 2) Plaintiffs fail to plausibly allege Defendants received the benefit of that overpayment.  As

2    to the first argument, Defendants cite cases such as *Babaian v. Dunkin' Brands Grp., Inc*., No.

3    LA-cv-174890, 2018 WL 11445613 (C.D. Cal. June 12, 2018), and *Horti v. Nestle HealthCare*

4    *Nutrition, Inc*., No. 21-cv-09812, 2022 WL 2441560 (N.D. Cal. July 5, 2022), to suggest a

5    complaint must plead the quantity of the price premium in order to state a cognizable economic

6    injury.  The Court finds neither case persuasive.  In *Babian*, the court considered whether a

7    plaintiff had plausibly alleged an overpayment injury from his purchase of donuts, which he

8    alleged misleadingly contained artificial ingredients.  2018 WL 11445613 at *6.  There, the court

9    found the plaintiff's overpayment theory implausible, since he alleged the overpayment equaled

10   the total value of the donuts.  *Id*.  Despite the plaintiff's contention the donuts were valueless to

11   him because of the ingredients, the court noted there must be some value to the product he

12   received.  *Id*.  The court ultimately rejected this implausible approach to pleading the price

13   premium since "a consumer's subjective willingness to pay is not a functional indicator of the

14   objective market effects of the purported misrepresentation."  *Id*.  To wit: the issue in *Babian* was

15   not that the plaintiff had failed to plead the quantity of the price premium, but rather the premium

16   he alleged was implausible.  *Id*.  Here, the Court does not confront an implausible theory of price

17   premium, and Plaintiffs do not allege the Class Trucks are utterly worthless.

18       Separately, the district court in *Horti* relied on an unpublished Ninth Circuit opinion for the

19   proposition that "[t]he bare recitation of the word 'premium' does not adequately allege a

20   cognizable injury."  2022 WL 2441560, at *8 (quoting *Naimi v. Starbucks Corp*., 798 F. App'x 67,

21   70 (9th Cir. 2019)).  There, the court rejected a false advertising claim when the plaintiffs failed to

22   plead how much they paid for the product or would have paid for it absent the alleged deception.

23   *Id*. at *8.  The Court disagrees with this interpretation of the pleading standard.  Rule 9(b) serves

24   to inform defendants of the claims against them so they may mount a defense, and "does not

25   require absolute particularity or a recital of the evidence."  *United Healthcare Ins. Co*., 848 F.3d at

26   1180.  A requirement that plaintiffs plead the precise amount of an alleged overcharge goes well

27   beyond the purposes of 9(b).  Indeed, in published authority, the Ninth Circuit has held "a

28   consumer's allegation that 'she would not have bought the product but for the misrepresentation

31

. . . is sufficient to allege causation . . . [and ] to allege economic injury.'" *Davidson v. Kimberly-Clark Corp*., 889 F.3d 956, 965–66 (9th Cir. 2018) (citation omitted).  Plaintiffs have done as much, and nothing further is required at this stage.

Turning to Defendants' second argument, Plaintiffs do not need to allege FCA or Cummins received direct payment from consumers to support a claim for restitution.  *See County of Solano v. Vallejo Redevelopment Agency*, 75 Cal. App. 4th 1262, 1278 (1999) ("For a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution." (citation omitted)).  Instead, Plaintiffs need only plausibly allege the benefit ultimately accrued to Defendants.  Here, Plaintiffs have done so.  The Complaint states Defendants "sold and leased the Class Trucks for more than what the vehicles were worth, and/or accepted the inflated benefits from the sale and lease of the Class Trucks, at the expense of Plaintiffs and the California Subclass."  (Dkt. No. 75 ¶ 387.)  Further, they allege "Defendants profit from sales of Class Trucks, including sales made through FCA's dealership network and sales brokered through its financing and leasing arms."  (*Id*. ¶ 388.)  These allegations plausibly connect the alleged price premium to a benefit received by Defendants.

So, the Court DENIES the motions to dismiss the unjust enrichment claim.

## V.    CONCLUSION

For the reasons stated above, the Court GRANTS the motions to dismiss:

- Count I (civil RICO)
- Count II (common law fraud brought on behalf of the nationwide class)
- Count V (breach of express warranty under the California Commercial Code)
- Count VI (breach of express warranty under the Song-Beverly Act)
- Count VII (breach of implied warranty under the California Commercial Code)
- Count IX (breach of express emissions warranties).

Further, the motion is GRANTED as to Plaintiffs' misrepresentation claims (Counts II, III, IV, and X) only to the extent they rely on preempted theories of misrepresentation, as discussed in the Court's Clean Air Act analysis above.  *See* Part II.B.1., *supra*.  Count I is dismissed without leave to amend as amendment would be futile given Plaintiffs are indirect purchasers of the Class

United States District Court
Northern District of California

Trucks. As for Count II, should Plaintiffs intend to add additional plaintiffs with standing to bring other state law claims, they must submit a stipulation or seek leave from the Court prior to doing so. Counts V, VI, VII, and IX are otherwise dismissed with leave to amend. The Court DENIES the motions to dismiss:

- Count II (common law fraud brought on behalf of the California state class)
- Count III (violation of CLRA)
- Count IV (violation of FAL)
- Count VIII (breach of implied warranty under the Song-Beverly Act)
- Count X (violation of UCL)
- Count XI (unjust enrichment).

Any amended complaint shall be filed within 30 days of this Order. This Order disposes of Docket Nos. 78 and 80.

**IT IS SO ORDERED.**

Dated: February 11, 2025

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

33